Exhibit E

AMENDED AND RESTATED OPERATING AGREEMENT

OF

ROBOTICS HUB FUND 1, LLC

THE MEMBERSHIP INTERESTS REPRESENTED BY UNITS EXPRESSED HEREIN HAVE NOT BEEN REGISTERED WITH OR QUALIFIED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY JURISDICTION. SUCH UNITS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS. SUCH UNITS CANNOT BE SOLD, TRANSFERRED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN THIS OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

US_ACTIVE-125559578.9-380777-20001

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ............................................................................ 1
    Section 1.1   Definitions.................................................................. 1
**ARTICLE II ORGANIZATION** ...................................................................... 7
    Section 2.1   Formation ................................................................... 7
    Section 2.2   Name ............................................................................ 7
    Section 2.3   Principal Place of Business ...................................... 7
    Section 2.4   Registered Agent and Office .................................... 7
    Section 2.5   Purpose; Powers ....................................................... 7
    Section 2.6   Term ............................................................................ 7
    Section 2.7   No State-Law Partnership ........................................ 7
**ARTICLE III CAPITALIZATION** ................................................................... 8
    Section 3.1   Membership Interests ................................................ 8
    Section 3.2   Authorization of Common Units ............................. 8
    Section 3.3   Authorization of Carry Units ................................... 8
    Section 3.4   Unit Certificates ....................................................... 8
**ARTICLE IV MEMBERS** ................................................................................ 9
    Section 4.1   Admission of New Members .................................... 9
    Section 4.2   Meetings ..................................................................... 9
    Section 4.3   Place of Meetings ..................................................... 9
    Section 4.4   Notice of Meeting ..................................................... 9
    Section 4.5   Record Date .............................................................. 9
    Section 4.6   Quorum ...................................................................... 10
    Section 4.7   Voting ........................................................................ 10
    Section 4.8   Action by Written Consent ...................................... 10
    Section 4.9   Proxies ...................................................................... 10
    Section 4.10  Co-Investment Right ............................................... 10
    Section 4.11  No Withdrawal ......................................................... 11
    Section 4.12  No Personal Liability of Members .......................... 11
**ARTICLE V MANAGEMENT** ....................................................................... 11
    Section 5.1   Establishment of Board of Managers ...................... 12
    Section 5.2   Board Composition .................................................. 12
    Section 5.3   Removal; Resignation .............................................. 12
    Section 5.4   Meetings ..................................................................... 12

Section 5.5    Quorum; Manner of Acting ............................................................ 12

Section 5.6    Action by Written Consent ............................................................ 13

Section 5.7    No Compensation or Employment ................................................ 13

Section 5.8    No Personal Liability of Managers ............................................... 13

Section 5.9    Binding Effect of Actions ............................................................ 13

**ARTICLE VI OFFICERS** ............................................................................... 13

Section 6.1    Officers of Company ..................................................................... 14

Section 6.2    Term of Office .............................................................................. 14

Section 6.3    Removal ........................................................................................ 14

Section 6.4    Vacancies ...................................................................................... 14

Section 6.5    President ........................................................................................ 14

Section 6.6    Vice President ............................................................................... 14

Section 6.7    Treasurer ....................................................................................... 14

Section 6.8    Secretary ....................................................................................... 15

Section 6.9    Assistant Treasurers and Assistant Secretaries ............................ 15

Section 6.10   Compensation ............................................................................... 15

**ARTICLE VII CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS** ............. 15

Section 7.1    Initial Capital Contributions ........................................................ 15

Section 7.2    Additional Capital Contributions ................................................. 15

Section 7.3    Capital Accounts ........................................................................... 15

Section 7.4    Succession Upon Transfer ............................................................ 16

Section 7.5    Negative Capital Accounts ........................................................... 16

Section 7.6    Treatment of Loans ....................................................................... 16

Section 7.7    No Withdrawal .............................................................................. 16

Section 7.8    Compliance with Treasury Regulations ........................................ 16

**ARTICLE VIII ALLOCATIONS, TAX MATTERS AND REPORTS** .................... 17

Section 8.1    Allocation of Net Income and Net Losses ..................................... 17

Section 8.2    Special Allocations ....................................................................... 17

Section 8.3    Accounting Principles ................................................................... 19

Section 8.4    Interest on and Return of Capital Contributions ........................... 19

Section 8.5    Loans to Company ........................................................................ 19

Section 8.6    Accounting Period ........................................................................ 19

Section 8.7    Records and Reports ..................................................................... 19

Section 8.8    Returns and Other Elections ......................................................... 19

Section 8.9      Tax Matters Partner...................................................................................20
ARTICLE IX DISTRIBUTIONS .......................................................................................20
Section 9.1      Requirement to Make Distributions.....................................................20
Section 9.2      Distributions to Holders of Carry Units................................................20
Section 9.3      Distributions to Holders of Common Units...........................................21
Section 9.4      Tax Distributions ...............................................................................21
Section 9.5      Distributions in Kind...........................................................................22
Section 9.6      Distributions to Members Upon Liquidation ..........................................22
ARTICLE X RESTRICTIONS ON TRANSFERABILITY ...................................................22
Section 10.1     General.............................................................................................22
Section 10.2     Right of First Refusal for Common Unit Holders ..................................22
Section 10.3     Further Requirements for Transfer ......................................................23
Section 10.4     Effectiveness of Transfer ...................................................................24
ARTICLE XI DISSOLUTION AND LIQUIDATION...........................................................24
Section 11.1     Dissolution ........................................................................................24
Section 11.2     Winding Up........................................................................................24
Section 11.3     Liquidator..........................................................................................24
Section 11.4     Distribution of Assets Upon Winding Up..............................................25
Section 11.5     Certificate of Dissolution....................................................................25
Section 11.6     Recourse for Claims...........................................................................25
ARTICLE XII EXCULPATION AND INDEMNIFICATION ................................................25
Section 12.1     Covered Persons................................................................................25
Section 12.2     Exculpation of Covered Persons.........................................................25
Section 12.3     Liabilities and Duties of Covered Persons............................................26
Section 12.4     Indemnification..................................................................................26
Section 12.5     Reimbursement .................................................................................27
Section 12.6     Entitlement to Indemnity ....................................................................27
Section 12.7     Insurance..........................................................................................27
Section 12.8     Funding of Indemnification .................................................................28
Section 12.9     Amendment and Survival ...................................................................28
ARTICLE XIII MISCELLANEOUS PROVISIONS............................................................28
Section 13.1     Notices .............................................................................................28
Section 13.2     Application of Delaware Law ...............................................................29
Section 13.3     Waiver of Action for Partition ..............................................................29

Section 13.4    Amendment ........................................................................................... 29

Section 13.5    Execution of Additional Instruments ................................................... 29

Section 13.6    Counsel to the Company ...................................................................... 29

Section 13.7    Construction ......................................................................................... 29

Section 13.8    Headings ............................................................................................... 29

Section 13.9    Waivers ................................................................................................. 29

Section 13.10    Rights and Remedies Cumulative ...................................................... 29

Section 13.11    Severability ........................................................................................ 30

Section 13.12    Heirs, Successors and Assigns ........................................................... 30

Section 13.13    Creditors ............................................................................................. 30

Section 13.14    Counterparts ....................................................................................... 30

Section 13.15    Recitals ............................................................................................... 30

Section 13.16    Investment Representations ................................................................ 30

## AMENDED AND RESTATED OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "*Operating Agreement*"), dated as of March 23, 2016, is made by and among Robotics Hub Fund 1, LLC, a Delaware limited liability company (the "*Company*"), and the Members executing this Operating Agreement on the signature pages hereto or who are admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

## RECITALS

WHEREAS, the Company was duly formed under the Delaware Act (as defined below) on February 17, 2016 (the "*Formation Date*") for the primary purpose of serving as the general partner of Robotics Hub Fund 1, LP, a Delaware limited partnership which invests in early-stage robotics companies (the "*Fund*");

WHEREAS, certain of the Members and the Company entered into an Operating Agreement, dated as of March 11, 2016, governing the operations of the Company (the "*Original Operating Agreement*"); and

WHEREAS, the Members and the Company desire to amend and restate the Original Operating Agreement in its entirety, as of the date set forth above, in order to set forth their respective rights and obligations with respect to the Company in accordance with the terms and subject to the conditions set forth in this Operating Agreement and the Delaware Act.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Company and the Members hereby agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1    Definitions. The following terms used in this Operating Agreement have the following meanings (unless otherwise expressly provided herein):

"*Accounting Method*" means the cash basis method of accounting.

"*Adjusted Taxable Income*" means, as to any Member for a Fiscal Year (or portion thereof) with respect to the Units held by such Member, the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (a) *minus* any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or

indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"*Applicable Law*" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"*Bankruptcy*" means, with respect to any Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"*Bidder*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Board*" has the meaning set forth in <u>Section 5.1</u>.

"*Capital Account*" has the meaning set forth in <u>Section 7.3</u>.

"*Capital Contribution*" means any contribution to the capital of the Company in cash or property by a Member whenever made.

"*Carry Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Carry Units" in this Operating Agreement.

"*Carry Unit Distribution Amount*" has the meaning set forth in <u>Section 9.2</u>.

"*Certificate*" means the Certificate of Formation of the Company as filed by the organizer of the Company with the Secretary of State of the State of Delaware on the Formation Date, as the same may be amended from time to time.

"*Code*" means the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"*Common Units*" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Operating Agreement.

"*Common Unit Holders*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Company*" has the meaning set forth in the introductory paragraph of this Operating Agreement.

"*Company Minimum Gain*" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"*Deadlock Advisor*" means David Mawhinney or, in the event of his death or mental incapacitation, an individual mutually chosen by the Managers.

"*Deficit Capital Account*" means with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the debit to such Capital Account for the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations. This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d), and will be interpreted consistently with those provisions.

"*Delaware Act*" means the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101 et seq., as the same may be amended from time to time.

"*Direct Family Member*" means, with respect to any Member, such Member's spouse, sibling, son, daughter, step-son, step-daughter, parent or step-parent. In the event that a Member has no living Direct Family Member, the beneficiaries of such Member's estate will each be treated as a Direct Family Member and will be subject to this Operating Agreement to the same extent as a Direct Family Member.

"*Direct Investment Company*" has the meaning set forth in Section 4.10(a).

"*Direct Investment Materials*" has the meaning set forth in Section 4.10(a).

"*Direct Investment Returns*" means any amount received by the Company as a dividend, distribution or payment on outstanding debt or otherwise from a Direct Investment Company or from the sale of the stock or other interests held by the Company in a Direct Investment Company.

"*Disability*" means, with respect to any Member, that a medical doctor has determined and memorialized in writing that the Member is incapacitated or mentally incompetent and has been such for a period of at least six (6) consecutive months.

"*Estimated Tax Amount*" means, with respect to any Member for a Fiscal Year, such Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Board. In making such estimate, the Board shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Board are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"*Excess Amount*" has the meaning set forth in Section 9.4(c).

"*Fiscal Year*" means January 1 through December 31 of any given year.

"*Formation Date*" has the meaning set forth in the recitals to this Operating Agreement.

"*Fund*" has the meaning set forth in the recitals to this Operating Agreement.

"*Fund Carry Amount*" means any distributions received by the Company from the Fund pursuant to Section 4.05(c)(iii) and/or Section 4.05(c)(iv) of the Fund LPA.

"*Fund LPA*" means that certain Limited Partnership Agreement of the Fund, as amended from time to time.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Initial Capital Contribution*" with respect to any Member, means such Member's initial Capital Contribution pursuant to this Operating Agreement, as set forth on Exhibit A, attached hereto.

"*Investment Returns*" means all revenue received by the Company from either the Fund Carry Amount or Direct Investment Returns.

"*Joinder Agreement*" means the joinder agreement in substantially the form attached hereto as Exhibit B.

"*Liquidator*" has the meaning set forth in Section 11.3(a).

"*Losses*" has the meaning set forth in Section 12.4.

"*Manager*" has the meaning set forth in Section 5.1.

"*Member*" means each of the parties who execute a counterpart of this Operating Agreement and each of the parties who are subsequently admitted as a Member in accordance with Section 10.1 of this Operating Agreement.

"*Member Nonrecourse Debt*" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"*Member Nonrecourse Debt Minimum Gain*" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"*Membership Interest*" means a Member's entire interest and rights in the Company, including such Member's right (based on the class of Unit or Units held by such Member), as applicable, (a) to distributions of income, gain, loss and deduction of the Company; (b) to a distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Operating Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Operating Agreement or the Delaware Act.

"*Members Schedule*" has the meaning set forth in <u>Section 3.1</u>.

"*Net Losses*" means, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any expenditures described in Section 705(a)(2)(B) of the Code.

"*Net Income*" means, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the Accounting Method and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, plus any income described in Section 705(a)(1)(B) of the Code.

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Offer Notice*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Offered Interests*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Offering Member*" has the meaning set forth in <u>Section 10.2(a)</u>.

"*Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Original Operating Agreement*" has the meaning set forth in the recitals to this Operating Agreement.

"*Person*" means any individual or entity, and their heirs, executors, administrators, legal representatives, successors and assigns where the context so permits.

"*Permitted Transfer*" has the meaning set forth in <u>Section 10.1</u>.

"*Purchasing Member*" has the meaning set forth in <u>Section 10.2(b)</u>.

"*Quarterly Estimated Tax Amount*" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and

one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all distributions previously made during such Fiscal Year to such Member.

"*Reed Smith*" has the meaning set forth in Section 13.6.

"*ROFR Notice*" has the meaning set forth in Section 10.2(b).

"*ROFR Notice Period*" has the meaning set forth in Section 10.2(b).

"*ROFR Portion*" means, with respect to any Purchasing Member, on the date of the Offer Notice, the number of Common Units equal to the product of: (a) the total number of Offered Interests and (b) a fraction determined by *dividing* (x) the number of Common Units owned by such Purchasing Member *by* (y) the total number of Common Units owned by all of the Purchasing Members.

"*Securities Acts*" has the meaning set forth in Section 13.16.

"*Shortfall Amount*" has the meaning set forth in Section 9.4(b).

"*Subsidiary*" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"*Tax Amount*" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"*Tax Distributions*" has the meaning set forth in Section 9.1(a).

"*Transferring Member*" means (a) any Member who sells, assigns, pledges, hypothecates, transfers, exchanges or otherwise transfers for consideration all or any portion of his Membership Interest or (b) any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to Bankruptcy) all or any part of his Membership Interest.

"*Tax Rate*" of a Member, for any period, means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period for an individual residing in Pittsburgh, Pennsylvania, taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions.

"*Treasury Regulations*" means proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

"*Unit*" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Common Units and Carry

Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Operating Agreement, and the Membership Interests represented by such type or class of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

## ARTICLE II

## ORGANIZATION

Section 2.1    Formation.    The Company has been organized as a Delaware limited liability company by executing and delivering the Certificate to the Delaware Secretary of State in accordance with and pursuant to the Delaware Act.

Section 2.2    Name.  The name of the Company is "Robotics Hub Fund 1, LLC" or such other name or names as the Board may from time to time designate; provided, that the name shall always contain the words "Limited Liability Company" or the abbreviation "LLC."

Section 2.3    Principal Place of Business.  The principal place of business of the Company is 309 Cola Street, Pittsburgh, Pennsylvania 15203.  The Company may locate its place of business at any other place or places as the Board may deem advisable from time to time.

Section 2.4    Registered Agent and Office.  The registered office of the Company shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Delaware Act. The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by the Delaware Act.

Section 2.5    Purpose; Powers.  The purpose of the Company is to engage in any lawful business or activity, and to have and exercise all of the powers, rights and privileges which a limited liability company organized pursuant to the Delaware Act may have and exercise.

Section 2.6    Term.  The term of the Company commenced on the Formation Date and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Operating Agreement or the Delaware Act.

Section 2.7    No State-Law Partnership.  The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or officer of the Company shall be a partner or joint

- 7 -

venturer of any other Member, Manager or officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.7.

## ARTICLE III

## CAPITALIZATION

Section 3.1    Membership Interests.    The Membership Interests of the Members shall be represented by issued and outstanding Units. Each of the Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement. The Board shall maintain a schedule of all Members, their respective mailing addresses and the amount and type of Units held by them (the "*Members Schedule*"), and shall update the Members Schedule upon the issuance or transfer of any Units to any new or existing Member. A copy of the Members Schedule as of the execution of this Operating Agreement is attached hereto as Exhibit A.

Section 3.2    Authorization of Common Units.    The Company is hereby authorized to issue a class of Units designated as Common Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement.

Section 3.3    Authorization of Carry Units.    The Company is hereby authorized to issue a class of Units designated as Carry Units, with the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Operating Agreement; provided, however, that Carry Units shall have no rights to vote on any matters of the Company or the Members, unless as otherwise expressly provided in this Operating Agreement or in the Delaware Act.

Section 3.4    Unit Certificates.    The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member. In the event that the Board shall issue certificates representing Units in accordance with this Section 3.4, then in addition to any other legend required by the Securities Acts, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPERATING AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH OPERATING AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFERABILITY CONTAINED IN SUCH OPERATING AGREEMENT AND APPLICABLE U.S. FEDERAL AND STATE

SECURITIES LAWS AND THE SECURITIES LAWS OF ANY OTHER APPLICABLE JURISDICTION.

## ARTICLE IV

## MEMBERS

Section 4.1    Admission of New Members.

(a)    Any Person may be admitted as a Member from time to time by (i) the affirmative vote of the holders of a majority of Common Units, or (ii) in connection with a transfer of Units from an existing Member in accordance with Article X.

(b)    In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the amendment of the Members Schedule by the Board and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units. The Board shall also adjust the Capital Accounts of the Members as necessary in accordance with Article VII.

Section 4.2    Meetings.  Meetings of the Members, for any purpose or purposes, may be called by (i) the Board or (ii) by a Member or group of Members holding at least a majority of the then-outstanding Common Units. Meetings of the Members may be held either in person or by means of telephone or video conference or other communications device that permits all Members participating in the meeting to hear each other.

Section 4.3    Place of Meetings.  The Members holding at least a majority of the then-outstanding Common Units may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members.  If no designation is made, the place of meeting will be the principal place of business of the Company.

Section 4.4    Notice of Meeting.

(a)    Except as otherwise provided in Section 4.4(b), notice of each meeting of the Board shall be given to each Member entitled to vote at such meeting at least 24 hours prior to each such meeting.

(b)    Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting by such Member, except where such Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Members need be specified in the notice or waiver of notice of such meeting

Section 4.5    Record Date.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any

- 9 -

other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, will be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 4.5, such determination will apply to any adjournment thereof.

Section 4.6    Quorum.  A majority of the Members entitled to vote at a given meeting of the Members, represented in person or by proxy, will constitute a quorum at any meeting of Members.  If a quorum shall not be present at any meeting of the Members, then the Members present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 4.7    Voting.

(a)      Except as otherwise provided in Section 4.7(b) or as otherwise required by the Delaware Act:

(i)      each Member shall be entitled to one vote per Common Unit on all matters upon which the Members have the right to vote under this Operating Agreement; and

(ii)      Carry Units shall not entitle the holders thereof to vote on any matters required or permitted to be voted on by the Members.

(b)      Notwithstanding anything to the contrary contained in this Operating Agreement, at any time that there are any Carry Units outstanding, the Company shall not amend or modify Section 4.10, Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, or defined terms used in Section 4.10, Section 9.1(a)(i) or Section 9.2 of this Operating Agreement, without the prior written approval of the holders of a majority of the outstanding Common Units and the holders of a majority of the outstanding Carry Units, each voting separately as distinct classes.

Section 4.8    Action by Written Consent.  Any matter that is to be voted on, consented to or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to in writing, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of a Member or Members.

Section 4.9    Proxies.  At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy must be filed with the secretary of the Company before or at the time of the meeting. No proxy will be valid after 12 months from the date of its execution, unless otherwise provided in the proxy.

Section 4.10    Co-Investment Right.

(a)      Each holder of Carry Units, for so long as such holder owns at least one Carry Unit, shall have the right, but not the obligation, to invest up to an amount equal to

- 10 -

$50,000 per Carry Unit held by such holder in all available co-investment opportunities in companies or partnerships (other than the Fund) in which the Company makes a direct investment (each, a *"Direct Investment Company"*), on the same terms and conditions as the Company's investment in such Direct Investment Company (including but not limited to anti-dilution, first refusal, co-sale, drag along, registration, information, preemptive and other rights and transfer and other restrictions); provided, that such holder of Carry Units shall have no right to invest, in the aggregate, in excess of $50,000 per Carry Unit for all investments in Direct Investment Companies by such holder of Carry Units.  Reasonably promptly after initially receiving any investment documents from a potential Direct Investment Company, the Company shall distribute such investment documents to each holder of Carry Units along with any due diligence materials utilized by the Company in determining whether to make its investment in such Direct Investment Company (collectively *"Direct Investment Materials"*). Holders of Carry Units shall not have any right to provide comments to any Direct Investment Materials.

(b)     Each holder of Carry Units shall make a final determination of whether it will invest in a Direct Investment Company no later than fourteen (14) days after the Company has provided Direct Investment Materials to such holder of Carry Units. Within such timeframe, each holder of Carry Units shall provide the Company with written notice of its intent to invest in such Direct Investment Company, including the amount it intends to invest in such Direct Investment Company.

(c)     Each holder of Carry Units acknowledges that it is not looking to, or relying upon, the Company to make any investment decision, analysis or recommendation and will make its own independent investment decision regarding whether or not to invest in any Direct Investment Company.  The Company shall solely be responsible for asking questions of and receiving answers from representatives of a Direct Investment Company concerning the terms and conditions of an investment in such Direct Investment Company, and to obtain any additional information necessary to evaluate the merits and risks of an investment in a Direct Investment Company.  Nothing contained herein constitutes a binding commitment on any holder of Carry Units to invest in any Direct Investment Company.

Section 4.11  No Withdrawal.  A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.12  No Personal Liability of Members.  Except as otherwise provided in the Delaware Act or expressly in this Operating Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

## ARTICLE V

## MANAGEMENT

- 11 -

Section 5.1    Establishment of Board of Managers.  A board of managers of the Company (the "**Board**") is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with Section 5.2. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Operating Agreement and the Delaware Act.

Section 5.2    Board Composition.  The size of the Board and the Managers to serve thereon shall be determined by the vote of the holders of a majority of Common Units; provided, that, the size of the Board shall initially be set at two (2), and the initial Managers shall be Christopher Moehle and Eric Daimler.

Section 5.3    Removal; Resignation.

(a)    A Manager may be removed or replaced at any time, with or without cause, upon, and only upon, the affirmative vote of the holders of a majority of Common Units.

(b)    A Manager may resign at any time from the Board by delivering his or her written resignation to the Board. Any such resignation shall be effective upon receipt thereof by the Board unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make such resignation effective.

Section 5.4    Meetings.

(a)    The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the offices of the Company or such other place (either within or outside the State of Delaware) as may be determined from time to time by the Board. Notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b)    Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting by such Manager, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 5.5    Quorum; Manner of Acting.

(a)    A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the

meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)     Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(c)     Each Manager shall have one vote on all matters submitted to the Board. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board. For so long as the Board is comprised of an even number of Managers, if the Managers are unable to reach a decision on a matter by majority vote, and such deadlock is unresolved for a period of ten (10) days following the date when the deadlocked matter was initially submitted to the Board for decision, the Board shall refer such matter to the Deadlock Advisor, who shall provide a decision on such deadlocked matter within ten (10) days after referral to him or her of the deadlocked matter (or, if mutually agreed by the Managers, within a longer period of time). Any decision by the Deadlock Advisor shall be final and binding on the Company, the Board and the Members.

Section 5.6     Action by Written Consent.  Any matter that is to be voted on, consented to or approved by the Board may be taken without a meeting, without prior notice and without a vote if consented to in writing, by such number of Managers as would be necessary to authorize or take such action at a meeting of the Board at which a quorum was present and voted. The secretary of the Company will maintain a record for each such action taken by written consent of the Managers.

Section 5.7     No Compensation or Employment.   No Manager shall be reimbursed or otherwise receive compensation for performance of his or her duties as a Manager. This Operating Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager. Nothing contained in this Article V shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

Section 5.8     No Personal Liability of Managers.  Except as otherwise provided in the Delaware Act or expressly in this Operating Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Member, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

Section 5.9     Binding Effect of Actions.  Each Member will be bound by, and hereby consents to, any and all actions taken and decisions made by the Members in accordance with the terms of this Operating Agreement.  Each of the Members agrees that the officers listed in Section 6.2 hereof will have the authority to bind the Company.  Except as provided in this Article V, no Member will have authority to bind the Company.

## ARTICLE VI

## OFFICERS

- 13 -

Section 6.1    Officers of Company. The officers of the Company will consist of a president, a treasurer and a secretary, and such vice presidents, assistant vice presidents, assistant treasurers, assistant secretaries or other officers or agents as may be elected and appointed by the Board from time to time. Any two or more offices may be held by the same person. The officers will act in the name and on behalf of the Company and will supervise its operation under the direction and management of the Board, as further described below.

Section 6.2    Term of Office. Each officer will hold office until his or her successor shall have been duly appointed and qualified or until his or her death or until he or she resigns or has been removed in the manner hereinafter provided. Election or appointment of an officer or agent will not of itself create contract rights.

Section 6.3    Removal. Any officer or agent may be removed, with or without cause, by the Board whenever in their judgment the best interests of the Company would be served thereby.

Section 6.4    Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled for the unexpired portion of the term by the Board.

Section 6.5    President. The president will be the chief executive officer of the Company and will be in charge of the entire business and all the affairs of the Company and will have the powers and perform the duties incident to that position, including the power to bind the Company in accordance with this Section 6.5. He or she will have such other powers and perform such duties as are specified in this Operating Agreement and as may from time to time be assigned to him or her by the Board.

The president will have general and active management of the business of the Company and will see that all orders and resolutions of the Board are carried into effect. The president may execute bonds, mortgages and other contracts, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof is expressly delegated by the Board to some other officer or agent of the Company. The president will have general powers of supervision and will be the final arbiter of all differences between officers of the Company, and such decision as to any matter affecting the Company will be final and binding as between the officers of the Company subject only to the Board.

Section 6.6    Vice President. In the absence of (or at the request of) the president, or in the event of the president's inability or refusal to act, a vice president (or in the event there be more than one vice president, the vice presidents in the order designated, or in the absence of any designation, then in the order of their election) will perform the duties of the president, and when so acting, will have all the powers of and be subject to all the restrictions upon the president. Any vice president will perform such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.7    Treasurer. The treasurer will be the chief financial officer of the Company. The treasurer will not be required to give a bond for the faithful discharge of his or her duties. He or she will: (a) have charge and custody of and be responsible for all funds and

securities of the Company; (b) be charged with primary responsibility for dealing with national securities exchanges or other exchanges in which the Company may hold a membership or on which the Company may trade; (c) receive and give receipts for moneys due and payable to the Company from any source whatsoever, and deposit all such moneys in the name of the Company in such banks, trust companies or other depositories as are selected by the Board; and (d) in general perform all the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him by the president or by the Board.

Section 6.8  Secretary.  The secretary will: (a) keep the minutes of the Members' meetings and the Board meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Operating Agreement or as required by law; (c) be custodian of Company records; (d) keep a register of the post office address of each Member which will be furnished to the secretary by such Member; (e) certify the resolutions of the Members and the Board and other documents to the Company as true and correct thereof; and (f) in general perform all duties incident to the office of secretary and such other duties as from time to time may be assigned to him by the president, a vice president (as designated by the president) or by the Board.

Section 6.9  Assistant Treasurers and Assistant Secretaries.  The assistant treasurers will respectively, if required by the Board, give bonds for the faithful discharge of their duties in such sums and with such sureties as the Board determines. The assistant treasurers and assistant secretaries, in general, will perform such duties as are assigned to them by the treasurer or the secretary, respectively, or by the president or the Board.

Section 6.10  Compensation.  The compensation of the officers of the Company will be fixed from time to time by the Board, and no officer or employee will be prevented from receiving such compensation by reason of the fact that he or she is also a Member or director of the Company.

## ARTICLE VII

## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

Section 7.1  Initial Capital Contributions.  Any amounts contributed by any Member prior to or simultaneously with such Member becoming a party to this Operating Agreement will be recorded by the Company as that Member's Initial Capital Contribution and will be placed in the Member's Capital Account and recorded on the Members Schedule opposite such Member's name. Whether a prospective Member is required to make an Initial Capital Contribution, and the amount of such Initial Capital Contribution, shall be determined by the Board, in its sole discretion.

Section 7.2  Additional Capital Contributions.  No Member shall be required to make any additional Capital Contributions. Any future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units.

Section 7.3  Capital Accounts.  The Company shall establish and maintain on its books and records a separate capital account (a "*Capital Account*") for each Member.

(a)     Each Member's Capital Account shall be increased by: (i) such Member's Capital Contributions, including such Member's Initial Capital Contribution; (ii) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Income; and (iv) allocations to such Member of income described in Section 705(a)(1)(B) of the Code in accordance with Section 8.1.

(b)     Each Member's Capital Account shall be decreased by: (i) the cash amount of any distributions to such Member by the Company; (ii) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (iii) allocations of Net Losses; (iv) allocations to such Member of expenditures described in Code Section 705(a)(2)(b) of the Code; and (v) allocations to the account of such Member of losses and deductions as set forth in such Treasury Regulations, taking into account adjustments to reflect book value.

Section 7.4   Succession Upon Transfer.   In the event of a permitted sale or exchange of Units pursuant to Article X hereof, the Capital Account of the Transferring Member will become the Capital Account of the transferee to the extent it relates to the transferred Units in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

Section 7.5   Negative Capital Accounts.   In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by the Delaware Act (and subject to Section 7.1 and Section 7.2) or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Operating Agreement.

Section 7.6   Treatment of Loans.   Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account.

Section 7.7   No Withdrawal.   No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any distribution from the Company, except as provided in this Operating Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Operating Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

Section 7.8   Compliance with Treasury Regulations.   The manner in which Capital Accounts are to be maintained pursuant to this Article VII is intended to comply with the requirements of Section 1.704-1(b) of the Code and the Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. If the Board determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Article VII should be modified in order to comply with Section 1.704-1(b) of the Code and

the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Article VII, the Board may authorize such modifications.

## ARTICLE VIII

## ALLOCATIONS, TAX MATTERS AND REPORTS

Section 8.1    Allocation of Net Income and Net Losses.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 8.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 9.2 and Section 9.3 and if the Company were dissolved, its affairs wound up and its assets sold for cash equal to its fair market value, all Company liabilities were satisfied, and the net assets of the Company were distributed, in accordance with Section 11.4, to the Members immediately after making such allocations, *minus* (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 8.2    Special Allocations.  Notwithstanding Section 8.1 hereof:

(a)    No allocations of loss, deduction and/or expenditures described in Section 705(a)(2)(B) of the Code will be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account.  The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account will instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with their interests in Net Income pursuant to Section 8.1.

(b)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions, described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member as adjusted under those Treasury Regulations, then items of Company income and gain (consisting of a *pro rata* portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) will be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the adjusted Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 8.2(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c)    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member will be

- 17 -

specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)     Notwithstanding any other provision of this Section 8.2, if there is a net decrease in the Company's Minimum Gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member will be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 8.2(d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and will be interpreted consistently therewith.

(e)     Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations will be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f)     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions will be allocated to the Members in accordance with, and as part of, the allocations of Company profit or loss for such period.

(g)     In accordance with Code Section 704(c), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property will, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)     Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within seven years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member will be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Section 704(c)(1)(A) of the Code if the property had been sold at its fair market value at the time of the distribution.

(i)     In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member, or in connection with the liquidation of the Company the Capital Accounts of the Members will be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property will be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the

- 18 -

Company are taken into account in determining the Members' shares of tax items under Section 704(c) of the Code.

(j)     Any credit or charge to the Capital Accounts of the Members pursuant to Section 8.2(b), (c), and/or (d) hereof will be taken into account in computing subsequent allocations of profits and losses pursuant to Section 8.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Section 8.1 and Section 8.2 will to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article VIII if the special allocations required by Section 8.2(b), (c) and/or (d) had not occurred.

Section 8.3     Accounting Principles. The Company's financial statements must be prepared and its profits and losses be determined in accordance with accounting principles applied on a consistent basis under the Accounting Method.

Section 8.4     Interest on and Return of Capital Contributions. No Member will be entitled to interest on his Capital Contribution or a return of his Capital Contribution.

Section 8.5     Loans to Company. Nothing in this Operating Agreement will prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

Section 8.6     Accounting Period. The Company's accounting period will be the year ending December 31st.

Section 8.7     Records and Reports. At the expense of the Company, the secretary of the Company will maintain records and accounts of all operations and expenditures of the Company. At a minimum, the Company will keep at its principal place of business the following records:

(a)     A current list of the full name and last known business residence, or mailing address of each Member;

(b)     A copy of the Certificate and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)     Copies of the Company's financial statements and income tax returns and reports, if any, for the three most recent years; and

(d)     Copies of the Company's currently effective written operating agreement.

Section 8.8     Returns and Other Elections.

(a)     The Members will cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. The Treasurer will furnish copies of such returns or pertinent information therefrom to the Members within a reasonable time after the end of the Company's Fiscal Year.

(b)     All elections permitted to be made by the Company under federal or state laws may be made by the Members in their sole discretion.

(c)     In recognition of the fact that the Company expects to be treated as a partnership for federal income tax purposes, the Members agree to treat their Membership Interests as partnership interests for U.S. federal and state income tax reporting purposes.

Section 8.9   Tax Matters Partner.   Christopher Moehle is hereby designated as the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE IX

## DISTRIBUTIONS

Section 9.1   Requirement to Make Distributions.

(a)     Subject to Section 9.1(b) and Section 9.4, the Company shall:

(i)     make distributions, in accordance with Section 9.2, to the holders of Carry Units within thirty (30) days of the Company's receipt of any Investment Returns, and

(ii)     make distributions, in accordance with Section 9.3, to the holders of Common Units at such times and in such amounts as the Board may determine from time to time, in its sole discretion, including deciding to forego payment of distributions to the holders of Common Units in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies); provided, that, the Company shall make distributions, in accordance with Section 9.3, to the holders of Common Units within thirty (30) days of the Company's receipt of any Investment Returns.

(b)     Notwithstanding the foregoing, the Company shall not make any distribution to any Members if such distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

Section 9.2   Distributions to Holders of Carry Units.   Each Carry Unit shall entitle the holder thereof to one quarter of a percent (0.25%) of the total amount of any Investment Returns (the "*Carry Unit Distribution Amount*"). After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, when required to make a distribution under Section 9.1(a)(i), the Company shall distribute the Carry Unit Distribution Amount to the Members holding Carry Units, in proportion to the number of Carry Units held by such Members.

- 20 -

Section 9.3    Distributions to Holders of Common Units.    After making any distributions required under Section 9.4 and subject to the priority of distributions pursuant to Section 11.4, if applicable, all distributions made in the discretion of the Board pursuant to Section 9.1(a)(ii) shall be made to the Members holding vested Common Units *pro rata* in proportion to their holdings of vested Common Units; provided that, in the event a distribution is made to the Members holding Common Units as a result of Investment Returns received by the Company, up to fifty percent (50%) of such total amount to be distributed (calculated after deducting any amounts required to be paid to the Members holding Carry Units in accordance with Section 9.2) shall be distributed to the Members holding vested Common Units in such amounts as determined in the discretion of the Board (which, for the avoidance of doubt, need not be in accordance with their holdings of vested Common Units); provided, further, that, in the event that the Company receives any Investment Returns, no distributions shall be made to the Members holding Common Units, other than Tax Distributions, until the full amount of distributions are made to the Members holding Carry Units in accordance with Section 9.2.

Section 9.4    Tax Distributions.

(a)    Subject to any restrictions in any of the Company's then applicable debt-financing arrangements, and subject to the Board's sole discretion to retain any other amounts necessary to satisfy the Company's obligations, at least ten (10) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "***Tax Distribution***").

(b)    If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 9.4(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "***Shortfall Amount***"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the fiftieth (50th) day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 9.4, the Board may apply such distributions to reduce any Shortfall Amount.

(c)    If the aggregate Tax Distributions made to any Member pursuant to this Section 9.4 for any Fiscal Year exceed such Member's Tax Amount (an "***Excess Amount***"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 9.4, except to the extent taken into account as an advance pursuant to Section 9.4(d).

(d)    Any distributions made pursuant to this Section 9.4 shall be treated for purposes of this Operating Agreement as advances on distributions pursuant to Section 9.2 and Section 9.3 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 9.2 and Section 9.3.

- 21 -

Section 9.5   Distributions in Kind.  The Board is hereby authorized, in its sole discretion, to make distributions to the Members in the form of securities or other property held by the Company; provided, that Tax Distributions shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the fair market value of such securities or property would be distributed among the Members pursuant to Section 9.2 and Section 9.3. Any distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that the Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on transfer with respect to such laws. No Member has a right to demand and receive any distribution in a form other than cash.

Section 9.6   Distributions to Members Upon Liquidation.  Upon liquidation of the Company, after settling accounts of creditors and providing for reserves for unforeseen liabilities in the order described in Section 11.4, liquidating distributions will be made to the Members in the following manner:

(a)      first, to the Members holding Carry Units, *pro rata* in proportion to their holdings of Carry Units, to the extent any distributions are owed pursuant to Section 9.2 but have yet to be distributed by the Company to such holders; and

(b)      second, any remaining amounts to the Members holding Common Units, *pro rata* in proportion to their holdings of Common Units.

## ARTICLE X

## RESTRICTIONS ON TRANSFERABILITY

Section 10.1   General.  No Member may: (a) sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (each, a "sale"), or (b) gift, bequeath or otherwise transfer for no consideration (whether or not by court order, divorce decree, settlement agreement or operation of law, except in the case of Bankruptcy) (each, a "gift"), any Units, without the consent of the Board, provided that, any Member may transfer his, her or its Units to (i) its Subsidiary or (ii) a Direct Family Member upon the occurrence of such Member's death or Disability, without obtaining the consent of the Board (each of (i) and (ii), a "***Permitted Transfer***"). Any sale or gift pursuant to this Section 10.1 shall only be effective to the extent set forth in Section 10.2 (for a sale only), as applicable, and Section 10.3 (for a sale and gift). Any Permitted Transfer will only be effective to the extent that the Subsidiary or the Direct Family Member who is a recipient of Units delivers a written undertaking substantially in the form of the Joinder Agreement.

Section 10.2   Right of First Refusal for Common Unit Holders.

(a)      At any time, and subject to the terms and conditions specified in this Section 10.2, each Member holding Common Units shall have a right of first refusal if any other

- 22 -

Member (the "*Offering Member*") receives a bona fide offer from an independent third party (the "*Bidder*") to purchase all or any portion of the Common Units owned by the Offering Member (the "*Offered Interests*"), and which the Offering Member desires to accept. Each time the Offering Member receives a bona fide offer for any of his, her or its Common Units, the Offering Member shall first provide written notice to the other Members then currently holding Common Units (the "*Common Unit Holders*") of the proposed offer terms (an "*Offer Notice*") and make an offering of the Offered Interests to the Common Unit Holders in accordance with the following provisions of this Section 10.2 prior to selling or otherwise transferring such Offered Interests to the Bidder. The Offer Notice will constitute the Offering Member's offer to sell the Offered Interests to the other Common Unit Holders, which offer will be irrevocable until the end of the ROFR Notice Period.

(b)     Upon receipt of an Offer Notice, each Common Unit Holder will have fifteen (15) days (the "*ROFR Notice Period*") to elect to purchase all (and not less than all) of the Offered Interests by delivering a written notice (a "*ROFR Notice*") to the Offering Member stating that such Common Unit Holder offers to purchase such Offered Interests on the terms specified in the Offer Notice. Any ROFR Notice will be binding upon delivery and irrevocable by the applicable Common Unit Holder. If more than one Common Unit Holder delivers a ROFR Notice (each a "*Purchasing Member*"), each such Purchasing Member will be allocated and will pay for its ROFR Portion of the Offered Interests, unless otherwise agreed by such Purchasing Members. Each Common Unit Holder that does not deliver a ROFR Notice during the ROFR Notice Period will be deemed to have waived all of such Common Unit Holder's rights to purchase the Offered Interests under this Section 10.2, and the Offering Member is thereafter, subject to the rights of any Purchasing Member, free to sell the Offered Interests to the Bidder specified in the Offer Notice without any further obligation to such Common Unit Holder pursuant to this Section 10.2.

(c)     If no Common Unit Holder delivers a ROFR Notice in accordance with Section 10.2(b), the Offering Member may, during the sixty (60) day period immediately following the expiration of the ROFR Notice Period, sell all of the Offered Interests to the Bidder on terms and conditions no more favorable to the Bidder than those set forth in the Offer Notice. If the Offering Member does not sell the Offered Interests within such period, the rights provided hereunder will be deemed to be revived and the Offered Interests cannot be sold to the Bidder unless the Offering Member sends a new Offer Notice in accordance with, and otherwise complies with, this Section 10.2.

Section 10.3   Further Requirements for Transfer.   If a gift is permitted under Section 10.1 or a sale to a non-Member is permitted under both Section 10.1 and Section 10.2 (as applicable), no Member may sell or gift any of his, her or its Units: (a) without registration under applicable federal and state securities laws, or unless he, she or it delivers an opinion of counsel satisfactory to the Board that registration under such laws is not required; (b) if the Units subject to the sale or gift, when added to the total of all other Units subject to sales or gifts in the preceding twelve (12) consecutive months prior thereto, would result in the termination of the Company under Section 708 of the Code; (c) without any proposed transferee agreeing to be bound by this Operating Agreement and delivering a written undertaking substantially in the form of the Joinder Agreement; (d) without the proposed transferee making all representations and delivering all such certificates, evidences or assurances reasonably requested by the Board;

- 23 -

and (e) without the proposed transferee paying all expenses in connection with his, her or its admission as a Member, unless the Board specifically waives (a), (b), (c),or (e) above.

Section 10.4 <u>Effectiveness of Transfer</u>. Any sale or gift of any of a Member's Units will take effect on the first day following receipt by Board of written notice that all of the requirements of <u>Section 10.1</u>, <u>Section 10.2</u> (if applicable) and <u>Section 10.3</u> have been met. Any Permitted Transfer will take effect on the date a Manager of the Board executes an acknowledgment to a written undertaking substantially in the form of the Joinder Agreement delivered to the Board by the Subsidiary or the Direct Family Member who is a prospective recipient of Units pursuant to such Permitted Transfer.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

Section 11.1 <u>Dissolution</u>

(a)     The Company shall be dissolved upon the occurrence of any of the following events:

(i)     the election of the Members in accordance with <u>Section 4.7</u>;

(ii)     the sale, exchange, involuntary conversion, or other disposition or transfer of all or substantially all the assets of the Company; or

(iii)     the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

(b)     Dissolution of the Company will be effective on the day on which an event described in <u>Section 11.1(a)</u> above occurs, but the Company will not terminate until a certificate of dissolution has been filed with the Secretary of State of the State of Delaware and the assets of the Company are distributed as provided in <u>Section 11.4</u> below. Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members will continue to be governed by this Operating Agreement.

Section 11.2 <u>Winding Up</u>. If the Company is dissolved pursuant to <u>Section 11.1</u>, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the provisions of <u>Section 11.4</u>.

Section 11.3 <u>Liquidator</u>.

(a)     The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of Common Units, shall act as liquidator to wind up the Company (the "*Liquidator*"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)     As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

Section 11.4  Distribution of Assets Upon Winding Up.  Upon liquidation and winding up of the Company, the Liquidator shall distribute the assets of the Company as follows, unless otherwise required by mandatory provisions of Applicable Law:

(a)     first, to creditors, in the order of priority as provided by law, including all Members who are creditors to the extent otherwise permitted by law, in satisfaction of liabilities of the Company and expenses of liquidation, including sales commissions incident to any sales of assets of the Company, and whether by payment or the making of reasonable provisions for payment thereof;

(b)     second, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(c)     third, to the Members in accordance with the priority set forth in Section 9.6.

Section 11.5  Certificate of Dissolution.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, the Liquidator shall execute a certificate of dissolution, which certificate shall set forth the information required by the Delaware Act. The Liquidator shall file the executed certificate of dissolution with the Delaware Secretary of State to accomplish the cancellation of the Certificate upon the dissolution and completion of the winding up of the Company.

Section 11.6  Recourse for Claims. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XII

## EXCULPATION AND INDEMNIFICATION

Section 12.1  Covered Persons.  As used herein, the term "*Covered Person*" means (i) each Member, (ii) each officer, director, shareholder, partner, member, Subsidiary, employee, agent or representative of each Member, and each of their Subsidiaries, and (iii) each Manager, officer, employee, agent or representative of the Company.

Section 12.2  Exculpation of Covered Persons.

(a)     No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Operating Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(b)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Delaware Act.

Section 12.3   Liabilities and Duties of Covered Persons.

(a)     This Operating Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Operating Agreement. The provisions of this Operating Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)     Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Operating Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Operating Agreement or any other Applicable Law.

Section 12.4   Indemnification.   To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments,

- 26 -

fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "*Losses*") to which such Covered Person may become subject by reason of:

(a)    any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(b)    the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, Subsidiary, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Subsidiaries, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

Section 12.5    Reimbursement.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to Section 12.4; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by Section 12.4, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

Section 12.6    Entitlement to Indemnity.  The indemnification provided by Section 12.4 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Article XII shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under Section 12.4 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

Section 12.7    Insurance.    To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with

such deductibles as the Board may determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

Section 12.8    Funding of Indemnification.    Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Article XII shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

Section 12.9    Amendment and Survival.

(a)    If any portion of this Article XII shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Article XII to the fullest extent permitted by any applicable portion of this Article XII that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(b)    The provisions of this Article XII shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Article XII is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Article XII that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

(c)    The provisions of this Article XII shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.1    Notices.    Any notice, demand or communication required or permitted to be given by any provision of this Operating Agreement will be in writing and will be deemed to have been given when actually received. Any such notice, demand or communication may be given by overnight courier, email or certified mail (return receipt requested) and will be addressed to Members at the addresses shown on the Members Schedule, and/or to the Company at its principal office or to such other address as a party may from time to time designate by notice to the other parties.

- 28 -

Section 13.2  Application of Delaware Law.  This Operating Agreement shall be applied, interpreted and governed subject to its terms and by the laws of the State of Delaware, and specifically the Delaware Act and the Certificate.  In the event of a direct conflict between the provisions of this Operating Agreement and the provisions of the Delaware Act or provisions of the Certificate, such provision of the Delaware Act or the Certificate, as the case may be, will control.

Section 13.3  Waiver of Action for Partition.  Each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to the property of the Company.

Section 13.4  Amendment.  Except as otherwise set forth in Section 4.7(b), this Operating Agreement may be amended at any time in writing by the consent of the Company and the Members holding a majority of the Common Units.

Section 13.5  Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

Section 13.6  Counsel to the Company.  Reed Smith LLP ("*Reed Smith*") will act as legal counsel to the Company in connection with the offering of Units and its general operations.  In connection with the offering of Units and operations of the Company, Reed Smith will not be representing the Members.  Each Member acknowledges that Reed Smith does not represent any Member in the absence of a clear and explicit agreement to such effect between a given Member and Reed Smith (and then only to the extent specifically set forth in that agreement), and that in the absence of any such agreement Reed Smith shall owe no duties directly to any Member.  Each Member further acknowledges that, whether or not Reed Smith has in the past represented such Member with respect to other matters, Reed Smith has not represented the interests of any Member in the preparation and negotiation of this Operating Agreement.

Section 13.7  Construction.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same will include the plural and vice versa, and the masculine gender will include the feminine and neuter genders and vice versa.

Section 13.8  Headings.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

Section 13.9  Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 13.10 Rights and Remedies Cumulative.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party will not preclude or waive the right to use any or all other remedies.  Said rights and

remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 13.11 Severability.  If any provision of this Operating Agreement or the application thereof to any person or circumstance would be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof will not be affected and will be enforceable to the fullest extent permitted by law.

Section 13.12 Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained will be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

Section 13.13 Creditors.  None of the provisions of this Operating Agreement will be for the benefit of or enforceable by any creditor of the Company.

Section 13.14 Counterparts.   This Operating Agreement may be executed in counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

Section 13.15 Recitals.  The recitals set forth following the pre-amble are hereby incorporated into this Operating Agreement.

Section 13.16 Investment Representations.  The undersigned Members understand (a) that the Units issued pursuant to this Operating Agreement have not been registered under the Securities Act of 1933 or any state securities laws (the *"Securities Acts"*) because the Company is issuing such Units in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (b) that the Company has relied upon the fact that the Units are to be held by each Member for investment, and (c) that exemption from registration under the Securities Acts would not be available if the Units were acquired by a Member with a view to distribution.

Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Units for such own Member's account, for investment and not with a view to the resale or distribution thereof without complying with an exemption for registration under the Securities Acts.  Each Member agrees not to transfer, sell or offer for sale any portion of his, her or its Units unless there is an effective registration or other qualification relating thereto under the Securities Acts or unless the holder of the Units delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Securities Acts is not required in connection with such transfer, offer or sale.  Each Member understands that the Company is under no obligation to register the Units or to assist such Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to dispose of the Units.  Furthermore, each Member realizes that the Units are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an "affiliate" of the Company and the Units have been beneficially owned and fully paid for by such Member for at least three (3) years.

*[Signature Page Follows]*

- 30 -

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Robotics Hub Fund 1, LLC

_____
Name: Christopher Moehle
Title: Manager

MEMBERS:

_____
Christopher Moehle

_____
Eric Daimler

_____
Jean-Sébastien Valois

_____
Jamie Fee

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement effective as of the date first above written.

COMPANY:

Robotics Hub Fund 1, LLC

Name: Christopher Moehle
Title: Manager

MEMBERS:

Christopher Moehle

Eric Daimler

Jean-Sébastien Valois

Jamie Fee

(See Attached Joinder Agreements)

[Signature Page to Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC]

**EXHIBIT A**

MEMBERS SCHEDULE

| Name of Member | Address | Email | Initial Capital Contribution | Common Units[1] | Carry Units |
|---|---|---|---|---|---|
| Christopher Moehle | 309 Cola Street, Pittsburgh, PA 15203 | christophermoehle@gmail.com | $0 | 42 | 0 |
| Eric Daimler | 461 2nd St. #306c San Francisco, CA 94107 | edaimler@gmail.com | $0 | 42 | 0 |
| Jamie Fee | 322 Noroton Avenue Darien, CT 06820 | feejamie@gmail.com | $0 | 2 | 0 |

---

[1] Number of Common Units specified may be subject to vesting, pursuant to a restricted unit award agreement.

**EXHIBIT B**

FORM OF JOINDER AGREEMENT

Reference is hereby made to the Amended and Restated Operating Agreement of Robotics Hub Fund 1, LLC, a limited liability company organized under the laws of Delaware (the "*Company*"), dated [DATE], as further amended and restated from time to time (the "*Operating Agreement*"), by and among the current members party thereto. Pursuant to and in accordance with Section 4.1(b) of the Operating Agreement, the undersigned hereby acknowledges that he, she or it has received and reviewed a complete copy of the Operating Agreement, including all exhibits thereto, and agrees that upon execution of this Joinder Agreement, such Person shall become a party to the Operating Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Operating Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the Operating Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of _____ _____, 20___.

By: _____
     Name:
     Title:

Capital Contribution: $_____

Type of Units: _____

Number of Units: _____

*Acknowledged and agreed this* _____ *day of* _____, 20___:

Robotics Hub Fund 1, LLC

By: _____
     Name: Christopher Moehle
     Title: Manager