**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:18-cv-00165-NBF |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUB | ) | **JURY TRIAL DEMANDED** |
| FUND 1, LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | | |

## FIRST AMENDED COMPLAINT

Plaintiff, Eric Daimler ("Daimler"), by his counsel, Thompson & Knight LLP and Buchanan Ingersoll & Rooney PC, as and for his first amended complaint against defendants, Chris Moehle ("Moehle"), Robotics Hub Fund 1, LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This lawsuit arises from Defendants' intentional misrepresentations that were designed to mislead and induce Daimler to enter into: (i) a business partnership with Moehle, in connection with which Daimler made significant financial contributions; and (ii) certain related common unit award agreements that contained different and less favorable vesting schedules than those of Moehle, Daimler's equal partner.

2.      Defendants thereafter took steps to force Daimler out of Robotics Hub and Coal Hill (collectively, the "Companies")—companies in which Daimler was an equal partner and/or co-founded—by intentionally and wrongfully preventing him from satisfying the conditions of

1

his vesting schedules, thereby causing all of his common units in the Companies to be treated as having been forfeited.

3.      Defendants believe that, because of such wrongful forfeiture, Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member. After allegedly becoming a majority member of the Companies, Moehle purportedly removed Daimler from the Boards of the Companies so that he could obtain majority ownership and control over them.

## PARTIES

4.      Plaintiff, Daimler, is an individual who resides in the State of New York. Defendants believe that Daimler has no membership or ownership interest in Robotics Hub or Coal Hill.

5.      Defendant, Moehle, is an individual who resides in the Commonwealth of Pennsylvania.  Moehle is a member of Robotics Hub and Coal Hill.

6.      Defendant, Robotics Hub, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Pittsburgh, Pennsylvania.

7.      Defendant, Coal Hill, is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.[1]

---

[1]  Upon information and belief, Jamie Fee, a non-party member of Robotics Hub and Coal Hill, is an individual who resides in the State of Connecticut.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Robotics Hub and Coal Hill maintain their principal place of business in this district, Moehle resides in this district, and a substantial part of the events giving rise to Daimler's claims occurred in this district.

## FACTUAL BACKGROUND

I.      **Daimler Agrees to Form an Equal Partnership Based Upon Moehle's Misrepresentations**

A.      The Formation of the Partnership

10.     Daimler and Moehle formed a business partnership for the purpose of investing in early-stage robotics companies with high growth potential.

11.     Before becoming partners, Daimler and Moehle each maintained and operated their own companies in robotics and venture finance—Skilled Science and Coal Hill[2], respectively.

12.     In 2015, Daimler and Moehle decided to move forward with an equal partnership by combining Skilled Science and Coal Hill through a de-facto merger, and by co-founding two new entities: Robotics Hub and Robotics Hub Fund 1, LP (the "Fund"). Robotics Hub is the Fund's General Partner, and Coal Hill is the Fund's Investment Manager.

13.     Daimler and Moehle co-edited various documents—including, without limitation, documents entitled "Skilled Science/Coal Hill Merger" and "Combined Skilled Science Coal Hill Pro-Forma"—in connection with their efforts to merge Skilled Science and Coal Hill into a new entity reflecting their equal partnership.

14.     The de-facto merger was accomplished by, among other things: (i) Coal Hill amending and restating its operating agreement to reflect the equal partnership between Daimler

---

[2]  Moehle formed Coal Hill in April 2015.

and Moehle; (ii) Daimler and Moehle working together on marketing strategies for the partnership, and ultimately amending various Coal Hill marketing materials to add Daimler as a principal; (iii) Coal Hill engaging Jamie Fee, who previously worked with Daimler at Skilled Science; and (iv) merging expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub.

15.     Before their partnership began, Moehle represented to Daimler that General Electric ("GE"), among others, would be investing in the Fund, and that he had a strong relationship with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), which would lead to potential investment opportunities for the partnership.

16.     Specifically, with respect to GE, Moehle represented to Daimler throughout 2015 and 2016 that GE would invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise.

17.     Daimler relied on Moehle's representations concerning GE and the strength of his relationships with the NREC and RI when Daimler decided to pursue an equal partnership with Moehle in 2015.

18.     During 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships with the NREC and RI.

19.     However, throughout 2015 and 2016, Moehle continued to vigorously represent to Daimler GE's alleged commitment to invest $20,000,000.00 in the Fund.

B.     Daimler and Moehle Were Equal Partners in the Companies

20.     As of March 23, 2016, Daimler and Moehle were both members of the Companies.

21.     Pursuant to the Companies' respective Amended and Restated Operating Agreements, both dated March 23, 2016, Daimler and Moehle were the only members of the Companies' initial Boards of Managers.

22.     Daimler and Moehle entered into Common Unit Award Agreements, dated March 23, 2016, with each of the Companies pursuant to which Daimler and Moehle were both awarded forty-two common units in each company, which units were subject to certain disparate vesting schedules more fully discussed below.

23.     In contrast, Fee also entered into Common Unit Award Agreements with each of the Companies, dated March 23, 2016, pursuant to which Fee was awarded only two common units in each company.

24.     Further, pursuant to Section 3.08 of the Fund's Limited Partnership Agreement, both Daimler and Moehle are named "key persons," such that if both Daimler and Moehle cease to be actively involved in the Fund's affairs, the Fund's limited partners may elect to terminate the Fund's investment period.

25.     The Companies and the Fund uniformly promoted Daimler and Moehle as equal partners in connection with their public relations and fundraising efforts, including, without limitation, in the Fund's Confidential Private Placement Memorandum and other presentation materials provided to potential investors.

26.     During joint presentations to potential investors, some investors would expressly ask Daimler and Moehle if the two were equal partners, and their response was always "yes." In fact, Moehle explained their relationship by stating that he and Daimler had combined their efforts, not that Daimler had joined Coal Hill.

27.    Despite having an equal partnership, Daimler personally loaned Coal Hill $125,000.00 pursuant to a promissory note and advanced personal funds to cover corporate expenses. In contrast, Moehle provided an initial capital contribution of merely $1,000.00.

28.    On or about November 2, 2017, Coal Hill paid the promissory note in full, together with interest. Coal Hill also reimbursed Daimler for a portion of the expenses he personally advanced to the company, in the amount of $35,000.00.

## II.    Daimler Accepted a Presidential Fellowship that Benefitted the Companies and the Fund

29.    In January 2016, Daimler was appointed as a Presidential Innovation Fellow for the Barack Obama White House.

30.    Daimler accepted the fellowship, which is a twelve-month program, during Barack Obama's last year in office. Thus, it was axiomatic that Daimler's fellowship would end in early 2017.

31.    Moehle encouraged Daimler to accept the fellowship because of the value that the Companies and the Fund would derive from it.

32.    Daimler served as a Presidential Innovation Fellow from January 2016 to early 2017, during which time Daimler advised the White House on, among other things, issues relating to robotics and artificial intelligence.

33.    Daimler and Robotics Hub received positive press coverage with respect to Daimler's fellowship, and Defendants promoted Daimler's White House position in connection with their marketing and fundraising efforts.

34.    Because Daimler's fellowship allowed for outside employment, Daimler continued to provide services to the Companies during 2016, but the Companies did not

compensate him for such services. During such time, Daimler and Moehle agreed that Daimler's compensation for such services would accrue and be paid to Daimler at a later date.

35.     As fully explained below, the relationship between Daimler and Moehle began to break down, in part, because of Daimler's fellowship.

**III.    Defendants' Misrepresentations Caused Daimler to Enter into Common Unit Award Agreements with Different and Less Favorable Vesting Schedules than those of His Equal Partner Moehle**

36.     On or about March 10, 2016, soon after Daimler's fellowship began, the Companies and the Fund engaged Reed Smith LLP to, among other things, prepare various corporate formation and governing documents, including the Common Unit Award Agreements and the Companies' Amended and Restated Operating Agreements.

37.     With respect to the referenced engagement, Reed Smith interacted almost exclusively with Moehle.

A.     <u>Common Unit Awards</u>

38.     The Companies each entered into a Common Unit Award Agreement, dated March 23, 2016, with Moehle, pursuant to which Moehle was awarded forty-two common units in both Robotics Hub and Coal Hill (the "Moehle/RH Award" and the "Moehle/CH Award," respectively, and collectively the "Moehle Awards"), which units vest as follows:

> 20% vests on the first anniversary of Date of Award [March 23, 2017]; 1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Moehle/RH Award and the Moehle/CH Award are attached hereto as Exhibits A and B, respectively.

39.     The Companies also entered into Common Unit Award Agreements, dated March 23, 2016, with Daimler, pursuant to which Robotics Hub and Coal Hill each awarded

forty-two common units to Daimler (the "Daimler/RH Award" and the "Daimler/CH Award," respectively, and collectively the "Daimler Awards").

40.     Unlike Moehle's common units, however, Daimler's units vest as follows:

20% vests on the date when [Daimler] has provided 12 consecutive and uninterrupted months of Full Time Services to the Company Group, provided that [Daimler] must begin providing such Full Time Services to the Company Group no later than the first anniversary of the Date of Award [March 23, 2017]; and

provided the above conditions are met, the remaining 80% vests on a pro-rata basis on the last day of each month thereafter until the fifth anniversary of the Date of Award [March 23, 2021].

Copies of the Daimler/RH Award and the Daimler/CH Award are attached hereto as Exhibits C and D, respectively.

41.     Pursuant to Section 2(a) of the Daimler Awards, Daimler provides Full Time Services if he is employed by or otherwise provides greater than 95% of his professional activities, as determined in the sole discretion of the respective Boards, to the Company Group.

42.     Section 2(a) of the Daimler Awards defines the Company Group as a combination of Robotics Hub or Coal Hill, respectively, the Fund, and the Fund's investment manager (including services provided to portfolio companies of the Fund and Daimler's capacity as an employee of the Fund's investment manager).

B.     Defendants' Misrepresentations

43.     In multiple conversations during 2015 and 2016, some of which included associates and investors, Moehle intentionally misrepresented to Daimler that: (i) Moehle and Daimler would be treated as equals; (ii) the terms of the Daimler Awards were identical to those of the Moehle Awards; and (iii) the Daimler and Moehle Awards both contained vesting schedules pursuant to which a portion of the units would vest automatically while the remaining units would vest over time.

8

44.     Reed Smith made the same misrepresentations to Daimler during conversations in early 2016.

45.     In early 2016, Daimler made it clear to Moehle and Reed Smith that he would consent to the Daimler Awards only if he and Moehle were treated equally and the terms of the Daimler Awards were identical to those of the Moehle Awards.

46.     At no time did Defendants or Reed Smith inform Daimler that only the Daimler Awards, not the Moehle Awards, contained vesting schedules requiring twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, which services must start within a year of entering into the award agreements, before any common units would begin to vest.

47.     In fact, Moehle and Reed Smith continued to represent to Daimler until in or about July 2016, several months after the awards were executed, that Moehle and Daimler were treated equally and that the Daimler Awards and the Moehle Awards were identical.

48.     It was never Daimler's understanding, based upon representations by Moehle and Reed Smith, and, indeed, was incomprehensible to Daimler, that there could be any circumstance under which his common units in the Companies would be forfeited.

49.     Daimler would not have entered into the Daimler Awards if he had known that: (i) his common units vested differently than Moehle's common units; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group, and begin such services within one year of entering into the Daimler Awards, before any portion of his common units would begin to vest; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

C.      Amended and Restated Operating Agreements

50.     Also on March 23, 2016, Robotics Hub and Coal Hill, and their respective members, entered into Amended and Restated Operating Agreements (the "RH Operating Agreement" and the "CH Operating Agreement," respectively, and collectively the "Operating Agreements"), which terms are incorporated in the respective Moehle Awards and Daimler Awards. Copies of the RH Operating Agreement and the CH Operating Agreement are attached hereto as Exhibits E and F, respectively.

51.     Section 7.1 of the respective Operating Agreements requires the Companies to record members' initial capital contributions, and Section 7.3 requires the Companies to establish and maintain on their own books and records a separate capital account for each member.

52.     Section 7.2 of the respective Operating Agreements requires all additional capital contributions to be made in connection with the issuance of units.

53.     Pursuant to Section 12.3(b) of the Operating Agreements, Covered Persons (including, among others, members, officers and directors, and managers) who are permitted or required to make a decision in good faith must act under such express standard.

54.     Under Section 12.4 of the Operating Agreements, Covered Persons are entitled to indemnification from the Companies in connection with actions or omissions performed on behalf of the Companies only if such person acts in good faith and in a manner believed by such person to be in, or not opposed to, the best interests of the company, and such person's conduct does not constitute fraud or willful misconduct.

**IV.    The Relationship Between Daimler and Moehle Breaks Down, But Daimler Remains Engaged in the Companies and the Fund**

55.     As explained above, Daimler and Moehle began their partnership as equal partners—and were promoted as such—and each initially devoted equal time to the Companies.

10

56.     Although Daimler worked for the Companies only part-time during his Presidential Innovation Fellowship, both Moehle and Daimler understood that Daimler would return to his full-time position with the Companies when his fellowship ended.

57.     Indeed, as previously explained, it was understood that Daimler's fellowship necessarily had a finite end date in early 2017.

58.     Additionally, as of January 2016 when Daimler began his fellowship, the business partnership had budgeted matching salaries for Moehle and Daimler, and the Companies had budgeted another full-time salary which they never paid because the individual for whom it was budgeted did not become a member of the Companies as originally anticipated.

59.     In early-mid 2016, the business relationship between Daimler and Moehle began to break down.

60.     The attention and publicity Daimler received in connection with his Presidential Innovation Fellowship became a point of contention between Daimler and Moehle, and Moehle began criticizing Daimler as a business partner.

61.     Moehle became increasingly controlling over access to information about the Fund's investors and portfolio companies, information Moehle previously freely shared. Indeed, Moehle unilaterally determined that he would become the "gatekeeper" of the information soon after Daimler accepted his fellowship.

62.     Moehle would criticize Daimler about statements he made during joint presentations to potential investors about the Fund's portfolio companies, but Moehle would refuse to provide Daimler full access to relevant information about said portfolio companies. Moehle even criticized the content on Daimler's LinkedIn page, and directed Daimler to revise his descriptions of the Companies to mirror those on Moehle's LinkedIn page.

63.     Moehle also began to unilaterally assign Daimler "deliverables" without first consulting with Daimler.

64.     Despite rising tensions, Moehle needed Daimler to remain engaged in the Companies and the Fund so that he would continue to make financial contributions to them, and Daimler remained engaged throughout his fellowship.

65.     Daimler also continued to make financial contributions to the Companies throughout 2016 to pay, among other things, corporate expenses.

66.     Moehle used some of Daimler's financial contributions to the Companies to pay for his own personal expenses, such as his mortgage payments and family trips.

67.     Daimler made additional financial contributions to the Companies with the expectation that they would be treated as capital contributions, and Moehle agreed that they would be treated as such.

68.     From May 2016 through August 2016, Daimler wrote several checks to Coal Hill totaling approximately $30,000.00 to cover Coal Hill's operating expenses, as Moehle requested.

69.     Daimler did not receive additional common units in connection with his additional financial contributions, as required by Section 7.2 of the respective Operating Agreements.

## V.     Defendants Force Daimler Out of the Companies Despite His Attempts to Remain Actively Involved in Them

70.     During the second half of 2016, Moehle began taking steps to gain sole control of the Companies. Indeed, Moehle continued criticizing Daimler as a business partner and increasingly began obstructing efforts by Daimler and Fee to engage in the Companies and the Fund.

12

71.     During the Fall of 2016, Daimler and Fee made several attempts to arrange meetings with Moehle in Pittsburgh, where the Companies and the Fund are based, but Moehle thwarted all such efforts. In fact, Moehle told Daimler that the two would have a problem if Daimler scheduled a trip to Pittsburgh.

72.     On numerous occasions, Daimler and Fee offered to help Moehle with the Fund's first closing in December 2016. But Moehle repeatedly refused their help, stated that he would handle the closing, and directed Daimler and Fee to focus their efforts elsewhere.

73.     Further, Moehle continued to unilaterally assign Daimler "deliverables," including asking Daimler to make introductions to, among others, internet travel companies such as Google Travel. Daimler made the introductions Moehle requested, but afterwards Moehle would tell Daimler that the introductions were no longer needed. Moehle would then claim that Daimler failed to complete such "deliverables."

74.     On several occasions in mid-late 2016, Moehle actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio companies.

75.     Specifically, Daimler explicitly asked Moehle for the contact information for various investors and portfolio companies, including, among others, TravelWits. Moehle either ignored Daimler's requests or flatly refused to disclose the information. In some instances, Moehle even refused to disclose the contact's name.

76.     In late 2016, Moehle began discouraging Daimler from ending his fellowship, which he could have done at any time, because the Companies allegedly had no funds with which to pay him. Daimler suggested that his salary could continue to accrue and be paid to him at a later date, as had been done in the past, but Moehle opposed such structure.

524488.000004 20365301.3

77. Despite Moehle's efforts in 2016 to disassociate himself, the Companies, and the Fund from Daimler, he simultaneously represented to investors that Daimler was his equal partner until in or about November 2016.

78. Daimler and Moehle met in-person on January 5-6, 2017 to discuss the notion that Daimler would not return to his full-time role with the Companies at that time, but that Daimler could still earn some compensation in a non-operating role, and that a full-time operating role for Daimler would occur at a later date.

79. On or about January 5, 2017, just before Daimler's fellowship would ultimately end, Moehle recommended to the Companies' Boards (which constituted only Daimler and Moehle) that Daimler not be permitted to return to a full-time role with the Companies.

80. Although Moehle and the Companies had contemplated Daimler's return to full-time employment from the outset and budgeted a full-time salary for Daimler, Moehle purportedly made the above recommendation to the Boards because the Companies allegedly lacked sufficient funds to pay Daimler a full-time salary at that time. Indeed, Moehle refused to allow Daimler's salary to continue to accrue and be paid at a later date, as it had in the past.

81. At the Companies' respective Board meetings on or about January 5, 2017, Moehle voted against, and Daimler voted in favor of, Daimler returning to a full-time role with the Companies.

82. Because no other votes were cast, the Boards were deadlocked and the matter was referred to the Deadlock Advisor, David Mawhinney, in accordance with Section 5.5(c) of the Companies' respective Operating Agreements.

83. Daimler and Moehle met in-person again on January 18, 2017 in Orlando, Florida to resume their January 5-6, 2017 discussions.

84.     On or about March 22, 2017, just before the first anniversary of the date of the Daimler Awards, Mawhinney broke the deadlock by voting against Daimler returning to a full-time, fully compensated role with the Companies at that time due to their financial status, but understood when casting his vote that Daimler's full-time engagement with the Companies would occur at a later date and did not foreclose the possibility that Daimler could, if he so elected, return to work on a full-time basis with some portion of his compensation accrued, but not paid, as had been done in the past.

85.     Despite Defendants' previous representations to the contrary, they never offered Daimler a non-operating role in the Companies, provided any compensation to him, or permitted his full-time engagement with the Companies. Instead, Defendants took additional steps to ensure that Daimler had no role whatsoever within the Companies.

86.     Because Defendants wrongfully prevented Daimler from returning to his full-time role with the Companies within a year after executing the Daimler Awards, by March 23, 2017, despite Daimler's desire and attempts to do so, the Companies deemed all of Daimler's common units to be forfeited.

87.     As a result of such wrongful forfeiture, Defendants believe that Daimler has no membership or ownership interest in the Companies, thereby making Moehle the Companies' majority member.

88.     After obtaining a majority membership interest, to further prevent Daimler from serving the Companies in any capacity, Moehle purportedly directed the Companies to remove Daimler from their respective Boards and amend and restate the Fund's Limited Partnership Agreement to remove Daimler from the "Key Person" provision set forth in Section 3.08 of the agreement.

## COUNT ONE

## FRAUD IN THE INDUCEMENT
### (Against Moehle)

89.     Plaintiff repeats all prior allegations as though fully set forth herein.

90.     Moehle intentionally misrepresented to Daimler that GE, among others, would be investing in the Fund, and that he had a strong relationship with the NREC and the RI, which would lead to potential investment opportunities for Moehle and Daimler's business partnership.

91.     Moehle also intentionally misrepresented to Daimler that the terms of the Daimler Awards were identical to those of the Moehle Awards, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

92.     Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.  Such misrepresentations are material because Daimler would not have entered into the business partnership in 2015 if he had known that GE and others had not committed to investing in the Fund to the degree Moehle represented, and that Moehle had grossly overstated his relationship with the NREC and the RI.

93.     Nor would Daimler have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within one year of executing the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

94.     Moehle made such misrepresentations to Daimler with the intention of: (i) misleading Daimler into relying upon said misrepresentations; (ii) using said misrepresentations

16

to induce Daimler into funding the Companies in 2015 and 2016, some of which funds Moehle used for his own benefit; and (iii) later forcing Daimler out of the Companies in early 2017 so that Moehle would have majority ownership and control over them.

95.     Daimler justifiably relied upon Moehle's misrepresentations as being true when he decided to enter into a business partnership with Moehle in 2015 and the Daimler Awards in 2016.

96.     As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler Awards, thereby causing all of his common units in the Companies to be treated as having been forfeited (and thus as though Daimler has no membership or ownership interest in the Companies). Such wrongful forfeiture resulted in Moehle becoming a majority member of the Companies and removing Daimler from their respective Boards.

## COUNT TWO

### FRAUD IN THE EXECUTION
### (Against Moehle)

97.     Plaintiff repeats all prior allegations as though fully set forth herein.

98.     Moehle intentionally misrepresented to Daimler that the terms of the Daimler Awards were the same as those of the Moehle Awards, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

99.     Moehle made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

524488.000004 20365301.3

100.    Moehle made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler Awards such that he would continue funding the Companies (some of which funds Moehle used for his own benefit), and using said misrepresentations to later force Daimler out of the company.

101.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle, that the Daimler Awards were identical to the Moehle Awards, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

102.    Moehle's misrepresentations are material because Daimler would not have entered into the Daimler Awards if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in the Companies would be forfeited.

103.    The fact that Daimler was unaware of the contents of the Daimler Awards and the disparity between the Daimler Awards and the Moehle Awards is excusable because Daimler reasonably believed representations repeatedly made to him by his equal business partner Moehle, who was the Companies' counsel's primary point of contact with respect to drafting, among other things, the award agreements.

104.    Daimler justifiably relied upon Moehle's misrepresentations as being true when he executed the signature pages to the Daimler Awards.

524488.000004 20365301.3

105.    As a direct and proximate result of Moehle's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler Awards, thereby causing the Companies to treat all of his common units as having been forfeited (and thus as though Daimler has no membership or ownership interest in the Companies). Such wrongful forfeiture resulted in Moehle becoming a majority member of the Companies and removing Daimler from their respective Boards.

### COUNT THREE

### TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/RH AWARD
### (Against Moehle)

106.    Plaintiff repeats all prior allegations as though fully set forth herein.

107.    The Daimler/RH Award establishes a contractual relationship between Daimler and Robotics Hub, and Moehle was aware of the Daimler/RH Award at all relevant times.

108.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were the same as those of the Moehle/RH Award, and that a portion of Daimler's common units would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

109.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/RH Award, and prevented Robotics Hub from performing its contractual obligations under said award, with the intention of

causing Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Robotics Hub.

110.    Moehle's conduct was not privileged or justified.

111.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Robotics Hub were treated as having been forfeited. Such wrongful forfeiture resulted in: (i) Robotics Hub treating Daimler as having no membership or ownership interest in the company; and (ii) Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

## COUNT FOUR

**TORTIOUS INTERFERENCE WITH CONTRACT – DAIMLER/CH AWARD**
**(Against Moehle)**

112.    Plaintiff repeats all prior allegations as though fully set forth herein.

113.    The Daimler/CH Award establishes a contractual relationship between Daimler and Coal Hill, and Moehle was aware of the Daimler/CH Award at all relevant times.

114.    Moehle intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time. However, Daimler's award, unlike Moehle's, required him to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of executing the award.

115.    Thereafter, Moehle purposefully prevented Daimler from providing Full-Time Services to the Company Group in accordance with the Daimler/CH Award, and prevented Coal Hill from performing its contractual obligations under said award, with the intention of causing

20

Daimler's common units to be forfeited such that Moehle could obtain majority ownership and control over Coal Hill.

116.    Moehle's conduct was not privileged or justified.

117.    As a direct and proximate result of Moehle's purposeful and wrongful conduct, all of Daimler's common units in Coal Hill were treated as having been forfeited. Such wrongful forfeiture resulted in: (i) Coal Hill treating Daimler as having no membership or ownership interest in the company; and (ii) Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

## COUNT FIVE

### UNJUST ENRICHMENT
### (Against Moehle)

118.    Plaintiff repeats all prior allegations as though fully set forth herein.

119.    No direct contractual relationship exists between Daimler and Moehle.

120.    Daimler provided almost all of the initial capital and other financial contributions to the Companies for their benefit.

121.    Some of Daimler's capital and financial contributions were made at Moehle's request.

122.    Upon information and belief, compared to Daimler, Moehle has made insignificant capital and other financial contributions to the Companies.

123.    Moehle wrongfully used some of Daimler's capital and financial contributions to pay for his personal expenses, including his mortgage payments and family travel expenses, only a small portion of which has been repaid to Daimler.

124.    Additionally, Moehle's intentional and wrongful conduct preventing Daimler from satisfying the vesting requirements in the Daimler Awards caused Daimler's common units

in the Companies to be treated as having been forfeited, which units Daimler received in connection with his capital contributions. Such wrongful forfeiture resulted in: (i) the Companies treating Daimler as having no membership or ownership interest in the Companies; and (ii) Moehle thereby becoming a majority member of the Companies and removing Daimler from their respective Boards.

**COUNT SIX**

**BREACH OF CONTRACT – DAIMLER/RH AWARD**
**(Against Robotics Hub)**

125.    Plaintiff repeats all prior allegations as though fully set forth herein.

126.    Daimler and Robotics Hub entered into the Daimler/RH Award, dated March 23, 2016.

127.    Pursuant to Section 2 of the Daimler/RH Award, Robotics Hub agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

128.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

129.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

**COUNT SEVEN**

**BREACH OF CONTRACT – ROBOTICS HUB OPERATING AGREEMENT**
**(Against Robotics Hub)**

130.    Plaintiff repeats all prior allegations as though fully set forth herein.

22

131. Daimler and Robotics Hub entered into the Robotics Hub Operating Agreement, dated March 23, 2016.

132. Pursuant to Section 12.3(b) of the Robotics Hub Operating Agreement, Moehle, as an officer and member of Robotics Hub, was required to make decisions in good faith.

133. Moehle, on behalf of Robotics Hub, failed to act in good faith by: (i) misrepresenting to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time; and (ii) thereafter using the disparate terms of the awards to wrongfully prevent Daimler from satisfying his vesting requirements, resulting in (a) Robotics Hub treating Daimler as having no membership or ownership interest in the company, and (b) Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

134. Pursuant to Section 7.2 of the Robotics Hub Operating Agreement, Robotics Hub is required to issue units in connection with members' additional capital contributions.

135. Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Robotics Hub did not issue additional units in connection with said contributions.

136. As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it initially awarded to Daimler as having been forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

524488.000004 20365301.3

**COUNT EIGHT**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – DAIMLER/RH AWARD**
**(Against Robotics Hub)**

137.    Plaintiff repeats all prior allegations as though fully set forth herein.

138.    Robotics Hub had an implied contractual obligation to act in good faith and to refrain from arbitrary or unreasonable conduct which would have the effect of preventing Daimler from receiving the fruits of the bargain.

139.    Robotics Hub breached such obligations by fraudulently inducing Daimler to enter into and execute the Daimler/RH Award, and thereafter wrongfully preventing Daimler from returning to a full-time position with the company as required by said award for Daimler's units to begin vesting.

140.    As a direct and proximate result of Robotics Hub's intentional and wrongful conduct, Robotics Hub treated all of the forty-two common units it awarded to Daimler as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

**COUNT NINE**

**FRAUD IN THE INDUCEMENT**
**(Against Robotics Hub)**

141.    Plaintiff repeats all prior allegations as though fully set forth herein.

142.    Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

24

143.     Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

144.     Such misrepresentations are material because Daimler would not have entered into the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

145.     Robotics Hub made such misrepresentations to Daimler with the intention of inducing Daimler into entering the Daimler/RH Award, and with the intention of using said misrepresentations to later force Daimler out of the company.

146.     Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he decided to enter into the Daimler/RH Award.

147.     As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

## COUNT TEN

### FRAUD IN THE EXECUTION
### (Against Robotics Hub)

148.     Plaintiff repeats all prior allegations as though fully set forth herein.

149.     Robotics Hub intentionally misrepresented to Daimler that the terms of the Daimler/RH Award were identical to those of the Moehle/RH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

150.     Robotics Hub made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false, and with the intention of inducing Daimler into executing the Daimler/RH Award and using said misrepresentations to later force Daimler out of the company.

151.     Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Robotics Hub) and the Companies' counsel, that the Daimler/RH Award was identical to the Moehle/RH Award, and that a portion of Daimler's common units would vest automatically while the remaining units would vest over time.

152.     Robotics Hub's misrepresentations are material because Daimler would not have executed the Daimler/RH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Robotics Hub would be forfeited.

153.     The fact that Daimler was unaware of the contents of the Daimler/RH Award and the disparity between the Daimler/RH Award and the Moehle/RH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and

repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

154.    Daimler justifiably relied upon Robotics Hub's misrepresentations as being true when he executed the signature pages to the Daimler/RH Award.

155.    As a direct and proximate result of Robotics Hub's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/RH Award, thereby causing Robotics Hub to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Robotics Hub believes Daimler has no membership or ownership interest in the company.

**COUNT ELEVEN**

**UNJUST ENRICHMENT**
**(Alternatively, Against Robotics Hub)**

156.    Plaintiff repeats all prior allegations as though fully set forth herein.

157.    Daimler provided capital and other financial contributions to Robotics Hub for its benefit, including, without limitation, to pay company expenses.

158.    Robotics Hub awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

159.    Robotics Hub intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

160.    But, unlike Moehle's common unit award, Robotics Hub required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted

27

months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

161.    Robotics Hub intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

162.    Robotics Hub has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

163.    Such wrongful forfeiture resulted in Robotics Hub treating Daimler as having no membership or ownership interest in the company, and Moehle thereby becoming a majority member of Robotics Hub and removing Daimler from the Board.

**COUNT TWELVE**

**BREACH OF CONTRACT – DAIMLER/CH AWARD**
**(Against Coal Hill)**

164.    Plaintiff repeats all prior allegations as though fully set forth herein.

165.    Daimler and Coal Hill entered into the Daimler/CH Award, dated March 23, 2016.

166.    Pursuant to Section 2 of the Daimler/CH Award, Coal Hill agreed to award Daimler forty-two common units, which units were to begin vesting upon Daimler starting to provide Full-Time Services to the Company Group by March 23, 2017.

167.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services by March 23, 2017.

168.    As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Coal Hill treated all of the forty-two common units it awarded to Daimler as having been

28

forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

## COUNT THIRTEEN

### BREACH OF CONTRACT – COAL HILL OPERATING AGREEMENT
(Against Coal Hill)

169. Plaintiff repeats all prior allegations as though fully set forth herein.

170. Daimler and Coal Hill entered into the Coal Hill Operating Agreement, dated March 23, 2016.

171. Pursuant to Section 12.3(b) of the Coal Hill Operating Agreement, Moehle, as an officer and member of Coal Hill, was required to make decisions in good faith.

172. Moehle, on behalf of Coal Hill, failed to act in good faith by: (i) misrepresenting to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award and that a certain percentage of Daimler's common units would vest automatically while the others would vest over time; and (ii) thereafter using the disparate terms of the awards to prevent Daimler from satisfying his vesting requirements, resulting in (a) Coal Hill treating Daimler as having no membership or ownership interest in the company and (b) Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

173. Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue units in connection with members' additional capital contributions.

174. Daimler made several additional capital contributions in the amount of approximately $100,000.00, but Coal Hill did not issue additional units in connection with such contributions.

175. As a direct and proximate result of Coal Hill's intentional and wrongful conduct, Coal Hill treated all of the forty-two common units it awarded to Daimler as having been

29

forfeited, and Daimler was issued no additional units in connection with his additional capital contributions.

## COUNT FOURTEEN

### FRAUD IN THE INDUCEMENT
### (Against Coal Hill)

176.    Plaintiff repeats all prior allegations as though fully set forth herein.

177.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were identical to those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

178.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

179.    Such misrepresentations are material because Daimler would not have entered into the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

180.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into entering the Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

181.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he decided to enter into the Daimler/CH Award.

182.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

### COUNT FIFTEEN

### FRAUD IN THE EXECUTION
### (Against Coal Hill)

183.    Plaintiff repeats all prior allegations as though fully set forth herein.

184.    Coal Hill intentionally misrepresented to Daimler that the terms of the Daimler/CH Award were the same as those of the Moehle/CH Award, and that the Daimler Awards and Moehle Awards both contained vesting schedules pursuant to which a portion of common units would vest automatically while the remaining units would vest over time.

185.    Coal Hill made such misrepresentations knowing they were false or with a reckless disregard as to whether they were true or false.

186.    Coal Hill made such misrepresentations to Daimler with the intention of misleading Daimler into relying upon said misrepresentations, inducing Daimler into executing the Daimler/CH Award, and using said misrepresentations to later force Daimler out of the company.

187.    Daimler mistakenly believed, due to intentional misrepresentations by Moehle (as an officer and/or member of Coal Hill) and the Companies' counsel, that the Daimler/CH Award

was identical to the Moehle/CH Award, and that a portion of Daimler's units would vest automatically while the remaining units would vest over time.

188.    Coal Hill's misrepresentations are material because Daimler would not have executed the Daimler/CH Award if he had known that: (i) the terms of the Daimler Awards and Moehle Awards were not identical; (ii) he would be required to provide twelve consecutive and uninterrupted months of Full-Time Services to the Company Group before his common units would begin to vest, provided that he begin providing such services within a year of executing the awards; and (iii) there could be any circumstance under which his common units in Coal Hill would be forfeited.

189.    The fact that Daimler was unaware of the contents of the Daimler/CH Award and the disparity between the Daimler/CH Award and the Moehle/CH Award is excusable because Daimler reasonably believed representations made to him by the Companies' counsel and repeatedly by his equal business partner Moehle, who was counsel's primary point of contact with respect to drafting, among other things, the award agreements.

190.    Daimler justifiably relied upon Coal Hill's misrepresentations as being true when he executed the signature pages to the Daimler/CH Award.

191.    As a direct and proximate result of Coal Hill's misrepresentations, together with Daimler's justifiable reliance on said misrepresentations, Daimler was wrongfully prevented from satisfying the vesting requirements in the Daimler/CH Award, thereby causing Coal Hill to treat all of his common units as having been forfeited. As a result of such wrongful forfeiture, Coal Hill believes Daimler has no membership or ownership interest in the company.

## COUNT SIXTEEN

### UNJUST ENRICHMENT
### (Alternatively, Against Coal Hill)

192.    Plaintiff repeats all prior allegations as though fully set forth herein.

193.    Daimler provided capital and other financial contributions to Coal Hill for its benefit, including, without limitation, to pay company expenses.

194.    Coal Hill awarded Daimler forty-two common units in connection with some, but not all, of such contributions.

195.    Coal Hill intentionally and wrongfully misrepresented to Daimler that his common unit award was identical to Moehle's award, and that a certain percentage of the units awarded to both Moehle and Daimler would vest automatically while the others would vest over time.

196.    But, unlike Moehle's common unit award, Coal Hill required Daimler to provide Full-Time Services to the Company Group for twelve consecutive and uninterrupted months before his units would begin to vest, provided that Daimler began providing such services within a year of the date of the award.

197.    Coal Hill intentionally and wrongfully prevented Daimler from beginning to provide such services, and ultimately treated all of the forty-two common units it awarded to Daimler as having been forfeited.

198.    Coal Hill has not fully reimbursed Daimler for all of his capital and other financial contributions or for the value of his forty-two common units that were wrongfully forfeited.

524488.000004 20365301.3

199.    Such wrongful forfeiture resulted in Coal Hill treating Daimler as having no membership or ownership interest in the company, and Moehle thereby becoming a majority member of Coal Hill and removing Daimler from the Board.

## COUNT SEVENTEEN

### ACCOUNTING
### (Against Robotics Hub)

200.    Plaintiff repeats all prior allegations as though fully set forth herein.

201.    Information pertaining to the usage of Daimler's capital and other financial contributions and the value of Robotics Hub's common units is solely within the possession of Robotics Hub, which information is necessary for Daimler to properly calculate any damages due and owing to him.

202.    Robotics Hub has failed to account for its members' capital contributions, to provide account statements for its members' capital accounts, and to account for Robotics Hub's finances.

203.    Daimler has no adequate remedy at law.

## COUNT EIGHTEEN

### LEGAL ACCOUNTING
### (Against Coal Hill)

204.    Plaintiff repeats all prior allegations as though fully set forth herein.

205.    The Daimler/CH Award is a valid contract between Daimler and Coal Hill.

206.    Daimler is entitled to a full and complete accounting from Coal Hill because Coal Hill was responsible for collecting and recording its members' initial and additional capital contributions, and for establishing and maintaining on its own books a records a separate capital account for each member.

207.    Daimler is further entitled to a full and complete accounting from Coal Hill because the company is required to conduct an accounting annually and to maintain its financial statements and tax returns.

208.    Coal Hill has failed to account for the capital contributions of its members, to provide account statements for its members' capital accounts, and to account for Coal Hill's finances.

209.    Coal Hill is solely in possession of this information, which is necessary for Daimler to properly calculate any damages due and owing to him.

## PRAYER FOR RELIEF

WHEREFORE, Daimler demands judgment in his favor as follows:

(i)      On Counts One, Two, Three, and Four, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million;

(ii)     On Count Five, awarding Daimler monetary damages in an amount to be determined at trial, but in no event less than $10 Million, and requiring Moehle to account for all transactions between himself and the Companies, the Fund, and Daimler;

(iii)    On Counts Six, Eight, Nine, Ten, and Eleven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(iv)     On Count Seven, awarding Daimler injunctive relief, including, but not limited to, compelling Robotics Hub to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Robotics Hub from advancing Moehle funds for legal or

other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(v)     On Counts Twelve, Fourteen, Fifteen, and Sixteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vi)    On Count Thirteen, awarding Daimler injunctive relief, including, but not limited to, compelling Coal Hill to reissue Daimler's forty-two common units that it wrongfully treated as having been forfeited and to issue additional units in connection with Daimler's additional capital contributions, and enjoining Coal Hill from advancing Moehle funds for legal or other expenses as incurred in connection with this action; or, alternatively, compensatory damages in an amount to be determined at trial, but in no event less than $10 Million;

(vii)   On Count Seventeen, requiring Robotics Hub to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(viii)  On Count Eighteen, requiring Coal Hill to provide a full and complete accounting of its finances and its members' capital contributions and capital accounts;

(ix)    On all Counts, awarding Daimler reasonable attorneys' fees and expenses, costs, pre- and post-judgment interest, and punitive damages in an amount to be determined at trial; and such other and further relief as the Court deems just and proper.

524488.000004 20365301.3

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Daimler hereby demands a trial by jury on all issues so

triable.

Dated:  Pittsburgh, Pennsylvania            Respectfully submitted,
        February 14, 2018

                                            BUCHANAN INGERSOLL & ROONEY PC

                                            By:     /s/ Christopher P. Schueller
                                                    Christopher P. Schueller, Esq.
                                                    Pa. I.D. No. 92746
                                                    One Oxford Centre
                                                    301 Grant Street, 20th Floor
                                                    Pittsburgh, PA 15219
                                                    (412) 562-8432
                                                    christopher.schueller@bipc.com


                                            -and-

                                            THOMPSON & KNIGHT LLP

                                            Mitchell G. Mandell, Esq.
                                            (*pro hac vice* forthcoming)
                                            NY State Bar Id: 2042828
                                            900 Third Avenue, 20th Floor
                                            New York, New York 10022
                                            (212) 751-3411
                                            mitchell.mandell@tklaw.com

                                            *Attorneys for Plaintiff Eric Daimler*

524488.000004 20365301.3