# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC DAIMLER, )
)
    Plaintiff, )
) Civil Action No. 18-165
   v. )
) Hon. Nora Barry Fischer
CHRIS MOEHLE, ROBOTICS HUB )
FUND 1, LLC and COAL HILL )
VENTURES LLC )
)
    Defendants. )

## MEMORANDUM OPINION

  Plaintiff Eric Daimler ("Plaintiff" or "Daimler") brought this action alleging that Defendants Chris Moehle ("Moehle"), Robotics Hub Fund 1 LLC ("Robotics Hub"), and Coal Hill Ventures LLC ("Coal Hill") (Robotics Hub and Coal Hill, together, the "Companies") made intentional misrepresentations to Daimler intended to induce him into entering a business partnership with Moehle, which included merging their existing companies and creating new ones. (First Amended Complaint, Docket No. 4 at ¶ 1). He further alleges that the Defendants then forced Daimler out of these companies by preventing him from satisfying conditions precedent to a common unit vesting schedule, resulting in the forfeiture of all of his common units in the Companies. (*Id*. at ¶ 2). In short, Daimler claims that Defendants wrongly forced Daimler out of companies that he helped to create and build. Defendants now move to dismiss Daimler's complaint on the grounds that it fails to state a claim upon which relief may be granted.

  The Court has reviewed the Brief in Support of Defendants' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) (Docket No. 17), the Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint (Docket No. 19), and the Reply Brief in Support of Defendants' Motion to Dismiss Under FRCP 12(b)(6) (Docket No. 20). For

the reasons set forth below, Defendants' motion to dismiss (Docket No. [16]) is GRANTED IN PART AND DENIED IN PART.

## I.   <u>STATEMENT OF FACTS</u>

Sometime in 2015, Daimler and Moehle, each of whom operated his own robotics and/or venture finance company, formed a partnership in order to invest in high-growth-potential, early-stage robotics companies. (Docket No. 4 at ¶¶ 10-11). The two agreed to create an equal partnership by combining Moehle's company, Skilled Science, with Daimler's company, Coal Hill; they also created two new entities, Robotics Hub and Robotics Hub Fund 1 LP (the "Fund"). (*Id.* at ¶¶ 11-12). Daimler and Moehle amended and restated Coal Hill's operating agreement to reflect Daimler's and Moehle's equal partnership, began working together on marketing strategies, and merged "expenses accrued through the funding of Skilled Science into the fundraising expenses of Robotics Hub." (*Id.* at ¶ 14).

Before beginning the partnership, Moehle told Daimer that General Electric ("GE") would invest $20 million in the Fund and that he had strong relationships with the National Robotics Engineering Center ("NREC") and the Robotics Institute ("RI"), both of which would create investment opportunities for their venture. (Docket No. 4 at ¶¶ 15-16). By early 2016, however, Daimler learned that Moehle had misrepresented his relationships with NREC and RI. (*Id.* at ¶ 18). Nevertheless, throughout 2016, Moehle continued to represent that GE would be investing $20 million. (*Id.* at ¶ 19).

In January 2016, the Obama White House appointed Daimler as a Presidential Innovation fellow. (Docket No. 4 at ¶ 29). Daimler, with Moehle's encouragement, accepted the year-long fellowship. (*Id.* at ¶¶ 30-31). During the fellowship, Daimler advised the White House on robotics and artificial intelligence, and the fellowship generated positive press coverage for Daimler and

Robotics Hub. (*Id.* at ¶¶ 32-33). During the course of the fellowship, Daimler provided unspecified services to the Companies but did not receive any compensation. (*Id.* at ¶ 34). Daimler and Moehle agreed that Daimler would be paid at a later date. (*Id.*)

During public relations and fundraising efforts, as well as joint presentations to potential investors, the Companies and the Fund promoted Daimler and Moehle as equal partners. (Docket No. 4 at ¶¶ 25-26). Both were also designated as "key persons" in the Fund's Limited Partnership Agreement.[1] (*Id.* at ¶ 24).

In the spring of 2016, Daimler and Moehle retained Reed Smith LLP to prepare the formation and governing documents, including the Companies' Amended and Restated Operating Agreements and Common Unit Award Agreements. (Docket No. 4 at ¶ 36). Moehle was the main point of contact for the law firm. (*Id.* at ¶ 37). The Companies' Amended and Restated Operating Agreements and Coal Hill's and Robotics Hub's Common Unit Award Agreements with both Moehle and Daimler are attached to the complaint as exhibits, (Docket Nos. 4-1 through 4-6), and the Court has considered and relied upon each in deciding this motion.[2] *See, e.g.*, *Lum v. Bank of America*, 361 F.3d 217, 222 (3d Cir. 2004) (in resolving Rule 12(b)(6) motions, "courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim") (*citing In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Insofar as relevant here, the Amended and Restated Operating Agreements, both dated March 23, 2016,[3] noted that Daimler and Moehle were members of the Companies, and they

---

[1]     That limited partnership agreement was not attached to the complaint.

[2]     The Court has not relied upon the IRS form submitted by Defendants and therefore does not address Defendants' argument that the document is one that may be considered in this motion to dismiss. (Docket No. 17 at 12, n.6).

[3]     As noted above, the Amended and Restated Operating Agreements are attached as exhibits to the Complaint, and citations to each in this opinion are made to the assigned docket numbers, Docket No. 4-5 for the Robotics Hub

appointed the two as managers and board members. (Docket Nos. 4-5 and 4-6 at ¶¶ 5.2). The boards of each company were authorized to manage, control and operate each company and had:

> the full and complete power, authority, and discretion for, on behalf of and in the name of the Company, to take such action as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to [the Operating Agreement and applicable law.]

(Docket Nos. 4-5 and 4-6 at ¶ 5.1). Each Manager on the board had one vote on matters submitted to the board, and, in the event of a tie vote, the board would refer the matter to a Deadlock Arbitrator whose decision would be "final and binding on the Company, the board and the Members." (Docket Nos. 4-5 and 4-6 at ¶ 5.5(c)). Managers were not entitled to receive compensation for their duties as a manager, nor did the Operating Agreements "confer upon any Manager any rights with respect to continued employment by the Company." (Docket Nos. 4-5 and 4-6 at ¶ 5.7). The Agreements specifically provided, "[N]othing herein should be construed to have created any employment agreement with any Manager." (*Id*.) Officers, however, were entitled to compensation as determined by the board. (*Id*. at ¶ 6.10). The Agreements noted that neither Moehle nor Daimler had made any capital contributions, and the Agreements provided that neither would be required to make additional capital contributions. (*Id*. at ¶ 7.2 ). If additional capital contributions were made, those contributions could be made only "with the consent of the Board and in connection with an issuance of Units." (*Id*. at ¶ 7.2). Loans by any member were not to be considered capital contributions under the Agreements. (*Id*. at ¶ 7.6). The holders of a majority of common units were authorized to determine the size of the boards and the identity of

---

Agreement and Docket No. 4-6 for the Coal Hill Agreement. The Amended and Restated Operating Agreements are collectively referred to herein as the "Agreements." Robotics Hub was created as a Delaware Limited Liability Company, (Docket No. 4-5 at 7), and Coal Hill was formed as a Pennsylvania limited liability company (Docket No. 4-6 at 7). Robotics Hub was formed on February 17, 2016, and its original Operating Agreement was dated March 11, 2016. (Docket No. 4-5 at 7). Coal Hill was formed under Pennsylvania law on April 27, 2015, and its original Operating Agreement was dated the same day. (Docket No. 4-6 at 7). Neither of the original Operating Agreements are attached to the complaint or otherwise referenced in it.

the members serving the boards.  (Docket Nos. 4-5 and 4-6 at ¶¶ 5.2, 5.3).  Exhibit A to the Operating Agreements noted that both Daimler and Moehle each had 42 common units in each of the Companies, "which may be subject to vesting, pursuant to a restricted unit award agreement." (Docket No. 4-5 at 39; Docket No. 4-6 at 40).

The same day that the Operating Agreements were signed, each Company granted each of Daimler and Moehle the 42 common units referenced above.[4]  (Docket Nos. 4-1, 4-2. 4-3, and 4-4).  The units vested over time.  Moehle's units vested as follows:

▪20% vests on the first anniversary of the Date of the Award;

▪1.6666% vests ratably on the last day of each month thereafter until the fifth anniversary of the Date of the Award.

(Docket No. 4 at ¶ 38; Docket Nos. 4-1 and 4-2 at 2).  In addition, Moehle's units vested only if Moehle was providing Full Time Services to a combination of the Companies, the Fund and the investment manager of the Fund on the Vesting Date.[5]  (Docket Nos. 4-1 at 3, ¶ 2(a); 4-2 at 3, ¶ 2(a)).  If Moehle stopped working full time, he would forfeit any unvested units.  (Docket Nos. 4-1 and 4-2 at 4, ¶ 2(b)).

Daimler's units, however, vested pursuant to a different schedule.  According to the Summaries contained on the first page of the Daimler Awards, 20% of Daimler's units would vest on the date that he had provided twelve consecutive and uninterrupted months of Full Time

---

[4]      The Common Unit Award Agreement awarding Moehle units in Robotics Hub is found at, and is referenced herein as, Docket No. 4-1.  The Common Unit Award Agreement awarding Moehle units in Coal Hill is referenced as Docket No. 4-2.  The Court refers to those together as the "Moehle Awards." The Common Unit Award Agreement awarding Daimler units in Robotics Hub is at Docket No. 4-3, and the Common Unit Award Agreement awarding Daimler units in Coal Hill is at Docket No. 4-4.  Docket Nos. 4-3 and 4-4 are collectively referred to herein as the "Daimler Awards." The Court refers to both the Daimler Awards and the Moehle Awards together as the "Awards."

[5]      The Awards define "Full Time Service" to mean that the grantee "was employed by or otherwise providing greater than 95% of his professional activities, as determined in the the sole discretion of the Board . . . to a combination of the Compan[ies], the Fund and the investment manager of the Fund . . . on the applicable Vesting Date." (Docket Nos. 4-1, 4-2, 4-3, and 4-4 at ¶ 2(a)).

Services, provided that those services began within one year of the Award. (Docket Nos. 4-3 and 4-4 at 2). If Daimler met those conditions, the remaining 80% of the units would vest on a *pro-rata* basis on the last day of each month thereafter until the fifth anniversary of the award. (*Id.*) Like the Moehle Awards, the Daimler Awards stated that, if he stopped providing Full Time Services, he would forfeit any unvested units. (Docket No. 4-3 at ¶ 2(b) Docket No. 4-4 at ¶ 2(b)).

Each of the four award agreements otherwise appear to contain identical language, which includes a paragraph addressing employment rights. Of note, paragraph 10 of each award, entitled "**No Employment Rights**," provides:

> The grant of this Award shall not confer upon the Grantee any right to be retained by or in the employ or service of the Company and shall not interfere in any way with the right of the Company to terminate the Grantee's employment or service at any time. The right of the Company, as applicable, to terminate at will the Grantee's employment or service at any time for any reason is specifically reserved.

(Docket Nos. 4-1, 4-2, 4-3, and 4-4 at ¶ 10) (underline and bold in original).

Over the course of the partnership, Daimler provided the Companies with financial support. For example, he loaned $125,000 to the Companies pursuant to a promissory note, which has since been repaid with interest. (Docket No. 4 at ¶¶ 27-28). He advanced personal funds to cover unspecified corporate expenses – including $30,000 between May and August 2016 – and has been reimbursed $35,000. (*Id.* at ¶ 27, 28, 65, and 68). He also provided $100,000 capital contributions to Robotics Hub and Coal Hill but did not receive units in return, even though he and Moehle (the only two members of the board) had agreed that he would.[6] (*Id.* at ¶¶ 67, 135, 174). Moehle, on

---

[6] The Court does not consider the allegations made in Plaintiff's opposition brief that, "[u]pon further review," he determined that he had advanced in excess of $160,000 for expenses. (Docket No. 19 at 4, n.1). *Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss') (citations and internal quotation marks omitted). This 'amendment' is, in any event, far from clear and does not specify whether the additional advances were intended as loans or capital contributions and included in the breach of contract claims relating to ¶ 7.2 of the Agreements and discussed *infra*.

the other hand, contributed only $1,000 in capital. (*Id*. at ¶ 27). The complaint does not state whether Moehle received units in return for his capital contribution.

In early to mid-2016, Daimler's and Moehle's relationship began to deteriorate. (Docket No. 4 at ¶ 59). Moehle became critical of Daimler and refused to share information or consult with him. (*Id*. at ¶¶ 59-69). By mid to late-2016, Moehle began taking steps "to gain sole control of the Companies." (*Id*. at ¶ 70). Moehle "thwarted" Daimler's efforts to arrange meetings, refused Daimler's help with the Fund's first closing, and "actively obstructed Daimler's efforts to communicate with the Fund's investors and portfolio managers." (*Id*. at ¶¶ 71-75). Moehle also assigned work to Daimler, which Daimler performed, and then claimed that the work was not necessary and accused Daimler of having failed to complete the work. (*Id*. at ¶ 73). All the while, at least until November 2016, Moehle told investors that he and Daimler were equal partners. (*Id*. at ¶ 77).

In January 2017, Daimler and Moehle met to discuss Daimler's full-time role with the Companies. (Docket No. 4 at ¶ 78). However, on or about January 5, 2017, as Daimler's fellowship was ending, Moehle recommended to the Companies' boards that Daimler not be permitted to work full-time with the Companies, purportedly because the Companies could not afford to pay Daimler. (*Id*. at ¶¶ 79, 80). Because Daimler and Moehle were the only two board members, the board was deadlocked on the issue and, pursuant to the Operating Agreements, the matter was referred to the Deadlock Arbitrator. (*Id*. at ¶¶ 81, 82). On March 22, 2017, the Deadlock Arbitrator voted against Daimler. (*Id*. at ¶ 84). As such, Daimler did not provide full time services to the Companies before the first anniversary of his Awards, and he forfeited the 42 unvested units he had been issued pursuant to the Daimler Awards. (*Id*. at ¶¶ 85-87). Moehle then

became the majority member of the Companies and removed Daimler from the boards.  (*Id*. at ¶¶ 88).

II.  **DISCUSSION**

A.  **The Legal Standard**

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a Rule 12(b)(6) challenge, a plaintiff's "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Id*. (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). "Thus, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Although the Court must accept the allegations in the complaint as true, "'[it is] not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555).  Instead, the plaintiff must plead facts which permit the court to make a reasonable inference that the defendant is liable.  Iqbal, 556 U.S. at 678; *Twombly*, 550 U.S. at 556–57.

Consistent with these principles, the Third Circuit Court of Appeals has prescribed a three-step analysis for purposes of determining whether a claim is plausible. First, the court should

"outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.; see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Third, the court should assume the veracity of all well-pled factual allegations and then "'determine whether they plausibly give rise to an entitlement to relief.'" *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). This third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. (quoting *Iqbal*, 556 U.S. at 679).

### B. Fraud in the Inducement (Counts 1, 9, and 14)

Plaintiff asserts three "fraud in the inducement claims," one against each of Moehle, Robotics Hub, and Coal Hill. He has also identified three representations that he alleges misled him and induced him to enter into a business relationship with Moehle: (1) the representations about Moehle's relationships with NREC and RI; (2) the representations about GE's $20 million investment; and (3) the representations about the Moehle Awards being identical to the Daimler Awards. Specifically, Daimler asserts that Moehle's misrepresentations, upon which he justifiably relied, induced him to sign both the Daimler Awards and the Agreements. (Docket No. 4 at ¶¶ 95, 146, 181). None of these theories survive Defendants' motion to dismiss, but this Court will grant leave to re-plead the claim arising from the alleged misrepresentations about GE's investment.

Under Pennsylvania law, which governs the Coal Hill Agreements, the elements of fraud in the inducement are: (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation;

and (6) injury proximately caused by the reliance. *McWreath v. Range Resources – Appalachia, LLC*, 81 F. Supp. 3d 448, 470 (W.D. Pa. 2015) (Fischer, J.), *aff'd* 645 Fed. App'x 190 (3d Cir. 2016). *See also Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 969 (E.D. Pa. 2015) ("Fraud in the inducement is found where 'an opposing party made false representations that induced the complaining party to agree to the contract."). *Id.* Similarly, under Delaware law, which governs the Robotic Hub Agreements, a plaintiff alleging fraud in the inducement must plead: "(1) a false representation, usually one of fact, made by the defendant; (2) the Defendants' knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance."[7] *In re Med. Wind Down Holdings III, Inc*., 332 B.R. 98, 102 (Bankr. D. Del. 2005) (citing *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983)). Under both Delaware and Pennsylvania law, fraud in the inducement renders a contract voidable, and a victim of this fraud may either rescind the contract or affirm it and sue for damages. *Connors v. Fawn Mining Corp*., 30 F.3d 483, 490 (3d Cir. 1994); *McWreath*, 81 F. Supp. 3d at 470; *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Trust*, 28 A.3d 436, 441 (Del. 2011). *See also Langley v. Fed. Deposit Ins. Corp*., 484 U.S. 86, 87 (1987) (noting that fraud in the inducement rendered a disputed note "voidable but not void"); Restatement (Second) of Contracts § 164 (1981). Here, Plaintiff has not sought rescission of the contracts at issue.

The first set of alleged misrepresentations, those regarding Moehle's relationships with the NREC and RI, cannot serve as the basis of a fraudulent inducement claim because Plaintiff admits

---

[7] Although the parties agree that the Coal Hill Agreements are governed by Delaware law and that the Robotics Hub Agreements are governed by Pennsylvania law (Docket No. 17 at 4, n.3; Docket No. 19 at 9, n.3), Daimler asserts that Pennsylvania law should govern his fraud claims (Docket No. 19 at 21, n.8). The Court need not address this dispute because it does not affect the outcome of the motion to dismiss.

that, "during 2015 and early 2016, Daimler came to learn that Moehle misrepresented and overstated the strength of his relationships" with those entities. (Docket No. 4 at ¶ 18). Daimler therefore cannot argue that he justifiably relied to his detriment on those statements which he knew were false (or suspected them to be) when agreeing to form the companies and executing the agreements at issue.[8] *See, e.g.*, *Dunkin' Donuts Franchised Rests.*, *LLC v. Claudia I, LLC*, 998 F. Supp. 2d 383, 389 (E.D. Pa. 2014) ("A person who believes that a representation is false cannot seriously say they reasonably relied on the representation") (citing *In re Thorne's Estate,* 344 Pa. 503, 25 A.2d 811, 816 (1942) ("A person . . . who acquiesces in a proposal which he believes to be wrongful and disadvantageous deprives himself of the plea of fraud when later he finds that he has been hurt.")).

The second set of alleged misrepresentations, the statements about GE's future investment, likewise cannot form the basis of a fraudulent inducement claim because Plaintiff has failed to plead that claim with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires plaintiffs bringing a fraud claim to "plead the who, what, when, where, why, and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F. 3d 242, 253 (3d Cir. 2009). "[P]laintiffs must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004) (citations and internal quotation marks omitted). "Plaintiffs may satisfy this [particularity]

---

[8] In addition, statements regarding the strength of a relationship, more akin to opinion than to fact, are not the type of misrepresentations upon which a plaintiff may premise a fraud claim. *Lookout Windpower*, 714 F. Supp. 2d at 556 ("Predictions about the future and expressions of opinion cannot support a common law fraud claim.") (*citing Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.3d 544, 554 (Del. Ch. 2001); *Metro Communication Corp. BVI v. Advanced Mobilecomm. Techs Inc.*, 854 A. 2d 121, 148 (Del. Ch. 2004) ("The law is rightly reluctant to find that mere expressions of opinion about the future can buttress a claim of fraud.").

requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

Here, Plaintiff alleges that Moehle made the representations about GE both "before their partnership began" and "throughout 2015 and 2016." (Docket No. 4 at ¶¶ 15, 16). He does not, however, provide any more detail. He does not specify dates, location(s), or the manner/medium (in person, by telephone, in writing, *etc.*) the representations were made. Nor does he provide any context to the allegation: Did Moehle have conversations with representatives of GE? Had GE responded to any outreach? Had GE ever expressed interest in the Companies or the Fund? Or had Moehle simply lied about it all? Plaintiff must "allege facts that give rise to an inference that [Moehle] knew or was reckless in not knowing that . . . the statements were misleading," and "[i]t is not enough for [Daimler] to allege generally that defendants "knew or recklessly disregarded each of the false and misleading statements for which they were sued." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1422 (3d Cir. 1997). Rather, Daimler "must allege facts that could give rise to a "strong" inference of scienter." *Id.* (citations and internal quotation marks omitted). Daimler's failure to plead any such facts forecloses his claim of fraud in the inducement arising from these alleged misrepresentations. Although the Court will dismiss the claims of fraudulent inducement based upon this theory, these claims are dismissed with leave to amend. *In re Burlington Coat Factory*, 114 F.3d at 1435 ("Ordinarily where a complaint is dismissed on Rule 9(b) failure to plead with particularity grounds alone, leave to amend is granted."). [9]

---

[9]     Defendants also urge the Court to find that this claim fails because Plaintiff has not alleged a misrepresentation of a past fact. (Docket No. 17 at 14.) Plaintiff's failure to plead fraud with the requisite particularity makes it difficult for the Court to evaluate this argument, and given that the Court has found that Plaintiff's claim fails to meet the requirements of Rule 9(b), the Court need not  -- and does not -- resolve this issue. That said, as Defendants argue, in order to successfully plead this claim, "Plaintiff[] must allege a misrepresentation relating to a past or existing fact." *Lookout Windpower*, 714 F. Supp. 2d at 556. *See also supra* n. 8. "A statement as to future plans or intentions will not satisfy the falsity element of fraud unless the speaker knowingly misstates his true state of mind." *Dunkin Donuts*, 998 F. Supp. at 389 (citing *Nat'l Data Payment Sys., Inc. v. Meridian Bank,* 212 F.3d 849, 858 (3d Cir. 2000)). Here, Daimler's claims as currently styled are hardly clear. He alleges that GE "would be investing," which may refer

Finally, the claims relating to the assertion that Daimler's and Moehle's awards were identical must fail because Plaintiff cannot allege that he suffered any injury as a result of that misrepresentation. Specifically, Daimler does not allege that he was promised terms different from what the awards actually contained. Instead, he complains that he and Moehle should have had the same terms. (Docket No. 4 at ¶¶ 49, 93, 102, 133, 172, 179, 188). But, regardless whether the terms of Moehle's award mirrored that of Daimler's, or whether Daimler's mirrored those of Moehle's, Plaintiff could not have satisfied the vesting requirements because he had not provided Full Time Services to the Companies by March 23, 2017. (*Compare* the Moehle Awards (Docket Nos. 4-1 and 4-2 at 2, 3 ¶ 2(a)) with the Daimler Awards (Docket Nos. 4-3 and 4-4 at 2)).

### C. Fraud in the Execution (Counts 2, 10, and 15)

Plaintiff also alleges that the misstatements about the terms of the Awards constitute fraud in the execution. "Fraud in the execution arises when a party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." *Red Online Mktg. Grp.*, *LP v. Reviser, Ltd.*, No. 14-1353, 2015 U.S. Dist. LEXIS 11686, at *14 (E.D. Pa. Feb. 2, 2015). Fraud in the execution voids the contract. *Connors v. Fawn Mining Corp.*, 30 F. 3d 483, 490 (3d Cir. 1994) (fraud in the execution renders a contract "void *ab initio*"). *See also Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011).

In addition to the fact that, as set forth above, Plaintiff cannot plausibly allege damages stemming from this alleged misrepresentation, his claim also fails because he has not pled facts

---

to a future, anticipated, event. (Docket No. 4 at ¶¶ 15, 90). However, Daimler also claims that Moehle "vigorously" represented GE's "alleged commitment to invest," a statement that may or may not reflect existing fact. (Docket No. 4 at ¶ 19).

demonstrating excusable neglect. A party claiming fraud in the execution must demonstrate "excusable ignorance of the contents of the writing signed." *Fawn Mining*, 30 F.3d at 491. Daimler, however, does not allege that the contracts' pages were surreptitiously substituted, that there was a significant time pressure that prevented him from reviewing the contracts, or that he was provided only with signature pages. *See Red Online Mktg.*, 2015 U.S. Dist. LEXIS 11686 at *19. Nor does Daimler allege what he thought the terms of the contracts should have been, other than to complain that he thought his awards were identical to Moehle's. In other words, Daimler does not allege that the contracts contained terms different from what was actually there. Rather, and as set forth above, he complains that he thought Moehle had the same deal.

While Daimler argues that he was repeatedly told that the awards were identical, and while he may have thought that the contracts would reflect those discussions, these sentiments simply "did not relieve [Daimler] of the responsibility to read the [agreements] and determine [their] precise contents for [himself] prior to signing [them]." *Red Online Mktg.*, 2015 U.S. Dist. LEXIS 11686, at *16. *Cf. McWreath*, 81 F. Supp. 3d at 471 ("contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood."). Plaintiff's citation to *Axalta Coating Systems, LLC v. Midwest II, Inc*., 217 F. Supp. 3d 813 (E.D. Pa. 2016), for the proposition that the law does not require him to have read the contracts he signed is unavailing. (Docket No. 29 at 23). In that case, the aggrieved party had been presented with redlined documents reflecting that the language he had insisted upon was in the contracts, but the execution copy – which omitted the critical language – had been clandestinely substituted. In other words, that aggrieved party had read the agreement before signing it, but alleged that the counterparty deleted a material term without informing him and re-presented the document without mentioning this edit. *Axalta*, 217 F. Supp. 3d at 816-17, 821, 824. Thus, the court held that

aggrieved party was under no obligation to read the document again and had adequately pled facts demonstrating excusable neglect. *Id*. at 824. That, however, is not the case here. Daimler never alleges that he *ever* read the Awards or the Agreements. In sum, Plaintiff has failed to plead any facts that would excuse his failure to read the relevant documents or that otherwise support an allegation of excusable neglect.

D. **Breach of Contract and Covenant of Good Faith**
   **(Counts 6, 7, 8, 12, and 13)**

Plaintiff also brings several breach of contract claims. Counts Six and Twelve, against Robotics Hub and Coal Hill respectively, allege that Robotics Hub and Coal Hill breached the terms of the Awards by preventing Daimler from providing full time services. (Docket No. 4 at ¶¶ 125-129, 164-168). Counts Seven and Thirteen allege that Robotics Hub and Coal Hill breached the terms of the Agreements by: (1) misrepresenting the terms of the Awards and wrongly preventing Daimler from working full-time, thereby resulting in the forfeiture of Daimler's unvested units and the loss of his board positions; and (2) failing to issue units in connection with Daimler's capital contributions. (*Id*. at ¶¶ 130-136, 169-175). Count Eight is a claim against Robotics Hub for breach of the Implied Covenant of Good Faith and Fair Dealing and arises from the company having wrongfully prevented Daimler from working full time and thereby satisfying the vesting requirements of his award. (*Id*. at ¶¶ 137-140).

Under both Delaware and Pennsylvania law, a breach of contract claim has three elements: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages resulting from that breach. *Greenstar LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011); *Rendon v. Ragans*, No. 08-1665, 2009 WL 1514471, at *2 (W.D. Pa. May 29, 2009) (Fischer, J.) (*citing Novinger Group Inc. v. Hartford Insurance, Inc*. 514 F. Supp. 2d 662, 670 (M.D. Pa. 2007)). Daimler has failed to allege a breach of contract related to the Companies' failure to hire him, but

he has pled facts sufficient to establish a breach of ¶ 7.2 of the Operating Agreements for failure to issue him units in connection with his capital contributions.

### 1. *The Failure to Employ*

With respect to his claims that he was wrongfully prevented from working full-time, Plaintiff has failed to allege facts reflecting a breach of a duty imposed by the contract. Although Plaintiff asserts that the parties contemplated his working full-time for the Companies, the contracts state otherwise. Specifically, both Agreements plainly state that they do not "confer upon any Manager any rights with respect to continued employment by the Company." (Docket Nos. 4-5 and 4-6 at ¶ 5.7). Similarly, the Awards provide that Daimler had no "right to be retained by or in the employ or service of the Company" and that the grant of the units could not "interfere in any way with the right of the Company to terminate [Daimler's] employment or service at any time." (Docket Nos. 4-3, and 4-4 at ¶ 10). They further provide that the "right of the Company, as applicable, to terminate at will [Daimler's] employment or service at any time for any reason is specifically reserved." (*Id*.) Moreover, given Moehle's and Daimler's disagreement, in accordance with ¶ 5.5(c) of the Agreements, the parties called upon the Deadlock Arbitrator to resolve the dispute. (Docket No. 4 at ¶¶ 82, 84). The arbitrator – about whom Daimler has made no allegations of wrongful conduct – sided with Moehle. (*Id*. at ¶ 84). While Plaintiff may have hoped that he would work for the Companies and that his units would therefore vest, he signed an agreement that clearly and unambiguously provided that he had no such right. This Court cannot enforce the contract Plaintiff wishes he signed.

The fact that the contracts at issue expressly authorize the complained-of conduct also defeats any claims that Defendants breached the implied covenant of good faith and fair dealing.[10] In order to pursue a claim of breach of the implied covenant, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation, and damages. *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581–82 (D. Del. 2007)*; Kelly v. Blum*, No. 4516-VCP, 2010 WL 629850 (Del. Ch. Feb. 24, 2010). Daimler argues that the contracts implied an obligation to hire him and that the failure to do so constitutes a breach of the covenant of good faith. However, under Delaware law, the implied covenant cannot modify or override express contractual terms. *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009). Because the Awards and the Agreements clearly contemplated that Daimler might not work for the Companies, and because they expressly provided that he had no right to employment, Daimler cannot claim a breach of the covenant of good faith based upon the Companies' refusal to employ him. Moreover, the Agreements provided for deadlock arbitration, and the parties availed themselves of this provision. The Deadlock Arbitrator's decision is final and binding. Plaintiff cannot convert his disagreement with the arbitrator's decision into a breach of contract claim against Defendants. Although Daimler undoubtedly regrets entering into these contracts, this Court may not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec*, 991 A.2d at 1126.

---

[10] According to Daimler, breach of the implied covenant "is asserted only against Robotics Hub under Delaware law (Count Eight), because Pennsylvania law does not recognize this as an independent claim." (Docket No. 19 at 15 n. 6).

### 2. *The Failure to Issue Units in Connection with Capital Contributions*

In addition to the forfeited 42 units under the awards, Daimler claims that he is entitled to an unspecified number of additional units in one or both of the Companies. Specifically, he states that he made capital contributions to the Companies of an additional $100,000 for which he did not receive units. (Docket No. 4 at ¶¶ 135, 174). Daimler does not state when this contribution or contributions were made, nor does he specify when and where he and Moehle agreed to the terms. In addition, the claim that Daimler is entitled to an unspecified number of additional units seems to contradict his earlier claims that he and Moehle were equal partners, and he does not explain why Moehle would agree to treat these advances as capital contributions (thereby making Daimler the majority owner) as opposed to treating them as loans. *See, e.g.* (Docket No. 4-5 at ¶ 14) (defining membership interest by the number of issued and outstanding units). However, Daimler does allege that he and Moehle (the only two members of the Companies' boards) agreed that Daimler would provide funding to the Companies and that he would receive units in return. Defendants counter that this does not constitute board approval is an overly technical reading of the Agreements. (Docket No. 20 at 8). Moehle and Daimler were the only board members, and Daimler has alleged that the two had agreed that his contributions would constitute capital contributions. Thus, Daimler had the "consent of the board" for the issuance of units in exchange for his $100,000. Albeit thinly pled, these facts suffice to defeat Defendants' motion to dismiss Plaintiff's breach of contract claim relating to the failure to issue units in connection with his capital contributions.

### D. Tortious Interference
### (Counts 3 and 4)

Plaintiff alleges that Moehle tortiously interfered with Daimler's contracts with the Companies. These claims must be dismissed because, as set forth above, Moehle's actions were authorized by the contracts at issue. Under Delaware law, a plaintiff claiming tortious interference with contract must plead and prove: (1) the existence of a contract; (2) about which the defendant knew; (3) an intentional act that was a significant factor in causing a breach of the contract; (4) that was without justification; and (5) which caused injury. *Kuhn Const. Co. v. Ocean and Coastal Consultants, Inc*., 844 F Supp. 2d 519 (D. Del. 2012). Similarly, in Pennsylvania, a plaintiff claiming tortious interference must prove: (1) the existence of a contract; (2) purposeful action by the defendant intended to harm the contractual relationship; (3) the absence of privilege or justification; and (4) damages. *Zurchin v. Ambridge Area School District*, 300 F. Supp. 3d 681, 694 (W.D. Pa. 2018) (Fischer, J.) (*citing Crivelli v. Gen. Motors Corp*., 215, F.3d 386, 394 (3d Cir. 2000). The Court has set forth above, and will not repeat here, that Moehle was under no obligation to agree to Daimler's full time service, and that the Companies' refusal to employ Daimler was expressly permitted under the terms of the Agreements. Moreover, in referring the dispute to the Deadlock Arbitrator for resolution, Moehle and the Companies complied with the terms of the Agreements. The claim for tortious interference therefore cannot lie.[11]

---

[11] Defendants also argue that Moehle could not have tortiously interfered with the Robotics Hub and Coal Hill agreements because, as a manager and board member of the Companies, he was an agent of both entities. (Docket No. 17 at 20). "[A] party to a contract cannot tortiously interfere with that very same contract," and "[b]y extension, agents of a contracting party are also unable to tortiously interfere." *Kuhn*, 844 F. Supp. 2d at 531. *See also Zurchin*, 300 F. Supp. 3d at 694. Plaintiff argues in response that Moehle acted in his personal capacity and not as an agent of the Companies, but the paragraphs cited by Plaintiff do not plead that Moehle was acting in his personal capacity or otherwise set forth facts that might suggest that Moehle was acting *ultra vires*. (*See* Docket No. 19 at 18 *citing* Docket No. 4 at ¶¶ 29-34, 78-80, and 85-88). However, because questions of agency often hinge on factual determinations, the Court does not resolve Daimler's tortious interference claims on these grounds. *See, e.g., Kuhn*, 844 F. Supp. 2d at 531 citing *Jurimex Kommerz Transit G.M.B.h. v. Case Corp*., 65 Fed. App'x 803, 808 (3d Cir. 2003). *But see Lubold v. Univ. Veterinary Specialists, LLC*, CV-17-507, U.S. Dist. LEXIS 102281, at * 7-8 (W.D. Pa., June 30, 2017) (in a Rule 12(b)(6) motion, dismissing tortious interference claim against officers of corporate defendant, noting that

### F.     Unjust Enrichment
####         (Counts, 5, 11, and 16)

Unjust enrichment, or *quantum meruit*, is a "quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Lookout Windpower Holding, Co. v. Edison Mission Energy*, 714 F. Supp. 2d 547, 553 (W.D. Pa. 2010) (citations omitted).   "Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls." *Id.* (citations and internal quotation marks omitted).   Indeed, "the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract, regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings." *Batoff*, 130 F. Supp. 3d at 972. However, a plaintiff may "pursue alternative theories of recovery based on both breach of contract and unjust enrichment" to the extent there "is any question as to the validity of the contract in question." *Id.*   In this case, Daimler admits that he has pled the unjust enrichment claims against the Companies in the alternative, should the Court reject his breach of contract claims.  (Docket No. 19 at 20).  Because the Court finds the existence of valid contracts, and because Plaintiff does not seek rescission of the contracts and instead claims damages pursuant to those contracts (which the parties agree address the at-issue conduct), these claims must be dismissed.

---

plaintiff had failed to plead that the individual defendants acted in their individual capacities as opposed to on behalf of the corporation).

### G.    Accounting
### (Counts 17 and 18)

In Pennsylvania, a legal accounting is "merely an incident" to a breach of contract claim. *McWreath*, 81 F. Supp. 3d at 468.  And, "[u]nder well-accepted Delaware law, an accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result. In other words, an accounting reflects a request for a particular type of remedy, rather than an equitable claim in and of itself." *Garza v. Citigroup Inc.*, 192 F. Supp. 3d 508, 511 (D. Del. 2016) (citations and internal quotation marks omitted), *reconsideration denied sub nom. Lopez Garza v. Citigroup Inc.*, No. CV 15-537-SLR, 2016 WL 7197364 (D. Del. Dec. 9, 2016), and *aff'd*, 724 F. App'x 95 (3d Cir. 2018), *cert. denied sub nom. Lopez Garza v. Citigroup Inc.*, No. 17-1388, 2018 WL 1639769 (U.S. June 11, 2018).  Because Daimler's accounting claims are not stand-alone claims and relate, instead, to the remedy sought, Counts Seventeen and Eighteen are dismissed.  Plaintiff, however, may demand an accounting as part of the relief sought in the re-pled complaint.  *See, e.g. McWreath*, 81 F. Supp. 3d at 468 (dismissing accounting claim, noting that legal accounting was a remedy, not a stand-alone claim, and that equitable accounting could not lie when parties had contractual relationship); *Garza*, 192 F. Supp. 3d at 514 (dismissing accounting claim because it was not a stand-alone claim and, in any event, plaintiff could not allege requisite elements).

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Docket No. [16]) is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to Counts Two, Three, Four, Five, Six, Eight, Ten, Eleven, Twelve, Fifteen, Sixteen, Seventeen, and Eighteen of Plaintiff's First Amended Complaint.  Counts Seven and Thirteen are dismissed insofar as they relate to allegations regarding Moehle's relationships with NREC and RI and the statements that

the Daimler and Moehle Awards were identical. Counts One, Nine, and Fourteen are dismissed with leave to re-plead the allegations regarding GE's potential investment. Defendants' motion (Docket No. [16]) is DENIED as to Counts Seven and Thirteen, insofar as those counts relate to Plaintiffs alleged capital contributions.

An appropriate order follows.


                                          _s/ Nora Barry Fischer_
                                          Nora Barry Fischer
                                          United States District Judge

Date:    July 27, 2018

cc/ecf: All counsel of record