# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | Civil Action No. 18-165 |
| Plaintiff, | ) | Judge Marilyn J. Horan |
| | ) | |
| v. | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS | ) | |
| HUB FUND 1 LLC, and COAL HILL | ) | Electronically Filed |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**K&L GATES LLP**
Patrick J. McElhinny (PA Bar No. 53510)
Christopher M. Verdini (PA Bar No. 93245)
Jessica L. G. Moran (PA Bar No. 325912)
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
T: 412.355.6500
F: 412.355.6501
patrick.mcelhinny@klgates.com
christopher.verdini@klgates.com
jessica.moran@klgates.com

*Counsel for Defendants Chris Moehle, Robotics Hub Fund 1 LLC, and Coal Hill Ventures LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   UNDISPUTED FACTS ......................................................................................... 3

    A.    The Formation of the Defendants' Business.................................................. 3

    B.    Daimler's Prior Investment Venture. ............................................................ 4

    C.    Daimler Joins the Companies. ...................................................................... 6

    D.    Daimler Fails to Honor His Commitments to the Companies and the
        Relationship Between Daimler and Moehle Breaks Down. ............................ 8

III.  PROCEDURAL HISTORY.................................................................................... 8

IV.   ARGUMENT ........................................................................................................ 9

    A.    Fed. R. Civ. P. 56 Requires Courts to Grant Summary Judgment Where
        There is No Genuine Issue of Material Fact And the Movant Is Entitled to
        Judgment As a Matter of Law ....................................................................... 9

    B.    Daimler Cannot Satisfy His *Prima Facie* Burden to Prove Fraudulent
        Inducement.................................................................................................. 10

        1.    Daimler's Sole Evidence of Any Purportedly Fraudulent
            Representation Is His Own Self-Serving Deposition Testimony. ........... 11

        2.    Even If Defendants Had Made Any Representations Relative to a
            GEV's $20 Million Commitment, Such Representations Are Not
            Actionable False Statements. .................................................................. 13

        3.    Daimler Cannot Proffer Any Evidence Showing Knowledge or
            Intent ..................................................................................................... 14

        4.    Daimler Cannot Demonstrate that He Justifiably Relied on Any
            Purported Representation ....................................................................... 15

        5.    Daimler Cannot Demonstrate That He Was Damaged. .......................... 18

    C.    Daimler Cannot Satisfy His *Prima Facie* Burden to Prove Breach of
        Contract....................................................................................................... 22

V.    CONCLUSION.................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Benevento v. Life USA Holding, Inc.*,
  61 F. Supp. 2d 407 (E.D. Pa. 1999) ...............................................................16

*Blair v. Scott Spec. Gases*,
  283 F.3d 595 (3d Cir. 2002)...........................................................................22

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014)...........................................................................24

*Estate of Boscio*,
  412 A.2d 505 (Pa. 1980) ................................................................................10

*Casso v. Pa. R. Co.*,
  219 F.2d 303 (3d Cir. 1955)...........................................................................16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................10

*Chetty Holdings, Inc. v. NorthMarq. Cap., LLC*,
  No. 11-4640, 2012 WL 1521857 (E.D. Pa. May 1, 2012)..............................14

*Coleman v. Sears, Roebuck & Co.*,
  319 F. Supp. 2d 544 (W.D. Pa. 2003)..................................................10, 13, 15

*Countryside Oil Co., Inc. v. Travelers Ins. Co.*,
  928 F. Supp. 474 (D.N.J. 1995) .....................................................................24

*Daimler v. Moehle*,
  No. 18-165, 2019 WL 2422843 (W.D. Pa. Jun. 10, 2019) .............................15

*Delahanty v. First Pa. Bank NA*,
  464 A.2d 1243 (Pa. Super. Ct. 1983)........................................................10, 11

*Dunkin' Donuts Franchised Restaurants, LLC v. Claudia I, LLC*,
  998 F. Supp. 2d 383 (E.D. Pa. 2014) .............................................................13

*Ecore Int'l, Inc. v. Downey*,
  343 F. Supp. 3d 459 (E.D. Pa. 2018) ........................................................22, 23

*Eigen v. Textron Lycoming Reciprocating Engine Div.*,
  874 A.2d 1179 (Pa. Super. Ct. 2005)..............................................................19

*Greenberg v. Tomlin*,
    816 F. Supp. 1039 (E.D. Pa. 1993) ...........................................................10, 18

*Haywood v. Univ. of Pittsburgh*,
    976 F. Supp. 2d 606 (W.D. Pa. 2013) ...............................................................22

*Irving v. Chester Water Auth.*,
    439 Fed. App'x 125 (3d Cir. 2011) ...................................................................11

*JHNY Corp. v. Dana Corp.*,
    No. 2:05-cv-02829, 2006 WL 8459414 (E.D. Pa. Apr. 13, 2006) ...................13

*Lind v. Jones, Lang LaSalle Am., Inc.*,
    135 F. Supp. 2d 616 (E.D. Pa. 2001) ..........................................................11, 18

*Lookout Windpower Holding Co., LLC v. Edison Mission En.*,
    714 F. Supp. 2d 547 (W.D. Pa. 2010) ...............................................................13

*Martelet v. AVAX Tech., Inc.*,
    No. 09-cv-2925, 2012 WL 1570964 (E.D. Pa. May 3, 2012) ....................19, 20

*Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.*,
    153 F. Supp. 3d 778 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017) .....19

*Porecco v. Porecco*,
    811 A.2d 566 (Pa. 2002) ............................................................................15, 16

*Printed Image of York, Inc. v. Mifflin Press, Ltd.*,
    133 A.3d 55 (Pa. Super. Ct. 2016) ....................................................................25

*Pro Spice, Inc. v. Omni Trade Grp., Inc.*,
    128 Fed. App'x 836 (3d Cir. 2005) ...................................................................14

*Scaife Co. v. Rockwell-Standard Corp.*,
    285 A.2d 451 (Pa. 1971) ...................................................................................11

*Siegel Transfer, Inc. v. Carrier Exp., Inc.*,
    54 F.3d 1125 (3d Cir. 1995) ..............................................................................10

*Snyder v. Gravell*,
    666 A.2d 341 (Pa. Super. Ct. 1982) ..................................................................10

*Tangle v. State Farm Ins. Cos.*,
    444 Fed. App'x 592 (3d Cir. 2011) ...................................................................25

*Toy v. Metro. Life Ins. Co.*,
    863 A.2d 1 (Pa. Super. Ct. 2004) ......................................................................16

*Tran v. Metro Life Ins. Co.*,
    408 F.3d 130 (3d Cir. 2005)...............................................................................16

*Walsh v. Fusion Japanese Steakhouse, Inc.*,
    No. 2:19-cv-00496-CCW, 2021 WL 2917795 (W.D. Pa. July 12, 2021) .......11

*Weeks v. Samsung Heavy Indus. Co. Ltd.*,
    933 F. Supp. 711 (N.D. Ill. 1996) ..................................................................11

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................10

Defendants Chris Moehle, Robotics Hub Fund 1 LLC, and Coal Hill Ventures LLC (collectively, "Defendants") submit this brief in support of their Motion for Summary Judgment.

## I.     <u>INTRODUCTION</u>

Despite filing this action nearly four years ago, Plaintiff Eric Daimler ("Daimler") has failed to adduce a scintilla of evidence to carry his burden of proof on his claims for fraud and breach of contract.  Daimler's failings were predictable.  After the Court dismissed Daimler's original complaint, *sua sponte*, the Court dismissed 16 of the 18 counts of the First Amended Complaint upon Defendants' motion.  ECF No. 23.  The gist of Daimler's dismissed claims was that Defendants fraudulently induced him to join Robotics Hub and Coal Hill (collectively, the "Companies") by orally misrepresenting the terms under which he would receive an interest in the Companies.  The Court dismissed those claims because bold text on the front pages of the agreements that Daimler reviewed and signed belied his claims for fraud and because Daimler could not plausibly assert any injury resulting from the alleged fraud.  *See* ECF No. 22 at 13.

With the main thrust of his complaint gutted, Daimler amended his complaint four additional times, asserting vague and inconsistent assertions of wrongdoing by Defendants.  In his now Fifth Amended Complaint ("FAC"), ECF No. 86, Daimler:

- asserts claims for fraudulent inducement based upon the assertion that Daimler walked away from $10 million of investments in another company he formed and joined the Companies based solely on Defendants' supposed **verbal** representation that General Electric Ventures ("GEV") had "committed" to investing $20 million in a fund the Companies managed (the "GEV Representation");

- asserts a breach of contract claim against Coal Hill for allegedly breaching an **oral** agreement to provide Daimler with unspecified units in Coal Hill; and

- seeks $10 million in damages based upon the supposed value of lost opportunities and unissued units in Coal Hill.

Notably, the alleged GEV Representation that now forms the entirety of Daimler's fraud claims was an afterthought in his first two complaints—referenced in only 5 of 209 paragraphs.  *See*

*generally* ECF No. 1.  Nor did Daimler even mention his supposed lost $10 million of investments until his third amended complaint.  ECF No. 33 And Daimler eschewed retaining an economic expert to quantify his supposed monetary harm, relying instead on an untimely "non-retained expert" opinion from his longtime business partner and friend, James Fee ("Fee").  Fee, however, completely undermined Daimler's damages claim by testifying that:

- with respect to calculating the monetary value of Daimler's lost business opportunities, it is "a hard thing to say . . . In fact, you cannot say," SMF ¶ 145;[1] and

- with respect to the value of the units Daimler is purportedly entitled to, "[w]hat are the value of the units [Daimler] should have been provided?   I don't know."  SMF ¶ 131.

Daimler's allegations, however, are not merely implausible, they are utterly unsupported by the evidentiary record.  Accordingly, the Court should grant summary judgment to Defendants for the following reasons.

 ***First***, Daimler cannot carry his burden to prove, by clear and convincing evidence, each of the elements of his fraudulent inducement claims (Counts One, Two, and Four).  Specifically:

- Daimler has failed to proffer any documentary evidence to establish that Defendants made the alleged GEV Representation, relying solely on his own vague self-serving testimony which cannot clear the high hurdle for summary judgment on claims that require clear and convincing evidence;

- even if the evidence sufficiently showed Defendants made the alleged GEV Representation, Daimler's testimony demonstrates that any such representation was nothing more than a hope for a future outcome which is not actionable as a matter of law;

- Daimler has failed to proffer any evidence to establish that Moehle had any intent, motive, or reason to mislead or deceive Daimler with regard to the alleged GEV Representation;

- Daimler cannot establish justifiable reliance; and

- Daimler has failed to proffer evidence to establish that he suffered any actionable harm.

Daimler's failure to proffer clear and convincing evidence to support just one of the elements

---

[1] Citations to the record in this Brief are to the particular numbered paragraph of Defendants' Concise Statement of Material Facts ("SMF") filed concurrently herewith as: "SMF ¶ ____."

above, let alone all of them, is fatal to his fraud claims.

*Second*, with respect to his breach of contract claim, Daimler has failed to carry his burden to prove that he entered into an oral agreement with Coal Hill (through Moehle) to issue units in Coal Hill in exchange for unspecified monetary expenditures that Daimler characterizes as capital contributions.  Specifically, Daimler:

- failed to proffer any documentary evidence of the purported agreement and could not testify about any of the details regarding when or how the parties came to the agreement;

- could not identify any of the material terms of the agreement, including how much money he supposedly contributed, how many units he would receive, what kind of units they were, or the vesting terms of the units; and

- has not proffered any evidence of the alleged damages he suffered.

Daimler admitted *in writing* prior to filing his first complaint that he was "pisse[d] off" after being properly removed as a member of the Companies and "prepared for [the] uneconomic investment" of pursuing this lawsuit to harm Defendants.  SMF ¶ 142.  After months of discovery, the evidence, or lack thereof, confirms that Daimler has pursued this action not because he has viable claims but purely out of vindictiveness.  It is time for the Court to put an end to Daimler's knowingly unjustified abuse of the legal process.

## II.  UNDISPUTED FACTS

### A.  The Formation of the Defendants' Business.

Moehle formed Coal Hill in April 2015 to invest in early-stage robotics companies.  SMF ¶ 1. To subsidize Coal Hill's startup costs, Moehle negotiated and obtained a one-time $75,000 sponsorship gift from GEV, General Electric's venture capital and investment arm.  SMF ¶ 2.  In August 2015, Moehle and Coal Hill publicly announced the formation of Robotics Hub to identify and guide startup companies in the field of advanced robotics.  SMF ¶ 3.  Moehle also formed Robotics Hub Fund 1, LP (the "Fund") to be the vehicle through which Robotics Hub would invest

in early-stage robotics companies.  SMF ¶¶ 5–6. GEV and Carnegie Mellon University, Moehle's former employer, issued a joint press release regarding their support of Robotics Hub.  SMF ¶ 4.

**B.    Daimler's Prior Investment Venture.**

In 2011, Daimler formed an investment venture called Skilled Science to commercialize innovations coming out of academia.  SMF ¶¶ 7–8.  Daimler initially capitalized Skilled Science with less than $500,000.  SMF ¶ 11.  Skilled Science proved to be an unsuccessful venture.  Despite approximately four years of trying, Skilled Science never obtained any funding beyond Daimler's initial capitalization and never obtained rights to any innovations from academia for commercialization.  SMF ¶¶ 12–13.  For example, even though by at least April 2014 Daimler had prepared a draft sponsorship agreement for third party investments in Skilled Science, he admitted that no individual or entity ever signed a sponsorship agreement with Skilled Science.  SMF ¶¶ 30–31, 35.  Fee, who worked at Skilled Science, confirmed that Skilled Science did not sign a single term sheet with any potential investor and never moved past the phase of simply "talking terms" with potential investors.  SMF ¶¶ 32–36.[2]  As Fee acknowledged, even though Skilled Science had spoken to potential investors, "one of the rules of capital raising is that it's not money until it's in the bank" such that an opportunity "doesn't count unless it happens."  SMF ¶¶ 38–39.  Consistent with the foregoing, Daimler's files included a document describing the "current reality" of Skilled Science around August 2015 as: (1) "hav[ing] no contract signed;" (2) "start[ing] conversations about this in fall '13;" and (3) "hav[ing] received, at various times, commitments of as much as 3.5M" but which Daimler admitted never came to fruition.  SMF ¶ 41.

Daimler nonetheless asserts that in the fall of 2015, Skilled Science had commitments to invest a total of $10 million from a company called Two Sigma and from the Sackler family.  With

---

[2] Despite spending more than half of his time on work for Skilled Science, Fee did not even list Skilled Science on his resume, SMF ¶ 51, a telling admission about the viability of the venture.

regard to Two Sigma, Daimler actually sought investment beginning no later than September 2014 and even provided Two Sigma with a memorandum of understanding reflecting the terms of a potential investment.   SMF ¶ 16.   Two Sigma, however, never signed the memorandum of understanding and never invested in Skilled Science.  SMF ¶ 19.  Daimler also failed to produce any documents in or around fall of 2015 that reflect discussions with Two Sigma to invest.

As to the Sackler family, Daimler claims that a third party, Adam Fried, was to "verbally advocate" to the Sackler family, in or around August 2015, to invest in Skilled Science.  SMF ¶ 22.   Daimler, however, had no knowledge of whether Fried ever verbally advocated for an investment in Skilled Science and could not recall meeting anyone from the Sackler family.  SMF ¶¶ 23–26.  Daimler also admitted that there are no documents reflecting that Fried verbally advocated for an investment or documents reflecting a decision by the Sackler family to invest in Skilled Science.  SMF ¶ 25.  As Daimler conceded, documents are not created until a decision to invest is made.  *Id.*  Confirming that there was no commitment from the Sackler family to invest in Skilled Science, Daimler and Fried exchanged emails in late September 2015, after Daimler claims he decided to join the Companies, wherein neither Daimler nor Fried discussed a commitment to invest in Skilled Science or even any commitment to "verbally advocate" for such an investment.  SMF ¶ 27.  To the contrary, Fried indicated that he would be out of town until October 5 and would "then have more color on how we would like to proceed." SMF ¶ 28.

## C.    Daimler Joins the Companies.

After Robotics Hub was publicly announced in August 2015, Daimler and Moehle were introduced through a mutual friend.  SMF ¶ 52.  Following that introduction, Daimler and Moehle engaged in discussions about Daimler joining the Companies.  *See* SMF ¶¶ 53–64.  In addition, between October 2015 and March 2016, Moehle and Daimler made presentations about the Companies and the Fund to possible third-party investors.  SMF ¶ 65.  Daimler alleges that, during

those meetings, Moehle made the supposed GEV Representation. *See* SMF ¶¶ 66–68. Daimler did not proffer evidence from a single potential investor claiming that Moehle ever made the alleged GEV Representation. *See* SMF ¶ 69. In fact, Daimler never even reached out to any of those individuals about his claims and failed to seek discovery from any such investors even though he identified them in his initial disclosures. *See* SMF ¶ 70. Daimler also failed to produce or identify a single document where the alleged GEV Representation was made. And even though Daimler asserts Moehle made the alleged GEV Representation for nearly eight months before he executed the agreements by which he joined the Companies, Daimler admitted that he did not pursue any meaningful investigation into whether GEV had committed to invest $20 million in the Fund, including admitting that he:

- did not ask Moehle whether Defendants had a signed commitment from GEV (SMF ¶ 101);

- could not recall taking any steps to double-check the alleged GEV Representation beyond reviewing in a "cursory way" publicly available information related to GE's operations to determine if a spinoff of its financial arm seemed reasonable (SMF ¶ 102);

- did not ask any questions about the nature, extent, or likelihood of GEV's commitment despite multiple meetings with GEV representatives (SMF ¶ 103);

- did not read the legal agreement that GEV and Coal Hill entered into relative to GEV's initial sponsorship gift (SMF ¶ 104);

- read the private placement memorandum ("PPM") that the Fund provided to investors, which did not include any disclosure of a GEV $20 million "commitment" and instead detailed GEV's "one time" sponsorship gift as a "third party relationship" (SMF ¶ 105); and

- did not speak with anyone other than a single mutual friend before allegedly deciding to wholly trust Moehle, "walk away" from $10 million in investments and enter into a business relationship with Moehle (SMF ¶ 106).

Daimler's sole evidence that Moehle made the alleged GEV Representation is his own self-serving testimony, which, as detailed *infra* at Section IV.B.1., is contradicted throughout the record, including by the documentary evidence, Daimler's testimony and the testimony of his own

expert.  Daimler also: (1) admitted he could not recall any of the details about the meetings during which Moehle purportedly made the GEV Representation, other than the purported GEV Representation, *see* SMF ¶¶ 57–64; (2) conceded he knew that the GEV investment was contingent upon a regulatory spin-off and there was no "legally binding" agreement for the investment, SMF ¶¶ 89–90;[3] and (3) could not recall how, when, or why he came to learn that the GEV Representation was allegedly untrue.  SMF ¶ 108.

Eight months after meeting Moehle, Daimler executed amended operating agreements for the Companies in April 2016 by which Daimler became a member of the Companies.  SMF ¶ 109.  At this same time, Daimler executed Common Unit Agreements that granted him 42 common units in the Companies that only vested if Daimler provided full-time services to the Companies by March 23, 2017.  SMF ¶ 110.  Under the Common Unit Agreements, "Full Time Service" meant "providing greater than 95% of his professional activities . . .to a combination of the Compan[ies] . . . ."  SMF ¶ 112.

**D.     Daimler Fails to Honor His Commitments to the Companies and the Relationship Between Daimler and Moehle Breaks Down.**

In 2016, Daimler was appointed as a Presidential Innovation Fellow for the Office of Science and Technology Policy.  SMF ¶ 132.  The fellowship was expected to continue until January 2017.  SMF ¶ 134.  While Daimler was engaged in his fellowship, Moehle believed that Daimler was not devoting sufficient time to the Companies.  SMF ¶ 135.  As a result, in January 2017, Moehle and Daimler discussed Daimler's future role with the Companies.  SMF ¶ 136.  After the meeting, the Boards of the Companies voted on whether to offer Daimler full-time employment.  SMF ¶ 137.  Daimler voted in favor; Moehle voted against, resulting in a "deadlock."

---

[3] Fee similarly testified that any investment would have been contingent upon a successful "spin-off."  SMF at ¶ 93.

SMF ¶¶ 138–139.  On March 27, 2017, the deadlock advisor broke the deadlock by voting against offering Daimler full-time employment.  SMF ¶ 140.  Daimler thereafter was removed from the Companies.  SMF ¶ 141.

### III.    PROCEDURAL HISTORY

Daimler filed his original complaint on February 5, 2018.  *See* ECF No. 1.  After the Court dismissed the complaint *sua sponte* for lack of subject matter jurisdiction, Daimler filed a 209-paragraph First Amended Complaint, which included 18 counts covering a hodge-podge of contract, fraud, tort, and equitable causes of action.  *See* ECF No. 4.  Defendants filed a motion to dismiss, which the Court granted as to all claims except for Daimler's "thinly pled" contract claims and with leave for Daimler to "re-plead the allegations regarding GE's potential investment."  ECF No. 22 at 18, 22.  Daimler's FAC is now the operative complaint.  *See* ECF No. 86.

In the FAC, Daimler asserts four causes of action—one count of fraudulent inducement against each of the Defendants and a breach of contract count against Coal Hill.  *See id.* at ¶¶ 115–38.  In essence, Daimler asserts that from August 2015 through at least April 2016, Moehle fraudulently represented to Daimler and to dozens of potential investors that GEV had committed to investing $20 million in the Fund, and that as a result of this purported representation, Daimler walked away from $10 million in committed investments in Skilled Science.  *See id.*  Additionally, Daimler asserts that Moehle orally agreed to grant Daimler additional units in Coal Hill in exchange for unspecified monetary expenditures allegedly made by Daimler.  *See id.* at ¶ 86–91.

With regard to Daimler's alleged damages, Daimler did not retain an economic expert but belatedly served a "non-retained expert" disclosure for Fee, his friend and business partner.[4]  SMF

---

[4] Fee and Daimler have been friends for over a decade.  SMF ¶ 42.  During this time, Daimler repeatedly retained Fee to assist him with his various investment ventures.  SMF ¶ 43.  While Fee worked for SpinGlass and Conexus, Daimler was Fee's "sole source of income."  SMF ¶ 47.

¶ 143.  In the disclosure, Daimler asserted Fee was "qualified to serve as a Business Development Executive expert commenting on issues related to damages" and would opine on (1) "the cost of lost opportunities borne by Daimler because he left [Skilled Science] to enter into a partnership with Moehle"; and (2) "the value of units that should have been provided to Daimler in return for his investment in the company, Robotics Hub."  SMF ¶¶ 143–144.  During his deposition, Fee admitted that he was unable to provide an opinion on either score: (1) on calculating the monetary value of Daimler's lost business opportunities, Fee admitted that it is "a hard thing to say . . . In fact, you cannot say," SMF ¶ 145; and (2) on calculating the value of the units, Fee stated "[w]hat are the value of the units he should have been provided?  I don't know." SMF ¶ 147.

## IV.   ARGUMENT

### A.   Fed. R. Civ. P. 56 Requires Courts to Grant Summary Judgment Where There is No Genuine Issue of Material Fact And the Movant Is Entitled to Judgment As a Matter of Law.

Summary judgment should be granted if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[A] court must assess the material facts against the proof required of the plaintiff on the substantive issues."  *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1131 (3d Cir. 1995).  A court should grant summary judgment when the moving party has shown that "there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Here, Daimler must prove his fraud claims by clear and convincing evidence.  *Estate of Boscio*, 412 A.2d 505, 506 (Pa. 1980) (applying clear and convincing standard to fraud claim); *Delahanty v. First Pa. Bank NA*, 464 A.2d 1243, 1252–54 (Pa. Super. Ct. 1983) (same).  Clear and convincing evidence requires evidence that is "clear, precise, and indubitable."  *Delahanty*, 464 A.2d at 1253.  On summary judgment, the Court must "decide as a ***matter of law*** before [it] submits

9

a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case." *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1054–55 (E.D. Pa. 1993) (emphasis added) (citing *Mellon Bank Corp. v. First Union Real Est.*, 951 F.2d 1399, 1409 (3d Cir. 1991); *Beardshall v. Minutemen Press Int'l, Inc.*, 664 F.2d 23, 26 (3d Cir. 1981)).  For his breach of contract claim, Daimler must satisfy the preponderance of the evidence standard.  *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa. Super. Ct. 1982).

**B.      Daimler Cannot Satisfy His *Prima Facie* Burden to Prove Fraudulent Inducement.**

To establish fraudulent inducement, Daimler must demonstrate each of the following elements by clear and convincing evidence:  (1) a material representation; (2) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (3) made with the intent to induce the other to rely on the representation; (4) justifiable reliance; and (5) resulting injury proximately caused by that reliance.  *Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544, 550 (W.D. Pa. 2003); *Delahanty*, 464 A.2d at 1252; *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 454 (Pa. 1971).  Daimler cannot proffer evidence to establish any of the required five elements—let alone all of them.

1.      *Daimler's Sole Evidence of Any Purportedly Fraudulent Representation Is His Own Self-Serving Deposition Testimony.*

The alleged GEV Representation, *i.e.*, Moehle's purported representation that GEV had "committed" to investing $20 million in the Fund, is the only statement that Daimler relies upon for his fraud claims.  Yet, although he asserts Moehle made the alleged GEV Representation over a period of eight months to dozens of possible investors in multiple meetings, Daimler has failed to proffer a single document where the representation was made and failed to proffer evidence (documentary or testimony) from any of the individuals who allegedly were in meetings where Moehle made the alleged GEV Representation.  Moreover, Daimler's own expert contradicted

Daimler's allegations, testifying that Daimler told him that GEV may make an investment in the "neighborhood of *$5 million*," and that any such investment would take place in a "potential next round" of funding. SMF ¶¶ 91-92 (emphasis added).

Consistent with the foregoing, Daimler's evidence of the alleged GEV Representation consists solely of self-serving testimony that, as a matter of law, is insufficient to carry his burden of clear and convincing evidence. *Lind v. Jones, Lang LaSalle Am., Inc.*, 135 F. Supp. 2d 616, 621 (E.D. Pa. 2001) ("plaintiff's evidence is insufficient to establish a prima facie case of fraud" because "the only evidence which Plaintiff has adduced consists of his own deposition testimony . . ."); *see also Weeks v. Samsung Heavy Indus. Co.*, 933 F. Supp. 711, 715 (N.D. Ill. 1996) (plaintiff's deposition testimony insufficient to survive summary judgment); *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) ("self-serving deposition testimony is insufficient to raise a genuine issue of material fact"); *Walsh v. Fusion Japanese Steakhouse, Inc.*, No. 2:19-cv-00496-CCW, 2021 WL 2917795, at *11 (W.D. Pa. July 12, 2021) ("conclusory self-serving affidavits are insufficient to withstand a motion for summary judgment").

Like *Lind* where the plaintiff had no evidence of the alleged misrepresentation other than plaintiff's own testimony, the Court should find Daimler's testimony on the alleged GEV Representation insufficient to survive summary judgment, particularly where it is contradicted by the evidentiary record. Daimler was unable to provide any details regarding the meetings during which Moehle purportedly made the GEV Representation, claiming in every instance that he "could not recall" anything other than the GEV Representation. *See* SMF ¶ 57–64. Indeed, Daimler identified meetings in the FAC where Moehle supposedly made the GEV Representation but where either Daimler or Moehle was not present, making Daimler's allegations impossible (*compare* SMF ¶¶ 71, 78 *with* SMF ¶¶ 72–77, 79–82). And Daimler cannot identify a single

document produced by either party that corroborates his testimony that Moehle made the alleged GEV Representation.  The record is devoid of (1) a single email between Daimler and Moehle in which Moehle made the GEV Representation; (2) a single email to or from any potential investor suggesting that Moehle made the GEV Representation; or (3) any marketing material, press release, draft agreements, or PPMs where Moehle made the alleged GEV Representation.  The absence of any documentary evidence supporting Daimler's allegations is striking given that Daimler asserts that Moehle made the GEV Representation to "every" potential investor in the Fund for more than eight months.  SMF ¶ 66.  Daimler further could not explain why contemporaneous documents did not even mention GEV in a list of possible "lead investors" or "near term potential deals" if, in fact, Moehle was making the GEV Representation. SMF ¶ 96.

Even if Daimler's testimony were sufficient to prove by clear and convincing evidence that Moehle made the alleged GEV Representation, the record is devoid of any evidence showing that the representation was false, *i.e.*, that GEV never expressed an interest in possibly investing in the Fund in the future.  Indeed, the undisputed evidence is that GEV requested information relating to the Fund in the winter of 2016.  SMF ¶ 87–88.  Daimler conceded that he could not recall how, when, or why he came to "learn" that the purported representation was untrue.  SMF ¶ 108.  In the absence of such testimony or any documentary evidence proving the falsity of the alleged GEV Representation, Daimler's fraud claims fail as a matter of law.  *See JHNY Corp. v. Dana Corp.*, No. 2:05-cv-02829, 2006 WL 8459414, at *7 (E.D. Pa. Apr. 13, 2006) (granting summary judgment where there was no evidence that the representation was false).

> 2.   *Even If Defendants Had Made Any Representations Relative to a GEV $20 Million Commitment, Such Representations Are Not Actionable False Statements.*

Assuming, *arguendo*, that Daimler's testimony sufficiently demonstrated that Moehle made the GEV Representation and it was false, the alleged GEV Representation is not an

actionable statement.  It is black-letter law that statements that relate to opinions or future events that may never come to fruition are not actionable.  *Lookout Windpower Holding Co., LLC v. Edison Mission En.*, 714 F. Supp. 2d 547, 556 (W.D. Pa. 2010) ("Predictions about the future and expressions of opinion cannot support a common law fraud claim."); *Coleman*, 319 F. Supp. 2d at 551 (to be actionable, a statement must be more than a "general expression of hope"); *Dunkin' Donuts Franchised Rests., LLC v. Claudia I, LLC*, 998 F. Supp. 2d 383, 389 ("A statement as to future plans or intentions will not satisfy the falsity element of fraud unless the speaker knowingly misstates his true state of mind.") (E.D. Pa. 2014).

It is undisputed that the alleged GEV Representation was not a representation about a past or existing fact but addressed a future event that Daimler knew may never come to fruition. Daimler admitted that he understood any purported "commitment" to invest by GEV was contingent upon GEV successfully spinning out its financial arm and that there were no written or other legally binding agreements between Defendants and GEV for the supposed "commitment." SMF ¶¶ 89–90.  Daimler also conceded that "[t]he trigger of the $20 million would not occur until that spinout happened.  That was ***definitely a risk*** that I was taking."  SMF ¶ 90.  Fee similarly testified that Daimler told Fee that any purported investment would have been contingent on a "spin-off," and was "dependent upon some sort of divestiture."  SMF ¶¶ 93-94.  Stated differently, even if Moehle had made representations relating to an investment from GEV, any such representations was necessary a prediction about future events—*i.e.*, the purported "spin-off"— and Defendants' opinions as to the likelihood of a positive outcome from those future events.

Additionally, the alleged GEV Representation indisputably was based on the conduct of an unrelated third-party—not Defendants' own conduct.  Accordingly, the alleged GEV Representation, at most, would reflect only "their opinions as to whether or not" GEV would make

any such investment, which "cannot constitute misrepresentations." *Chetty Holdings, Inc. v. NorthMarq. Cap., LLC*, No. 11-4640, 2012 WL 1521857, at \*10 (E.D. Pa. May 1, 2012) (citing *Coleman*, 319 F. Supp. 2d at 551).

        3.      *Daimler Cannot Proffer Any Evidence Showing Knowledge or Intent.*

To prove fraud, a plaintiff must proffer evidence that the speaker intended to deceive, manipulate, or defraud. *See Pro Spice, Inc. v. Omni Trade Grp., Inc.*, 128 F. App'x 836, 839 (3d Cir. 2005) (granting summary judgment where there was no evidence of intent to defraud). Despite having years to conduct discovery, Daimler has failed to come forward with any evidence to prove that Moehle "lied about GE's commitment."

Daimler testified he did not know how, when, or why he came to learn that the purported GEV Representation was "untrue." SMF ¶ 108. This failing alone is sufficient to grant summary judgment as the Court allowed Daimler to proceed with his fraud claim only because Daimler had alleged that "'he came to understand among other things [that] *Moehle had lied about GE's commitment.*'" *Daimler v. Moehle*, No. 18-165, 2019 WL 2422843, at \*6 (W.D. Pa. Jun. 10, 2019) (quoting ECF No. 33 at ¶ 114) (emphasis original).

Moreover, there is no evidence that would give rise to an inference of reckless or conscious behavior by Moehle. *See Coleman*, 319 F. Supp. 2d at 552. To the contrary, Daimler and Moehle participated in a November 2015 meeting with GEV prior to which they discussed "pitching" GEV on an "initial commitment" of $500,000 scaling up to $25 million. SMF ¶ 85. This "planned pitch" not only contradicts Daimler's allegations that Moehle made the GEV Representation, but also provides compelling, unrebutted evidence that completely undercuts any assertion that Moehle had an intention to commit fraud (*e.g.*, Moehle would not have invited Daimler to pitch an investment to GEV if he was simultaneously representing to Daimler that he had already

14

secured an investment in excess of the amount sought with the pitch, nor would he have invited Daimler to meetings with key GEV representatives and risk being caught in his lie).  Further establishing Daimler's failure to prove fraudulent intent, it is undisputed that GEV expressed an interest in supporting the Companies at least as late as the winter of 2016.  SMF ¶ 87.  As Daimler cannot point to any evidence that would give rise to an inference of reckless or conscious behavior by Moehle, let alone a strong inference as required, Daimler has failed to carry his burden to prove the necessary scienter to maintain his fraud claims.

> 4.    *Daimler Cannot Demonstrate that He Justifiably Relied on Any Purported Representation.*

Daimler cannot proffer sufficient evidence to establish by clear and convincing evidence that he justifiably relied on the alleged GEV Representation.  "Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false."  *Coleman*, 319 F. Supp. 2d at 552 (citations omitted).  For reliance to be justified, it must be ***reasonable***.  *Porecco v. Porecco*, 811 A.2d 566, 571 (Pa. 2002).  "Determining whether reliance on a misrepresentation is justified is generally dependent, at least in part, upon such factors as the respective intelligence and experience of the parties, the relationship between them ***and the opportunities, if any, to ascertain the truth of the representation at issue*.**"  *Benevento v. Life USA Holding, Inc.*, 61 F. Supp. 2d 407, 416–17 (E.D. Pa. 1999) (emphasis added); *Tran v. Metro Life Ins. Co.*, 408 F.3d 130, 135 (3d Cir. 2005).  While the law does not impose a "duty to investigate," "[t]he recipient of a fraudulent misrepresentation is . . . required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 12 (Pa. Super. Ct. 2004) (quoting RST 2d Torts § 541); *Casso v. Pa. R.R. Co.*, 219 F.2d 303, 305 (3d Cir. 1955) (same);

*see also Porreco*, 811 A.2d at 571 ("[W]e hesitate to find reliance justified where the party claiming reliance had an adequate opportunity to verify the allegedly fraudulent statements."). Here, each of the factors relevant to proving justifiable reliance demonstrates that Daimler's supposed reliance on the alleged GEV Representation was unreasonable.

*First*, Daimler purports to be an experienced investor and businessman. Daimler touts that he has "over 20 years of experience in the field as an entrepreneur, investor, academic researcher, and policymaker." SMF ¶ 9. He also claims to have "co-founded six technology companies that have done pioneering work in fields ranging from storage software systems to statistical arbitrage." *Id*. He served as a Presidential Innovation Fellow for the Office of Science and Technology Policy where he asserts he "helped drive the agenda for US leadership in research, commercialization, and public adoption of AI & Robotics." SMF at ¶ 10.

*Second*, Daimler's alleged reliance *solely* on the alleged oral GEV Representation was not reasonable given the nature of the transaction. Daimler testified that the GEV Representation was the sole reason he decided to "walk away" from a purported $10 million in investments and join the Companies. SMF ¶ 99. He also testified that the GEV Representation was "the single most important issue of our pitch" to investors. SMF ¶ 98. Faced with a similar situation in connection with his failed Skilled Science venture, Daimler actually proposed an agreement to Two Sigma that would have authorized Skilled Science to represent that Two Sigma had committed to invest $5 million. SMF ¶ 17. Daimler testified that having a "committed *signed* investor" "makes all the difference" to starting a business like Skilled Science. SMF ¶ 18 (emphasis added).

Moreover, Daimler has alleged that Moehle informed him not to discuss the GEV Representation with anyone, despite the fact that it would be significant to their pitch. SMF ¶ 55. Daimler also testified he reviewed and read the PPM, which makes no reference to the GEV

Representation.  SMF ¶ 105.  Yet, despite making the decision to supposedly walk away from $10 million in investments, Daimler has admitted that:

- he did not ask Moehle or anyone else whether Defendants had a signed commitment from GEV (SMF ¶ 101);

- despite Moehle's purported representation starting in August 2015 that the "spin-off" on which the GEV investment depended would take place in a matter of months if not weeks, Daimler never asked for additional details even though eight months had passed by the time he signed the agreements to join the Companies in April 2016 (*see* SMF ¶107);

- he could not recall taking any steps beyond reviewing in a "cursory way" publicly available information related to GE's operations to determine if a spinoff of its financial arm seemed reasonable (SMF ¶ 102);

- during multiple meetings with GEV representatives, Daimler did not ask any questions about the nature, extent, or likelihood of GEV's commitment and could not recall anyone at GEV ever representing that they had committed $20 million to the Fund (SMF ¶ 103);

- he did not read the actual legal agreement between GEV and Coal Hill relative to GEV's obligations to Coal Hill (SMF ¶ 104);

- he did not investigate or inquire why GEV's alleged commitment was not identified in the PPM, even though he admitted it would be material (*see* SMF ¶ 105); and

- he did not speak with anyone other than a single mutual friend of the parties before deciding to wholly trust Moehle and enter into a business relationship with Moehle (SMF ¶ 106).

In short, Daimler has admitted that he conducted virtually no independent diligence to determine the veracity of Moehle's purported statements.  Instead, Daimler contends that he blindly trusted Moehle (with whom he had no prior relationship) and Moehle's supposed representations relative to an investment fund (with which Daimler had no personal experience or knowledge, had not done its first closing, and was yet to make an investment).  Daimler was presented with myriad opportunities, including multiple meetings with Moehle and GEV, during which he could have made some attempt to investigate the veracity of Moehle's purported statements.  SMF ¶¶ 83–88.  In placing his blind faith in a stranger, Daimler by his own allegations

purportedly walked away from $10 million in secured investments[5] without conducting any diligence despite the fact that an investment of $20 million could have been easily verified. Daimler elected not to avail himself of any such opportunities, choosing instead to play ostrich, which precludes him from proving justifiable reliance as a matter of law.

As the court found in both *Greenberg* and *Lind*, reliance is not reasonable where, as here, a sophisticated, experienced businessman blindly trusts the promisor's oral representations relating to an "uncertain prospect" and fails to seek confirmation in writing relative to a multimillion dollar transaction. *Greenberg*, 816 F. Supp. at 1056–57; *Lind*, 135 F. Supp. 2d at 623.

<div align="center">

*5.    Daimler Cannot Demonstrate That He Was Damaged.*

</div>

Daimler's failings in proof on his fraud claims extend to damages. Daimler has proffered no evidence to show that he suffered any economic harm as a result of the purported GEV Representation. "[A] party asserting a fraud claim 'must demonstrate that the fraud proximately caused economic harm.'" *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 153 F. Supp. 3d 778, 814 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017) (quoting *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1190 (Pa. Super. Ct. 2005)).

Daimler has alleged that the economic harm he suffered from Defendants' supposed fraud consisted of his decision to "walk[] away" from "parties willing to invest" $10 million in Skilled Science. SMF ¶ 99. Daimler testified that there were two parties – Two Sigma and the Sackler family – who were each willing to invest $5 million. SMF ¶ 15. On the other hand, Fee, Daimler's supposed damages expert and his partner in the Skilled Science venture, testified there were supposedly a half a dozen "investors that were moving toward engaging with us [Skilled Science] to deploy capital." SMF ¶ 33. Although Fee identified the Sackler family as one of the potential

---

[5] As explained in Section III.B.5, *supra*, the evidence established that these purported "investments" are but a figment of Daimler's imagination.

<div align="center">

18

</div>

investors, he did not identify Two Sigma.  SMF ¶ 37.  He also testified that it was a different entity, Wood Creek Capital, that "was talking about a potential 5 million" and the others were pieces of a possible investment.  *Id*.  While the two individuals who ran Skilled Science cannot get their stories straight, it is undisputed that Daimler does not have clear and convincing evidence of economic harm resulting from the supposed fraud.  In fact, his damages claim is nothing more than speculation about a failed business that, despite existing for more than four years, never obtained a single investment from a third party.  *See Martelet v. AVAX Tech., Inc.*, No. 09-cv-2925, 2012 WL 1570964, at *10 (E.D. Pa. May 3, 2012).  In *Martelet*, the court dismissed defendants' counterclaims seeking lost profit damages on summary judgment where "there is no explanation of how [the profits identified in a presentation serving as the sole evidence were] calculated, nor is there any evidence supporting those projections." *Id.*

Daimler founded Skilled Science in 2011 and capitalized it with less than $500,000.  SMF ¶ 7, 11.  From 2011 through 2015, Skilled Science never received any additional investments and never even executed an agreement that would have provided for such investments.  SMF ¶¶ 12, 31.  Daimler also failed to produce a single document that reflected any investor decided to commit to invest in Skilled Science, let alone an executed document setting forth such a commitment. SMF ¶ 35.

As to the purported "commitments" Daimler specifically identified, Daimler was engaged with Two Sigma from at least as early as September 2014.  SMF ¶ 16.  At that time, Daimler provided Two Sigma with a draft term sheet to invest $5 million.  SMF ¶ 17.  The agreement was never signed.  SMF ¶ 19.  Later that month, Daimler asked Two Sigma if he could meet with Two Sigma's full investment committee which was required to get started on a "500K" investment. SMF ¶ 20.  Daimler never met Two Sigma's full investment committee at any time after September

2014.  SMF ¶ 21.  Daimler did not produce any further communications with Two Sigma regarding a possible investment in Skilled Science of any amount—let alone $5 million—prior to his introduction to Moehle.

Daimler similarly failed to proffer evidence of a purported commitment by the Sackler family to invest in Skilled Science.  Daimler never met with the Sackler family and failed to produce any documents that reflected a commitment to invest from the Sackler family.  SMF ¶ 25.  Indeed, Daimler conceded that that documents of that nature are not created ***until a decision to invest is made***.  *Id.*  Like in *Martelet*, Daimler's only "evidence" of the Sackler family's commitment is his testimony that a third party, Mr. Fried, agreed to make a "verbal advocacy" to the Sackler family to invest in Skilled Science.  SMF ¶ 22.  Daimler admitted there were no documents reflecting Mr. Fried's agreement or the nature of the verbal advocacy.  SMF ¶ 26.  Daimler also had no knowledge of whether anyone ever actually verbally advocated to the Sackler family to invest in Skilled Science.  SMF ¶ 23.  Confirming the lack of any evidence that the Sackler family had committed to invest in Skilled Science, Daimler and Fried exchanged emails in late September 2015 and neither Daimler nor Fried discussed a commitment to invest in Skilled Science or even any commitment to "verbally advocate" for such an investment.  SMF ¶ 27.  To the contrary, Fried indicated that he would be out of town until October 5 and would "then have more color on how we would like to proceed."  SMF ¶ 28.

Having produced no documents or testimony during fact discovery to support his assertion that Skilled Science was on the verge of $10 million in investments, Daimler belatedly identified his friend Fee as a "non-retained expert" who would purportedly support his damages claims.  SMF ¶ 143.  Fee's testimony did the exact opposite, confirming that Daimler's alleged economic harm was nothing more than speculation.  Among other things, Fee testified:

- that Skilled Science had no written investment agreements or commitments (SMF ¶ 35);

- that Skilled Science "had a credible thesis, a credible principle, and it established credible engagement with a number of ***potential investors***" (SMF ¶ 36 (emphasis added));

- that, at best, Skilled Science was "talking terms" (*i.e.*, "period, return, risks") with potential investors but never drafted a PPM for an investment (SMF ¶ 32, 34–35);

- that any "lost business opportunity" for Skilled Science was dependent upon whether "Skilled Science would have been able to build a portfolio successfully that would have made for a big equity growth" (SMF ¶ 146);

- that investment is a world of "shoulda, coulda, woulda" where an investment "doesn't count unless it happens" (SMF ¶ 39); and

- that "one of the rules of capital raising is it's not money until it's in the bank" (SMF ¶ 38).

Ultimately, Fee conceded that there is no way to value Daimler's purported lost opportunities. SMF ¶ 145.

At bottom, the undisputed evidence demonstrates that Skilled Science existed for over four years, never obtained any third-party investments and never acquired any intellectual property to commercialize as was its purpose.  There is no documentary evidence to demonstrate that Skilled Science was on the verge of any investments, which was confirmed by Daimler's and Fee's testimony.  Thus, Daimler has not introduced any evidence to prove non-speculative damages as is necessary to carry his burden on his fraud claims.

## C.    Daimler Cannot Satisfy His *Prima Facie* Burden to Prove Breach of Contract.

Daimler has not proffered evidence to prove his breach of contract claim, *i.e.*, Coal Hill breached an oral agreement to issue units in exchange for purported monetary expenditures Daimler made. To prevail on a claim for breach of contract, a plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013).  To prove the existence of a contract, a party must establish (1) "both parties manifested an

intention to be bound by the agreement;" (2) "the terms of the agreement are sufficiently definite;" and (3) there was consideration. *Blair v. Scott Spec. Gases*, 283 F.3d 595, 603 (3d Cir. 2002). Daimler cannot carry his burden for the following reasons.

*First*, Daimler has not proffered any evidence of the essential terms of the purported agreement to issue additional unspecified units in exchange for monetary contributions. Under Pennsylvania law, "vague statements that fail to include material terms [of the contract], are indicia that [oral] agreements are too uncertain to be enforced." *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018). Daimler admitted that he did not know any of the material terms under which Moehle (on behalf of Coal Hill) agreed to treat purportedly unreimbursed payments by Daimler as capital contributions entitling Daimler to units in Coal Hill. SMF ¶ 127. Daimler testified that he could not recall: (1) what amount of money was involved in the agreement; (2) how many units the parties purportedly agreed he would receive; (3) what kind of units under the Operating Agreement he would receive—"Common Units" that entitle the holder to additional voting power or "Management Fee Units" that provide economic benefits only; or (4) how the units would vest. *Id.* In fact, Daimler disavowed all knowledge of anything about this purported oral agreement other than its supposed existence:

> Q: And you don't recall sitting here today any phone call where Mr. Moehle agreed to treat any financial contributions as capital contributions, is that right?
> A: …I don't recall any specific phone call.
> Q: How many units were you going to receive?
> A: I don't recall.
> Q: What kind of units were they?
> A: I don't recall.
> Q: What were the vesting terms?
> A: I don't recall.
> Q: How much money was going to be exchanged…Was it $200,000?
> A: I don't recall.

*Id.* (objections omitted). Under nearly identical circumstances, the court in *Ecore* explained:

> [T]he terms of the alleged October 2001 "Agreement" are too uncertain to

constitute an enforceable contract. Specifically, the alleged agreement does not identify what would constitute "reasonable compensation," how the compensation would be calculated, when it would be paid, whether it would be paid to Downey or one of his companies, or whether and to what extent Downey would share in the costs of procuring, enforcing, or defending the patents. Significantly, essential terms such as these were the subject of protracted negotiation when Dodge and Downey later exchanged written proposals for patent compensation. ***It defies reason to suggest that these parties would have agreed to be bound by an oral agreement that omitted any mention of such material terms***.

343 F. Supp. 3d at 490–91 (emphasis added).

***Second***, Daimler has no admissible evidence to support his assertion that he made unreimbursed monetary payments to Defendants. In his deposition, Daimler identified two payments he made to the Companies—one for $30,000 and another for $125,000. SMF ¶¶ 113–114. Daimler admitted he was repaid for both of those amounts. SMF ¶ 115. Daimler produced no credit card receipts, emails, or any similar documentation of other supposed unreimbursed monetary payments. Indeed, as Moehle testified, the Companies asked Daimler on multiple occasions to provide such documents and Daimler refused to do so. SMF ¶ 117.

In an attempt to manufacture evidence of supposed monetary expenditures, SMF ¶ 118, Daimler may point to an itemized list of supposed expenses that he produced during discovery. The Court should disregard this evidence for several reasons. First, Daimler was unable to testify about any of the specifics of the document, including who created it, when it was created, or why it was created. SMF ¶ 119. Daimler conceded that if he would have created the document, it was "very likely" he would have recalled doing so. SMF ¶ 120. Inadmissible, "unauthenticated documents may not be relied upon to defeat a motion for summary judgment." *Countryside Oil Co. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 295 n.66 (3d Cir. 2014).

Further, even if the document were considered, it is unreliable on its face as it identifies

expenses that cannot relate to Companies or for which Daimler had no information.  For example, the document lists a $15,000 payment to St. Maple 164 LLC—the LLC through which Fee was paid—on August 28, 2015, mere days after Daimler first met Moehle and before Fee had any introduction to Moehle.[6]  SMF ¶¶ 121–122.  The document also reflects that Daimler continued making $15,000 payments to Fee through St. Maple 164 LLC, even though Fee testified that he was being paid by Robotics Hub at $10,000 a month for his work and that he was "absolutely not" being paid a separate $15,000 for his work on Robotics Hub.  SMF ¶ 122.

The document also lists payments to a communications firm, Inside Revolution, Inc., dated January 1, 2016, which was months before Daimler signed the Operating Agreements.  SMF ¶ 123.  Daimler never informed Moehle that he was paying Inside Revolution and could not identify any specific service that Inside Revolution performed for the Companies.  SMF ¶ 124.  The document also contains multiple laptop purchases for which Daimler had no information, as well as non-specific block entries for travel that Daimler could not specifically attribute to the Companies.  SMF ¶¶ 125–126.  Without any information about the supposed expenses and any evidence that Daimler and Moehle specifically agreed that such expenses would be treated as capital contributions, Daimler's breach claim fails as a matter of law.

**Finally**, Daimler failed to demonstrate that he suffered any damages as a result of the purported breach.  "A party seeking damages for breach of contract must be able to prove such damages with reasonable certainty." *Printed Image of York, Inc. v. Mifflin Press, Ltd.*, 133 A.3d 55, 59 (Pa. Super. Ct. 2016).  As set forth above, Daimler has no evidence of the supposed monetary contributions he made to Coal Hill for which he has not been reimbursed.

---

[6] Fee acknowledged that while he worked for Skilled Science he was paid approximately $10,000 per month as reflected in the expense report submitted by Daimler.  SMF at ¶ 122.  Fee further admitted that he did not meet Moehle until the fall of 2015.  SMF at ¶ 44.

To the extent Daimler identified Fee to provide "expert" testimony on his contract damages, Fee denied any ability to do so.  Fee conceded that he had no knowledge of the terms of any such agreement, how much money, if any, Daimler contributed as capital contributions, or how many units Daimler would be entitled to assuming he had made such capital contributions. SMF ¶ 131.  Specifically, Fee testified that:

> [W]hen you're talking about the value of units that [Daimler] should have been provided, I'm not privy nor do I know what was his arrangement in terms of what he was given…I don't know whether or not that should have resulted in units or whether it was supposed to be just paid back….How many units for $200- to $300,000?  I don't know.  What are the value of the units he should have been provided?  I don't know.

*Id*.

As the only evidence that Daimler can proffer relative to his contact damages is idle speculation, the Court should grant Coal Hill summary judgment.  *See Tangle v. State Farm Ins. Cos.*, 444 F. App'x 592, 594 n.3 (3d Cir. 2011) (claim for damages fails where plaintiff could not specify the amount of his losses, did not solicit testimony from any witness as to the amount of his damages, and there "are no receipts to document" the cost of the items plaintiff claims were damaged).

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants respectfully request that the Court issue an order, in the form accompanying herewith, granting Defendants' Motion for Summary Judgment and entering judgment in favor of the Defendants on all causes of action asserted by Daimler.


Dated:  November 23, 2021                              Respectfully submitted,

                                                       **K&L GATES LLP**

                                                       <u>/s/ *Christopher M. Verdini*</u>
                                                       Patrick J. McElhinny, PA Bar No. 53510
                                                       Christopher M. Verdini, PA Bar No. 93245

Jessica L.G. Moran PA Bar No. 325912
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222-2613
Tel:  412-355-6500
Fax:  412-355-6501
Email: patrick.mcelhinny@klgates.com
Email: christopher.verdini@klgates.com
Email: jessica.moran@klgates.com

*Counsel for Defendants Chris Daimler,
Robotics Hub Fund 1 LLC, and Coal Hill
Ventures LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2021, the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

<div style="margin-left: 40%;">

<u>/s/ Christopher M. Verdini</u>
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
412.355.6500

</div>