THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC DAIMLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 18-165 |
| | ) | |
| | ) | |
| CHRIS MOEHLE, ROBOTICS HUB | ) | |
| FUND 1, LLC, and COAL HILL | ) | |
| VENTURES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Plaintiff Eric Daimler brings suit against Defendants Chris Moehle, Robotics Hub Fund 1, LLC (the Fund), and Coal Hill Ventures LLC (Coal Hill) asserting claims of fraudulent inducement and breach of contract. Daimler alleges that, in order to induce Daimler to enter into a business relationship with Defendants, Moehle falsely mispresented that General Electric Ventures had committed to invest $20 million into the Fund. Daimler also alleges that Coal Hill breached an oral agreement to compensate him for providing financial contributions to Moehle's businesses. Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 107. As more fully explained below, the Motion will be granted.

## I.     Factual Background

All material facts set forth below are undisputed unless otherwise indicated. With respect to certain disputed facts, the Court cites to the underlying documentary evidence, such as the actual testimony about a fact, rather than the parties' assertions. Additional facts may be discussed in context elsewhere in this Opinion.

### A.     Moehle's Business Ventures

Moehle formed Coal Hill in April 2015 to invest in early-stage robotics companies. Parties' Comb. Stmt. Mat. Facts, ¶ 1 (ECF No. 123).  To subsidize Coal Hill's startup costs, Moehle obtained a one-time $75,000 sponsorship gift from General Electric's venture capital and investment arm, General Electric Ventures (GEV).  Id. at ¶ 2.  In August 2015, Moehle and Coal Hill publicly announced the formation of Robotics Hub, a business accelerator company focused on identifying, building, and guiding promising startup companies in the field of advanced robotics.  Id. at ¶ 3.  GEV and Moehle's former employer, Carnegie Mellon University, issued a joint press release announcing the formation of Robotics Hub.  Id. at ¶ 4.  In connection with the formation of Robotics Hub, Moehle also formed the Robotics Hub Fund.  Id. at ¶ 5.  The Fund was created to be a vehicle through which Robotics Hub could invest in early-stage robotics companies.  Id. at ¶ 6.

### B.     Daimler and Moehle's Relationship

Daimler and Moehle were introduced through a mutual friend, Dave Mawhinney, who was a member of the Carnegie Mellon Computer Science Advisory Board .  Id. at ¶¶ 52, 148.  In his Complaint[1], Daimler alleges that "Moehle represented to Daimler throughout 2015 and 2016 that GE had committed to invest $20,000,000.00 in the Fund, which was a significant portion of the $50,000,000.00 the Fund sought to raise."[2]  Id. at ¶ 53, ECF No. 86 at ¶ 16.  Daimler testified that Moehle said that "GE would be investing at least $20 million as soon as they cleared a regulatory issue of spinning out a financial arm."  Parties' Comb. Stmt. Mat. Facts, ¶ 54; Daimler

---

[1]  The operative complaint in this matter is Plaintiff's Fifth Amended Complaint.  ECF No. 86.  For ease of reference, the Fifth Amended Complaint is referred to simply as the "Complaint."

[2]  The allegation: "Moehle represented that General Electric Ventures had committed to invest $20 million in the Fund," will be referred to by the shorthand term, "the GEV Representation".

Dep. 75:25–76:25.  Daimler alleges that Moehle informed him not to discuss the GEV

Representation with anyone.  Parties' Comb. Stmt. Mat. Facts, ¶ 55; ECF No. 86 at ¶ 27.

Daimler testified that Moehle told him in August 2015 that the GEV "investment would be

concluding in a matter of months, if not weeks, and that it was nearly imminent."  Parties' Comb.

Stmt. Mat. Facts, ¶ 56; Daimler Dep. 82:10–82:16.

### 1.     Introductory Telephone Calls

Daimler and Moehle had an introductory phone call on August 18, 2015, followed by a

second telephone call on August 19, 2015.  During one of these telephone calls, Daimler alleges

that Moehle first made the GEV Representation to Daimler.  Parties' Comb. Stmt. Mat. Facts, ¶

7, ECF No. 86 at ¶¶ 20, 21.  With respect to the August 18, 2015 telephone call, Daimler testified

as follows:

> **Q.** Who was on the call?
> **A.** I don't recall.
> . . .
> **Q.** How long was the introductory phone call with Mr. Moehle?
> **A.** I don't recall.
> **Q.** What did you discuss?
> **A.** I don't recall.
> **Q.** Did you ask any questions?
> **A.** I don't recall.
> **Q.** Did you discuss anything about Skilled Science[3]?
> **A.** I don't recall.
> **Q.** . . . - you don't recall any topics that were discussed in that first meeting?
> **A.** The first meeting in 2015, six years ago? No.
> **Q.** Yes. You don't recall any of the topics that you discussed?
> **A.** Correct?

Daimler Dep.71:10-72:19.  Given Daimler's lack of recollection as to what was discussed on the

telephone call, defense counsel asked the following question regarding the central allegation of

---

[3] In 2011, Daimler had formed Skilled Science, an early-stage investment company, to commercialize scientific
innovations coming out of academia.  Parties' Comb. Stmt. Mat. Facts, ¶¶ 7-8.

the Complaint:

> **Q.** In paragraph 20 of the Complaint, you write that – or you allege that Mr.
> Moehle represented to you that GE had committed to invest $20 million.
> If you can't recall any of the topics that were covered, what's the basis for the
> allegation?
> **A.** Because that would have been burned in my memory. That's the germane
> issue. There would be nothing out of the ordinary about me talking to [Moehle] or
> even being introduced to [Moehle]. I would have no reason to have taken
> scrupulous notes, let alone notes that I can immediately recall at first being asked
> about the nature, or let alone the details, of a conversation from six years ago. But
> the germane issue, absolutely, was what would have changed the course of my
> decisions, or even the course of my professional life. That's a germane issue, that I
> would have recalled.

Daimler Dep.  72:24-25; 73:1-13.  Daimler also could not recall whether he asked Moehle any

questions about the GEV Representation or whether he asked for any documents about the GEV

Representation.  Parties' Comb. Stmt. Mat. Facts, ¶ 59.

With respect to the August 19, 2015 telephone call, Daimler again was unable to recall

any details:

> **Q.** . . . Do you recall anything about that conversation?
> **A.** No.
> **Q.** Do you recall who was on the call?
> **A.** No.
> **Q.** How long the call was?
> **A.** No.
> **Q.** Any topics that you discussed?
> **A.** No.
> **Q.** . . . . Do you recall whether Mr. Moehle said anything about GE in that second
> conversation?
> **A.** I do not recall on which conversation [Moehle] represented GE's imminent
> investment into the companies.

Daimler Dep. 76:3-17.  Subsequently, Daimler and Moehle had a series of telephone calls on

September 15, 2015, September 24, 2015, November 3, 2015, and December 8, 2015.  62, ECF

No. 86 at ¶ 21.  With respect to all four telephone conversations, Daimler testified as follows:

> **Q.**  . . . Do you recall anything about any of those phone conversations with Mr.

4

Moehle?
**A.** I don't recall any specifics about any of those conversations.
**Q.** Do you recall generally how long any of those conversations were?
**A.** I do not.
**Q.** Do you recall whether there was anyone else on the phone with the two of you, or other than the two of you on those conversations?
**A.** No.

Daimler Dep. 86:7-17.

## 2.    Potential Investors

Daimler testified that, between October 2015 and March 2016, Moehle and Daimler made presentations about Robotics Hub and Coal Hill (collectively, the Companies) and the Fund to potential third-party investors.  Parties' Comb. Stmt. Mat. Facts, ¶ 65.  Daimler testified that Moehle made the alleged GEV Representation to "every" investor or potential investor in the Fund.  Id. at ¶ 66; Daimler Dep. 89:1–4.  Daimler identified multiple meetings with third parties where Daimler claims Moehle made the alleged GEV Representation.  Parties' Comb. Stmt. Mat. Facts, ¶-67, ECF No. 86 at ¶¶ 23–25, 32.  In his initial disclosures, Daimler identified approximately thirty potential investors to whom Moehle made the alleged GEV Representation. Parties' Comb. Stmt. Mat. Facts, ¶ 68.  With respect to such  potential investors, Daimler testified as follows:

> **Q.** Your allegations are that [the GEV Representation] was made to every investor in the Fund, or potential investor, right?
> **A.** Correct.
> . . .
> **A.** Everyone that I recall.
> **Q.** And not a single potential investor, other than you, has claimed that that representation was made or was false, right, to your knowledge?
> . . .
> **A.** Yeah, that's not what -- I don't know.

Daimler Dep. 89:1-12.  Daimler was asked, in Defendants' First Set of Interrogatories, to identify all communications he had with anyone identified in his initial disclosures that refer to

or concern any allegations he has made in this litigation.  Daimler Obj.s and Resp. to Defs.' First Set of Interrog., Interrogatory No. 3, ECF No. 110-2, at 4.   Daimler's relevant Response is: "Plaintiff can represent that the only person identified in his Initial Disclosures with whom he communicated about the allegations contained in the Complaint is Jamie Fee."  Id.; Resp. to Interrogatory No. 4, ECF No. 110-2, at 5.  Jamie Fee is Daimler's non-retained expert on damages.  Therefore, Daimler admits that he did not have any discussions with any of the potential investors identified in his initial disclosures relating to any allegations asserted by Daimler in this litigation.  Parties' Comb. Stmt. Mat. Facts, ¶ 70.

### a.     UPMC

Daimler alleges that Moehle "told representatives of the University of Pittsburgh Medical Center . . . that GE was a sponsor of the Fund and had already committed to invest $20,000,000" during a meeting on October 16, 2015.  Id. at ¶ 71, ECF No. 86 at ¶ 23.  The day after the meeting, Moehle sent an email to UPMC representatives, thanking them "for listening to the Coal Hill pitch yesterday."  Email from C. Moehle, Oct. 17, 2015, ECF No. 110-2, at 209. Moehle included Daimler and Dave Mawhinney on the email.  Id.  On October 23, 2015, on the same email chain, Daimler "replied all" and, in part, noted his regret "that my travel made me unavailable to attend the last [UPMC] meeting."  Email from E. Daimler, Oct. 23, 2015, ECF No. 110-2, at 208.  The GEV Representation is not mentioned in the email chain.

### b.     RIDC

Daimler alleges that Moehle repeated the GEV Representation, in Daimler's presence, during a November 3, 2015 meeting with representatives of the Regional Industrial Development Corporation of Southwestern Pennsylvania (RIDC).  Parties' Comb. Stmt. Mat. Facts, ¶ 78; ECF

No. 86 at ¶ 25.  On November 30, 2015, Daimler's and Moehle's mutual friend, Mr. Mawhinney, emailed representatives of RIDC.  Parties' Comb. Stmt. Mat. Facts, ¶¶ 80-81; Email from D. Mawhinney to D. Smith, C. Moehle, and E. Daimler, ECF No. 110-2, at 211.  Mr. Mawhinney wrote, "I would like to introduce you to Chris Moehle and Eric Daimler from the Robotics Hub and Coal Hill Ventures."  Id.  In response to Mr. Mawhinney's email, Moehle "replied all" and stated, "Thanks for the introduction, Dave.  Don – great to meet you."  Id.  There is no mention of a prior November 3, 2015 meeting, nor is the GEV Representation mentioned in the email chain.

**c.**     **GEV**

A document entitled "GE Ventures Conversation" was created in connection with Daimler and Moehle preparing for a November 2015 meeting between Daimler and Moehle and Alex Tepper, a GEV representative.  Id. at ¶¶ 83-84.  As reflected in the "GE Ventures Conversation" document, Daimler and Moehle planned a "pitch" at which they would ask GEV to make an "initial commitment" investment of $500,000, "escalating" up to a total investment of $25 million.  Id. at ¶ 85.  Daimler testified that he could not recall whether he and Moehle actually did ask GEV to make an "initial commitment" of $500,000 scaling up to $25 million.  Id. at ¶ 86.

In the fall of 2016, GEV asked Moehle to provide GEV with information about the Companies and the Fund.  Id. at ¶ 87.  In response, Moehle provided GEV with the Fund's private placement memorandum, limited partner agreement, investment summary document, and marketing material for a nuclear robotics event.  Id. at ¶ 88.

**3.**     **The GEV Representation**

7

Daimler did not allege in his Complaint, or state during his deposition, that Moehle had made the GEV Representation to Jamie Fee.  Nonetheless, Fee testified that Moehle represented to Fee that GEV was to invest in the Companies in the future, in the neighbored of $5 million "dependent upon some sort of divestiture." Fee Dep. 19:13-25-20:1-10.  With regard to the GEV Representation, the remainder of Fee's testimony is based on what Daimler told Fee.  Fee testified that Daimler told Fee that GEV may make an investment in the neighborhood of $5 million.  Parties' Comb. Stmt. Mat. Facts ¶ 91.  Fee did not testify that the potential investment was a "commitment" and he did not testify that the investment amount was $20 million.

On March 14, 2016, Moehle sent an email to Daimler and Fee with the subject heading, "Lead Investor Tracking Presentation."  Parties' Comb. Stmt. Mat. Facts, ¶ 95.  Moehle attached a PowerPoint presentation  to the email entitled, "Fund I Offers Tracking."  Id.  The attached PowerPoint presentation does not identify GEV as a "potential lead investor" or as a "near-term potential deal."  Id. at ¶ 96.  Daimler did not ask Moehle why GEV was not included as a potential lead investor in the "Lead Investor Tracking Presentation."  Daimler Dep. 232:17–20.

With respect to GEV's investment commitment, Daimler testified that he could not recall any documents "that support that GE had committed to a $20 million investment" in the Fund.  Parties' Comb. Stmt. Mat. Facts ¶ 64.  Daimler also testified that he knew that "[t]he trigger of the $20 million would not occur until [GEV's] spinout happened," and "[t]hat was definitely a risk that [Daimler] was taking."  Id. at ¶ 90; Daimler Dep. 83:13–16; see also 82:6-9.  Daimler testified: "In theory," GEV "could have just walked away," because the investment commitment "was not a legal obligation, that's absolutely true."  Daimler Dep. 203:12–15.

### C.    Skilled Science – Daimler's Business Venture

One of Daimler's business ventures was Skilled Science.  Daimler personally capitalized

8

Skilled Science with less than $500,000; thereafter, no additional capital was raised.  Parties'

Comb. Stmt. Mat. Facts, ¶¶ 11-12.  Although Daimler denies that his initial investment was less

than $500,000 and he denies that no additional capital was raised, he is unable to point to any

documentary evidence to show that said averments are untrue.[4]  Skilled Science prepared a

"Skilled Science Sponsorship Agreement."  Id. at ¶ 30.  Daimler testified that the Skilled Science

Sponsorship Agreement was to be used for "finalizing an investment from an investor, from a

limited partner."  Id. at ¶ 30; Daimler Dep. 39:25-40:22.  However, Skilled Science never

executed a sponsorship agreement with any investor.  Id. at ¶ 31.  Similarly, there is no evidence

that Skilled Science ever created a private placement memorandum or partnership agreement.

Id. at ¶ 32.

Daimler also produced an untitled document, dated in or around August 2015, centered

around the primary term, "SkilledScience."  Id. at ¶ 40.  In relevant part, the document identifies

---

[4]  To support his denial that Daimler's "initial investment was less than $500,000" and that "no additional capital was raised," Daimler cites to his Affidavit at paragraphs 7, 8, and 9, as well his Exhibits E, F, and G.  However, none of that information contradicts Daimler's deposition testimony that he provided initial capitalization for Skilled Science of "[u]nder a half million."  See Deposition E. Daimler, Feb. 24. 2021, 42:6-43:1-8 (ECF No. 110-2). Daimler's Exhibits, which are authored by Daimler, demonstrate only that Daimler was preparing to seek additional investment in Skilled Science; they do not show that Daimler in fact raised additional capital for Skilled Science.

the "current reality" for Skilled Science as: "hav[ing] no contract signed"; "started conversations

about this in fall '13"; and "have received, at various times, commitments of as much as 3.5M."

Id. at ¶ 41.  Daimler admitted that the "commitments of as much as 3.5M" never came to

fruition.  Id.

### 1.       Potential Investors into Skilled Science

Before joining Coal Hill and Robotics Hub, Daimler asserts that Skilled Science "was

planning to close on investments from two investors, totaling $10,000,000.00."  Id. at ¶ 14; ECF

No. 86 at ¶ 17.  Daimler testified that the two investors were Two Sigma and the Sackler Family.

Parties' Comb. Stmt. Mat. Facts, ¶ 15.  In his Summary Judgment pleadings, Daimler identifies a

third investor, Keith Furuya.  Id. at ¶ 154; Affidavit of E. Daimler, Jan. 7, 2022, at ¶ 9, ECF No.

117-2, at 2-5.

### a.       Two Sigma

Skilled Science provided Two Sigma with a draft Memorandum of Understanding, dated

September 11, 2014, reflecting proposed terms of a potential investment.  Id. at ¶ 16.  The

Memorandum of Understanding provided that Skilled Science would be "authorized by Two

Sigma to represent that it has a commitment of $5MM [$5 million] from investment partners,

including Two Sigma to be used under Skilled Science's direction, and in its discretion for the

purpose of effectively commercializing projects from selected research."  Id. at ¶ 17; Mem. of

Understanding, Sept. 11, 2014, at 1, ECF No. 110-2, at 173.  Daimler testified that he wanted

Two Sigma to agree to allow Skilled Science to represent that "investment partners" had

committed $5 million in investment, "[b]ecause once you have a first committed signed investor,

you can represent that to the public.  Once you can represent to the public that an investor has

committed money, that makes all the difference in starting off, starting off a business of this

nature."  Parties' Comb. Stmt. Mat. Facts, ¶ 18; Daimler Dep. 48:1-49:7.

On September 29, 2014, Daimler asked Two Sigma if he could meet with Two Sigma's full investment committee, which meeting was required to "get started with the 500K" investment.  Parties' Comb. Stmt. Mat. Facts, ¶ 20; September 29, 2014, Email from E. Daimler to C. Beirne, Sept. 29, 2014.  However, Daimler never attended a meeting with Two Sigma's full investment committee.  Parties' Comb. Stmt. Mat. Facts, ¶ 21.  Two Sigma did not execute a memorandum of understanding or any other agreement with Skilled Science and Two Sigma never invested in Skilled Science.  Id. at 19.

### b.    The Sackler Family

With respect to the Sackler Family's potential investment, Daimler testified that Skilled Science had a "verbal commitment" from Adam Fried who had agreed to make a "verbal advocacy" to the Sackler Family to invest in Skilled Science.  Id. at ¶ 22; Daimler Dep. 37:22–39:18.  Daimler did not recall if Mr. Fried actually did verbally advocate to the Sackler Family to invest in Skilled Science.  Parties' Comb. Stmt. Mat. Facts, ¶ 23; Daimler Dep. 62:8–10; 68:19–24.  Daimler also was not aware of any documents that reflected the nature of any verbal advocacy by Mr. Fried.  Parties' Comb. Stmt. Mat. Facts, ¶ 26.  In email correspondence dated September 24 and September 26, 2015, neither Daimler nor Mr. Fried referred to a commitment by Mr. Fried to verbally advocate to the Sackler Family to invest in Skilled Science or to any investment commitment by the Sackler Family.  Id. at ¶ 27.  Daimler testified he was not aware of any documents that reflected a commitment from the Sackler family to invest in Skilled Science and that such documents are not created until a decision to invest is made.  Id. at ¶ 25.  Daimler could not recall if he had ever met anyone from the Sackler Family, or if he had met or had a telephone conversation with Mortimer Sackler.  Id. at ¶ 24; Daimler Dep. 66:8–15.

### c.    Keith Furuya

Daimler also sought investment from Keith Furuya.  Id. at ¶ 154.  By email dated April 22, 2015, Keith Furuya, of Furuya & Co., wrote to Daimler: "I confirm $100k and believe that [they] have another $250K (the investors are thinking about it)."  Email from K. Furuya to E. Daimler, Apr. 22, 2015, ECF No. 117-2 at 20.  Mr. Furuya also related to Daimler that the "[i]ssue is that the investors are le[e]ry about this."  Id.  There is no record evidence that Mr. Furuya or Furuya & Co. invested in Skilled Science or that they committed to invest in Skilled Science.

### 2.    Fee's Testimony as to Investments in Skilled Science

Daimler and Fee have been friends for over a decade.  Parties' Comb. Stmt. Mat. Facts, ¶ 42.  During this time, Daimler has engaged Fee to assist him with his various investment ventures, including Skilled Science.[5]  Id. at ¶ 43.  Fee testified there were supposedly a half a dozen "investors that were moving toward engaging with [Skilled Science] to deploy capital." Id. at ¶ 33; Fee Dep. 86:20–88:16.  Fee testified that Skilled Science was "talking terms" with investors.  Parties' Comb. Stmt. Mat. Facts, ¶ 34; Fee Dep. 100:2–12.  Fee testified that Skilled Science did not sign a term sheet with any potential investor.  Parties' Comb. Stmt. Mat. Facts, ¶ 35; Fee Dep. 104:23–105:1.  Fee testified that Skilled Science "had a credible thesis, a credible principle, and it established credible engagement with a number of potential investors."  Parties' Comb. Stmt. Mat. Facts, ¶ 36; Fee Dep. 115:1–7.  37.  Although Fee identified the Sackler

---

[5] According to Fee's curriculum vitae, from October 2017 through June 2019, Fee was a partner in Daimler's SpinGlass venture.  Parties' Comb. Stmt. Mat. Facts, ¶ 46.  While Fee worked for Daimler's SpinGlass venture, Daimler was Fee's "sole source of income."  Id. at ¶ 47; Fee Dep. 59:5–7.  From October 2019 through the present, Fee has been a managing director in Daimler's Conexus venture.  Parties' Comb. Stmt. Mat. Facts, ¶ 48.  During the time Fee has worked for Conexus, Conexus has been his sole source of income.  Id. at ¶ 49.  Fee testified that while he was working for Skilled Science, he spent half of his time on work for Skilled Science.  Id. at ¶ 50.  Fee does not list Skilled Science on his resume.  Id. at ¶ 51.

family as one of the potential investors, he did not identify Two Sigma as a potential investor. Parties' Comb. Stmt. Mat. Facts, ¶ 37.  Fee testified that a different entity, Wood Creek Capital, "was talking about a potential 5 million" investment, with others, as pieces of a possible investment.  Id. at ¶ 37; Fee Dep. 100:2–12.  Fee testified that "one of the rules of capital raising is that it's not money until it's in the bank."  Parties' Comb. Stmt. Mat. Facts, ¶ 38; Fee Dep. 105:12–15.  Fee explained that the investment sphere is a world of "shoulda, coulda, woulda" and that because of this uncertain nature, an investment "doesn't count unless it happens." Parties' Comb. Stmt. Mat. Facts, ¶ 39; Fee Dep. 89:23–90:22.

### D.    Daimler's Questions as to the GEV Representation

Daimler testified that the GEV Representation was the sole reason he decided to "walk away" from a purported $10 million in investments for Skilled Science to join Defendants. Parties' Comb. Stmt. Mat. Facts, ¶ 99, Daimler Dep. 203:16–22.  Daimler also testified that the GEV Representation was "the single most important issue for our pitch."  Parties' Comb. Stmt. Mat. Facts, ¶ 98, Daimler Dep. Ex. 5 99:24–100:10.  Despite the significance of the GEV Representation to Daimler, he was unable to recall whether he ever asked Moehle if the Defendants had a signed investment commitment from GEV.  Parties' Comb. Stmt. Mat. Facts, ¶ 101.  Daimler Dep. 49:8–24.  Daimler later testified that he did not recall any signed legal agreements with GEV obligating them to invest $20 million.  Parties' Comb. Stmt. Mat. Facts, ¶ 100, Daimler Dep. 77:19–78:12.  Daimler admitted that he could not recall taking any steps to double-check Moehle's purported GEV Representation beyond reviewing in a "cursory way" publicly available information related to GE's operations to determine if a spinoff of its financial arm seemed reasonable.  Parties' Comb. Stmt. Mat. Facts, ¶ 102; Daimler Dep. 80:10–15.

Daimler also admitted that in multiple meetings with GEV representatives he did not ask

any questions about the nature, extent, or likelihood of any GEV commitment to invest in the

Companies.  Parties' Comb. Stmt. Mat. Facts, ¶ 103; Daimler Dep. 78:13–80:5.  With respect to

an alleged legal agreement between GEV and Robotics Hub, the following testimony occurred:

> **Q.** Okay. Let me ask the question: Did you know there was a written agreement
> between GE and Robotics Hub before you joined the companies?
> **A.** No.
> **Q.** Did you ever ask whether there was a written agreement?
> **A.** I don't recall.
> **Q.** So you never read an agreement between GE and Robotics Hub before you
> joined the  companies?
> **A.** If I said I didn't recall seeing an agreement, I certainly wouldn't be able to
> answer any differently about reading such an agreement.

Daimler Dep. 195:13–24.  The private placement memorandum that the Fund provided to

investors did not include any disclosure of a GEV $20 million commitment.  Parties' Comb.

Stmt. Mat. Facts, ¶ 105.  Daimler admitted that he read the Fund's private placement

memorandum.  Id.

Daimler did not speak with anyone, other than a single mutual friend of the parties,

before he entered into a business relationship with Moehle.  Id. at ¶ 106.  Daimler testified as

follows:

> **Q.** At this point the [GEV] spinout had been, according to your allegations,
> represented to you for about six months, right?  If it was August when it was first
> represented to you, and now it's in February and it's being represented still, is that
> right?
> **A.**  Correct.
> **Q.** At this point did you do any of your own diligence as to what the status of that
> spinout was?
> **A.** I don't recall what additional, if any, diligence I did other than bring the issue
> up with [Moehle]. I would not have ignored that issue. It was a material issue
> foundational to the operation of the company.
> **Q.** But all you did was ask Mr. Moehle about it. Is that fair?
> **A.** That's not what I said.
> **Q.** You don't recall doing anything other than asking Mr. Moehle about it, right?
> **A.** I don't recall what else I did in addition.

14

Daimler Dep. 219:21–220:16.  Daimler also could not recall how, when, or why he came to learn that the alleged GEV Representation was allegedly untrue.  Parties' Comb. Stmt. Mat. Facts, ¶ 108.

      **E.**     **Daimler Executes the Common Unit Agreements**

In April 2016, Daimler executed amended operating agreements for the Companies that added Daimler as a member of the Companies.  Id. at ¶ 109.  Daimler also executed Common Unit Agreements in April 2016, which granted Daimler 42 common units in the Companies, subject to certain vesting conditions, one of which was that Daimler provide full-time services to the Companies by March 23, 2017.  Id. at ¶ 110; Coal Hill Ventures LLC Common Unit Award Agreement, Ex. 20, ECF No. 110-2, at 350-358; Robotics Hub Fund 1, LLC Common Unit Award Agreement., Ex. 21, ECF No. 110-2, at 361-368.  Per the Common Unit Agreements, if Daimler failed to provide full-time services by March 23, 2017, he would forfeit the common units in their entirety.  Parties' Comb. Stmt. Mat. Facts, ¶ 111.  The Common Unit Agreements define "Full Time Service," in pertinent part, as "providing greater than 95% of his professional activities . . . to a combination of the Compan[ies] . . . ."  Id. at 112.

      **F.**     **Daimler's Loan**

Daimler alleges that he loaned $125,000 to Coal Hill pursuant to a promissory note and that he wrote several checks to Coal Hill totaling approximately $30,000.  Parties' Comb. Stmt. Mat. Facts, ¶¶ 113, 114; ECF No. 86 at ¶¶ 43, 84.  Daimler admits that on or about November 2, 2017, Coal Hill paid him the $125,000 promissory note in full, with interest, and separately reimbursed him in the amount of $35,000 for the checks he wrote.  Parties' Comb. Stmt. Mat. Facts, ¶ 115; ECF No. 86 at ¶ 44.

G.      **Daimler's Financial Contributions and Proof of Expenses**

Daimler alleges that he made financial contributions to Coal Hill in excess of $200,000

and that Moehle orally agreed that such would be treated as capital contributions.  Parties'

Comb. Stmt. Mat. Facts, ¶ 116, ECF No. 86 at ¶¶ 86–91.  Moehle testified that the Companies

asked Daimler on multiple occasions to produce documentation of any supposed unreimbursed

monetary payments but that Daimler refused to do so.  Parties' Comb. Stmt. Mat. Facts, ¶ 117.

During discovery, Daimler produced an undated document, which he testified looked

"familiar" and "looks like a list of expenses that I incurred supporting the operations of the

companies with my business partner at the time"  Id. at 118; Ex. 22, ECF No. 110-2, at 369-385;

Daimler Dep. 263:17-21.  With regard to this undated document of expenses, Daimler testified

that he did not recall when the document was created, how it was created, whether he created it

(or someone else did), and that he had "no idea" how the document got in his files.  Daimler

Dep.  263:22–264:5.  Daimler conceded that if he would have created the document, it was "very

likely" he would have recalled doing so.  Parties' Comb. Stmt. Mat. Facts, ¶ 120; Daimler Dep.

at 280:17–19.

The undated document of expenses lists payments to a communications firm, Inside

Revolution, Inc.  Parties' Comb. Stmt. Mat. Facts, ¶ 123.  Daimler could not specifically identify

any services that Inside Revolution performed for Robotics Hub or Coal Hill.  Id. at ¶ 124.

The document also lists multiple laptop purchases for which Daimler had no information, as well

as" block entries" for Daimler's travel.  Id. at 125-126.

The undated document of expenses also reflects that Daimler made twelve monthly

$15,000 payments to St. Maple 164 LLC, which is Fee's LLC through which Fee received

payments, from August 28, 2015 through January 27, 2017.  Parties' Comb. Stmt. Mat. Facts, ¶

121; Daimler Dep. 264:6–266:10; ECF No. 110-2, at 369-382.  As of August 28, 2015, Fee had

not yet been introduced to Moehle.  Parties' Comb. Stmt. Mat. Facts, ¶ 121.  In contrast to the

$15,000 payments Daimler made to Fee, Fee testified that he was being paid separately by

Robotics Hub at $10,000 a month for his work, and that he was "not being doubly compensated,

no." Fee Dep. 110:20-111:1-2; 3-11.  When asked specifically about $15,000 payments from

Daimler, Fee testified that "it's very possible that Eric-compensated the lower rate of $10,000 a

month from Robotics Hub with 5,000. Very possibly. But I don't recall."  Daimler Dep. 111:19-

22.  Counsel clarified that he was asking about "a separate $15,000 payment in addition to the

$10,000 that you earned," to which Fee responded, "Oh, absolutely not. I was not paid that

much."  Daimler Dep. 111:23-112:1.

In his Opposition to Summary Judgment, Daimler provides 1,879 pages of unorganized

alleged "back-up" expenses.  Parties' Comb. Stmt. Mat. Facts, ¶ 207.  Other than asserting that

such are evidence of Daimler's expenses incurred on behalf of the Companies, he fails to cite to

any document or documents or to provide an explanation or argument as to why such documents

support his allegations.

### H.   Alleged Oral Agreement

When asked about the material terms of Moehle's alleged oral agreement to treat

Daimler's financial contributions as capital contributions, Daimler testified as follows:

> **Q.** And you don't recall sitting here today any phone call where Mr.
> Moehle agreed to treat any financial contributions as capital contributions,
> is that right?
> . . .
> **A.** I don't recall any specific phone call.
> **Q.** How many units were you going to receive?
> **A.** I don't recall.

17

> **Q.** What kind of units were they?
> **A.** I don't recall.
> **Q.** What were the vesting terms?
> **A.** I don't recall.
> **Q.** How much money was going to be exchanged for the units? What was the number?
> **A.** I'll stand by what I wrote in the Complaint.
> **Q.** In the Complaint, you don't really provide a number. You say in excess of $200,000.
> So how much was agreed, according to your Complaint, to be treated as capital contribution?
> **A.** I would have to go back and take a look at the totality of the communications and the financial records.
> **Q.** Was it $200,000?
> **A.** I don't recall.

Daimler Dep. 256:18–257:18.  Fee likewise was unable to provide any specific information as to the alleged agreement, testifying as follows:

> [W]hen you're talking about the value of units that [Daimler] should have been provided, I'm not privy nor do I know what was his arrangement in terms of what he was given…I don't know whether or not that should have resulted in units or whether it was supposed to be just paid back.  And if capital wasn't available to pay it back, then it would be paid in units.  How many units for $200- to $300,000?  I don't know.  What are the value of the units he should have been provided?  I don't know.

Parties' Comb. Stmt. Mat. Facts, ¶ 131; Fee Dep. 116:24–117:24.  Fee further testified that he was not privy to the accounting of the Companies and had no independent knowledge of how much money, if any, Daimler contributed to the Companies.  Parties' Comb. Stmt. Mat. Facts, ¶ 128; Fee Dep. 95:6–96:14.  Fee testified that there "was very little acrimony" about the finances of the Companies while Daimler was with the Companies and "it's afterward that there was acrimony and a discussion of hey, I'm [Daimler] owed something."  Parties' Comb. Stmt. Mat. Facts, ¶ 129; Fee Dep. 120:18–121:2.  130.   Fee testified that Daimler did not say anything to him about Daimler contributing in excess of $200,000 until after they left the Companies.  Parties' Comb. Stmt. Mat. Facts, ¶ 130; Fee Dep. 120:5–22.

## I.      Daimler's Removal from the Companies

In 2016, Daimler was appointed as a Presidential Innovation Fellow for the Office of Science and Technology Policy.  Parties' Comb. Stmt. Mat. Facts, ¶ 132.  The fellowship was expected to continue until January 2017.  Id. at ¶ 134.  While Daimler was engaged in his fellowship, Moehle believed that Daimler was not devoting sufficient time to the Companies.  Id. at ¶ 135.  In January 2017, Moehle and Daimler discussed Daimler's future role with the Companies in light of Moehle's belief that Daimler was not devoting sufficient time to the Companies.  Id. at ¶ 136.  After Moehle and Daimler met, the Board of the Companies voted on whether to offer Daimler full-time employment.  Id. at ¶ 137.   Daimler voted in favor of full-time employment and Moehle voted against.  Id. at ¶ 138.  The resulting deadlock was referred to the contractually prescribed neutral deadlock advisor, which was Moehle and Daimler's mutual friend, Mr. Mawhinney.  Id. at ¶ 139.  On March 27, 2017, the deadlock advisor broke the deadlock and voted against offering Daimler full-time employment.  Id. at ¶ 140.  Daimler was then removed from the Companies' Boards of Managers.  Id. at ¶ 141.

## J.      Expert Testimony as to Damages

Daimler described his non-retained damages expert, Jamie Fee, as "qualified to serve as a Business Development Executive expert commenting on issues related to damages."  Parties' Comb. Stmt. Mat. Facts, ¶ 143.  Daimler disclosed that Fee would provide his opinion on (1) "the cost of lost opportunities borne by Daimler because he left [Skilled Science] to enter into a partnership with Moehle"; and (2) "the value of units that should have been provided to Daimler in return for his investment in the company, Robotics Hub."  Parties' Comb. Stmt. Mat. Facts, ¶ 144.  With respect to calculating the monetary value of Daimler's lost business opportunities,

Fee admitted that it is "a hard thing to say . . . In fact, you cannot say." Fee Dep. 88:20–89:10. Fee testified that any "lost business opportunity" for Skilled Science was dependent upon whether "Skilled Science would have been able to build a portfolio successfully that would have made for a big equity growth." Fee Dep. 89:3–8. With respect to calculating the value of the units Daimler is purportedly entitled to, Fee stated "[w]hat are the value of the units he should have been provided? I don't know." Fee Dep. 116:24–117:24.

### K.    Procedural Background

Daimler filed a Complaint on February 5, 2018, followed by an Amended Complaint on February 14, 2018.[6] ECF Nos. 1 & 4. Daimler filed a Second Amended Complaint on August 24, 2018. ECF No. 24. After the parties met and conferred regarding the Second Amended Complaint, Daimler filed a Third Amended Complaint on October 16, 2018. ECF No. 33. Following the Court's Order denying in part, and granting in part, Defendants' Motion to Dismiss the Third Amended Complaint, Daimler filed his Fourth Amended Complaint on June 28, 2019. ECF No. 48. The Court then granted Daimler's unopposed Motion to Amend his Complaint to modify his prayer for relief, and thus the Fifth Amended Complaint was filed on October 19, 2020. ECF No. 86. In Counts One, Two, and Four, Daimler asserts identical individual claims of fraudulent inducement against Moehle, the Fund, and Coal Hill, respectively, based upon the allegation that Moehle fraudulently represented to Daimler that GEV had committed to invest $20,000,000.00 in the Fund. In Count Three, Daimler alleges that Coal Hill breached an oral agreement to provide Daimler with Units in exchange for his financial contributions to the Companies.

---

[6] The First Amended Complaint was filed pursuant to the Court's sua sponte Order finding that the initial Complaint did not demonstrate that the Court had subject matter jurisdiction. ECF No. 3.

## II.   Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  The court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  Watson v. Abington Twp., 578 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing decisions); Anderson v. Liberty Lobby, 477 U.S. 242, 248–49 (1986); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998).  The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment.  Liberty Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be

insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). If the movant meets his or her burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323-25. The nonmoving party must go beyond his or her pleadings and designate specific facts using affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 260 (3d Cir. 1989). Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.    Discussion

Defendants seek summary judgment as a matter of law on all of Daimler's claims. They argue that Daimler is unable to establish the elements of his fraudulent inducement claim as

asserted in Counts One, Two, and Four, and that he cannot demonstrate the elements of his breach of contract claim asserted against Coal Hill in Count Three.  The Court addresses Defendants' arguments in turn.

### A.      Fraudulent Inducement Claims

To recover on a claim of fraudulent inducement, Pennsylvania requires proof of the following elements by clear and convincing evidence: "'(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.'"  Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (quoting Skurnowicz v. Lucci, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)).


Defendants argue that Daimler is unable to establish that a representation was made; that he cannot demonstrate that the representation is an actionable false statement; that Daimler cannot establish that Moehle intended to deceive Daimler; that Daimler is unable to show that he justifiably relied on the GEV Representation; and that Daimler cannot establish that he suffered resulting damages.

### 1.      The Representation

First, Defendants argue that Daimler has not produced clear and convincing evidence that Moehle made the representation that GEV had committed to invest $20 million in the Fund.  In support of the proposition that there is a genuine issue of material fact as to whether the GEV representation was made, Daimler relies on his deposition testimony and his Affidavit.  He argues that such evidence is corroborated by Fee's testimony and by allegations in a verified

23

complaint filed in the Delaware Chancery Court against the same Defendants.  As explained below, neither Fee's testimony, nor the Delaware Court verified Complaint, qualify as competent corroborating evidence.  Therefore, Daimler's argument rests solely on his own self-serving testimony and Affidavit.  As discussed below, Daimlers' testimony and Affidavit are unsupported and conclusory reassertions of his Complaint allegations, which are insufficient to create a genuine issue of material fact.

a.      **Fee's Testimony**

Fee's testimony does not support the allegation that Moehle represented to Daimler that GEV had committed to invest $20,000,000.00 in the Fund.  Fee testified that Moehle represented to Fee, one time, that GEV was to invest in the neighborhood of $5 million in the Fund, sometime in the future.  Fee Dep. 19:15-16.  The remainder of Fee's relevant testimony is hearsay testimony of what Daimler told Fee.  Fee Dep.  18:24-25-19:1-4.  In addition, Fee's testimony, both direct and hearsay, is inconsistent with, and contradictory to Daimler's allegation that Moehle represented to Daimler that GEV had *committed* to invest *$20,000,000.00* in the Fund.  Fee did not testify that a "commitment" was made, and he testified that GEV was to invest a "significant" amount of money, which Fee deemed to be around $5 million, not $20 million.  Fee Dep. 19:18-25-20:1-2; 20:4-10; 82:19-25-83:1.  Thus, Fee's testimony does not corroborate, and in fact contradicts, Daimler's testimony that Moehle had represented that GEV had committed to invest $20 million.  Finally, Fee provided no independent testimony corroborating the allegation that Moehle continued to make the GEV Representation multiple times to multiple investors throughout 2015 and 2016.

b.      **Delaware Civil Action**

Daimler also asserts that his testimony is corroborated by the allegations asserted in a

civil action in the Delaware Chancery Court in which the plaintiffs therein seek declaratory and injunctive relief.  ECF No. 117-2; <u>Friddle v. Moehle</u>, Court of the Chancery of the State of Delaware.  The <u>Friddle</u> Complaint includes the following allegation:

> To entice investors, and to induce Daimler to focus his efforts on the Partnership over his other successful businesses, Moehle represented that GE Ventures had committed to invest $20 million in the Fund, which was a significant portion of the $50 million the Fund sought to raise.

ECF No. 117-2, at 41 (Paragraph 27 of the <u>Friddle</u> Complaint).  The Delaware allegation is substantively identical to the allegations made by Daimler in his Complaint and carries no more probative force than Daimler's Complaint allegations herein.  The allegation in the Delaware case arguably carries less probative force than Daimler's allegations in that the Delaware action assertion is not based upon the Delaware plaintiffs' personal knowledge.  To that extent, the Delaware case allegation is also inadmissible hearsay.  The Court will disregard the Delaware civil complaint has having no impact on determining whether a genuine issue of material fact exists in this case.

### c.  Daimler's Testimony and Affidavit

In apparent recognition that Fee's testimony and the Delaware Complaint are not competent corroborating evidence, Daimler primarily argues that his self-serving testimony and Affidavit, when considered in conjunction with other evidence,[7] are sufficient to defeat summary judgment.  Pltf. Br. Opp. 6-9.  Daimler's argument does not apply where, as here, the self-serving testimony is conclusory, unsupported by other evidence, and is contested and rebutted by record evidence.  <u>Nunez v. McCool</u>, No. 21-3321, 2022 WL 1315087, at *2 (3d Cir. May 3,

---

[7] <u>Hanna v. Giant Eagle Inc.</u>, No. CV 15-1009, 2017 WL 1194676, at *12 (W.D. Pa. Mar. 9, 2017), Rep. and Recomm. adopted, No. 2:15CV1009, 2017 WL 1194713 (W.D. Pa. Mar. 30, 2017) (self-serving testimony and affidavit sufficient to withstand summary judgment only "when considered in conjunction with other evidence.")

2022) ("unsupported assertions [] insufficient to create a material question of fact"); Trivedi v. Slawecki, 642 F. App'x 163, 168 (3d Cir. 2016) (plaintiffs' unsupported conclusory assertions combined with the failure to produce documentary evidence to support allegations insufficient to defeat summary judgment); Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011) (self-serving testimony insufficient to defeat summary judgment when other evidence of record rebuts the testimony); and Lind v. Jones, Lang Lasalle Americas, Inc., 135 F. Supp. 2d 616, 621 (E.D. Pa. 2001) ("only evidence which Plaintiff has adduced consists of his own deposition testimony," which is insufficient to establish a prima facie case of fraud).  A party cannot defeat summary judgment "by simply reasserting unsupported factual allegations contained in his [] pleadings."   Williams, 891 F.2d at 460.

Daimler's testimony and Affidavit are conclusory and merely repeat his Complaint allegations that Moehle represented to Daimler that GEV had committed to invest $20 million in the Fund and that Moehle made this representation multiple times to dozens of potential investors over the course of eight months.  Daimler's Affidavit purports to incorporate the entirety of his Complaint allegations within his Affidavit.  Daimler Aff. ¶ 2.  The Complaint is the record pleading that is challenged by Defendants.  It is improper for a plaintiff to rely upon Complaint allegations as "bootstrap evidence" to support said plaintiff's testimony by repeating the same allegations.  Such is the very definition of self-serving and conclusory.  In Paragraph 4 of his Affidavit, Daimler addresses his lack of recall during his deposition testimony.

> While I may not remember immaterial facts from meetings or conversations that took place six (6) years ago, I do remember, with absolute and unequivocal certainty, Moehle's representation to me, and to numerous potential investors, that GE had committed to invest $20 Million in the Fund.

Daimler Aff. ¶ 4 (emphasis in original).  This assertion does not support or corroborate his

allegations – it just repeats Daimler's Complaint allegations and his deposition testimony.  See, generally, Daimler Dep.72-76.

In addition to contesting Daimler's testimony, the Defense has provided specific and general rebuttal evidence challenging Daimler's assertions that the GEV Representation was made.  First, Daimler alleged that he had attended an October 16, 2015 meeting with UPMC representatives at which Moehle made the GEV Representation.  However, in an email chain concerning said UPMC presentation, Daimler makes no mention of any such GEV Representation, and it confirms that Daimler did not even attend said meeting.  Email from E. Daimler, Oct. 23, 2015.  In response to such evidence that clearly contradicts Daimler's Complaint allegations, Daimler's Affidavit relates, "I remember quite clearly that Moehle made the GE investment representation to Talbot Heppenstall [of UPMC]. Whether my memory is mistaken about the date of that representation, or whether I was told by someone else in that meeting that Moehle made the representation, does not change the fundamental fact that the representation was made."  Daimler Aff. ¶ 4 n.1.  The problem with Daimler's attempt to challenge the evidence rebutting his allegation is, again, that it consists of conclusory, self-serving and possibly hearsay testimony that is not supported by other evidence.  Daimler's Affidavit also attempts to supplement his Complaint allegations to include assertions that Moehle made the GEV Representation to UPMC personnel on a different date than originally alleged, and that Daimler may or may not have attended a meeting on a different date; and/or that an unidentified person, who attended the October 16, 2015 UPMC meeting, later told Daimler that Moehle had made the GEV Representation.  Daimler has produced no evidence to corroborate said assertions about any such GEV Representation.

Similarly, Daimler's allegation, that Moehle made the GEV Representation at a

November 3, 2015 meeting with RIDC, is rebutted by record evidence.  An email from Mr.

Mawhinney to Daimler, Moehle, and an RIDC representative shows that Moehle was not

introduced to the RIDC representative until November 30, 2015.  Email from D. Mawhinney to

D. Smith, C. Moehle, and E. Daimler.  In addition, the documentary evidence regarding RIDC

contains no mention of the GEV Representation, and it does not corroborate Daimler's assertion

that the GEV Representation was made.  Further, the November 2015 "GE Ventures

Conversation" document does not even mention the asserted $20 million investment

commitment.  It only references that Moehle and Daimler planned to ask GEV to make an initial

investment commitment of $500,000, which they hoped would then scale up to $25 million.

When asked about this inconsistency, Daimler had no answer as to why Moehle would plan to

seek an initial investment of $500,000 from GEV if Moehle had already received an investment

commitment of $20 million from GEV.  Daimler Dep. 184:12-187:23.

Finally, GEV was not identified as an investor in a March 2016 PowerPoint, that Moehle

sent to Daimler and Fee, wherein Moehle discussed seeking investments from "lead investors."

Parties' Comb. Stmt. Mat. Facts, ¶¶ 95-96.  Daimler testified that he did not ask Moehle why

GEV was not included as a potential investor in the March 2016 PowerPoint.  Daimler Dep.

232:17–20.

Daimler did not produce any evidence to support his allegation that the GEV

Representation was made.  Daimler's self-serving and conclusory testimony and Affidavit,

which Defendants have contested and rebutted with evidence of record, cannot be used as

competent evidence to defeat summary judgment.  Nunez, No. 21-3321, 2022 WL 1315087, at

*2; Trivedi, 642 F. App'x at 168; Irving, 439 F. App'x at 127; and Lind, 135 F. Supp. 2d at 621.

The totality of the record fails to establish any question of material fact for a jury to determine

that a GEV Representation as alleged by Daimler was made.  Thus, Daimler has not met his

burden as to the first element of his fraudulent inducement claim.  As such, Daimler's fraudulent

inducement claims fail, and Defendants' Motion for Summary Judgment will be granted.

### 2.      Justifiable Reliance

Defendants next argue that Daimler's reliance on the alleged misrepresentation was not

justified.  The Court agrees that Daimler has not shown clear and convincing evidence to

establish any question of material fact that his alleged reliance was justified.  While the law does

not impose a duty to investigate, for reliance upon another's representation to be justifiable, it

must be reasonable.  Porreco v. Porreco, 811 **A.**2d 566, 571 (Pa. 2002).  A reviewing court thus

will consider whether the recipient of the alleged misrepresentation "knew or should have known

that the information supplied was false." Fort Wash. Res., Inc. v. Tannen, 858 F. Supp. 455, 460

(E.D. Pa. 1994) (citing Scaife Co. v. Rockwell-Standard Corp., 446 **A.**2d 280, 286–88 (Pa.

1971)).  Courts consider factors such as the relationship of the parties, the degree of the parties'

sophistication, the nature of the transaction, and the history of the parties' negotiations in

determining whether the plaintiff's reliance was reasonable.  See Fort Wash. Res., Inc., 858 F.

Supp. at 460; Huu Nam Tran v. Metro. Life Ins. Co., 408 F.3d 130, 135 (3d Cir. 2005).  As the

Pennsylvania Superior Court explained,

> "although the recipient of a fraudulent misrepresentation is not barred from
> recovery because he could have discovered its falsity if he had shown his
> distrust of the maker's honesty by investigating its truth, he is nonetheless
> required to use his senses, and cannot recover if he blindly relies upon a
> misrepresentation the falsity of which would be patent to him if he had
> utilized his opportunity to make a cursory examination or investigation."

Kline v. EDS Relocation & Assignment Servs., No. 1:CV-08-0980, 2008 WL 4822026, at *6

(M.D. Pa. Nov. 4, 2008) (quoting Toy v. Metropolitan Life Insurance Company. 863 **A.**2d 1, 12

(Pa.Super.Ct.2004)).

Daimler was an experienced investor, familiar with raising investment funds for similar advanced technological businesses.  In his own business, Daimler sought to obtain a signed agreement from a potential investor so that he could represent to other investors that he had already obtained a committed investor.  He testified that it was important to be able to represent to other potential investors that there were already committed investors in order to raise additional funds.  Yet, Daimler did not inquire as to whether the Companies had obtained, or should obtain, a similar signed agreement from GEV.  He further testified that he was unaware of the existence of any documents memorializing GEV's alleged commitment.  When asked if it would have been important to know that Moehle had obtained a signed commitment from GEV, Daimler answered that it "would have been a very wise course of action."  Daimler Dep. 49:15-20.  He also did not ask why GEV's $20 million commitment was not identified in the Companies' private placement memorandum.  Further, despite being present in meetings with GEV representatives, Daimler did not ask about the GEV Representation.  Although Daimler testified that he did not make such inquiries because Moehle told him not to, there is no documentary or corroborating testimonial evidence to support that Moehle told him not to make inquires.

GEV had already made an initial investment of $75,000 prior to Daimler meeting Moehle.  In November 2015, Moehle and Daimler planned to request an initial $500,000 investment from GEV, which they hoped would increase over time to $25 million.  Faced with such an obvious incongruence between the alleged GEV Representation and an actual plan to request only $500,000 from GEV, Daimler was "required to use his senses," and not "blindly" rely upon the falsity of the GEV Representation, "which would be patent to him if he had utilized

30

his opportunity to make a cursory examination or investigation" (in this case, by simply

comparing the pitch material to the GEV Representation).  Toy, 863 **A.**2d at 12.

Furthermore, Daimler testified that Moehle told him that "GE would be investing at least

$20 million as soon as they cleared a regulatory issue of spinning out a financial arm."  Daimler

Dep. 75:25–76:25.  Thus, Daimler understood that GEV's commitment was contingent upon a

future event and that his reliance on such GEV investment was not certain.  Daimler in fact

testified that his reliance on the GEV investment to occur "was definitely a risk that I was

taking[,]" knowing that "[t]he trigger of the $20 million would not occur until [GE's] spinout [of

an investment] happened."  Daimler Dep. 83:13–16.  Finally, Daimler knew that GEV's future

potential investment was "not a legal obligation" and that it was "absolutely true" that GEV

"could have just walked away."  Daimler Dep. 203:12–15.

Considering Moehle and Daimler's relationship, Daimler's relevant knowledge and

experience, the fact that Daimler was familiar with innovative tech investment companies, and

Daimler's failure to make inquiries when faced with multiple opportunities to do so, the Court

finds that Daimler has not produced clear and convincing evidence to establish a question of

material fact that Daimler's asserted reliance on Moehle's oral representation was justifiable.

### 3.    Resulting Damages

Finally, Defendants argue that Daimler cannot establish that he suffered damages as a

result of relying on the GEV Representation.  In Pennsylvania, "lost future income is the

appropriate measure of damages for a plaintiff who was fraudulently induced to leave otherwise

secure employment."  Martin v. Hale Prod., Inc., 699 **A.**2d 1283, 1287 (Pa. Super. Ct. 1997)

(citing Lokay v. Lehigh Valley Co-op. Farmers, Inc., 492 **A.**2d 405, 410 (Pa. Super. Ct. 1985)).

Daimler alleges that he suffered economic damages of at least $10 million when he was

31

fraudulently induced to walk away from $10 million in investment fund commitments in Skilled Science. However, he has not presented evidence of a causal connection between Daimler entering into a business relationship with Moehle and Daimler suffering a resulting economic injury.

Daimler's assertion that he suffered economic harm is at best speculative. The record evidence demonstrates that the only investment capital Skilled Science received was Daimler's initial $500,000. There is no evidence that any other party invested any money into Skilled Science. Daimler did not obtain any signed documents or other documentary evidence showing that any other investor had committed to invest in Skilled Science. Fee's testimony confirms that Skilled Science had no written investment agreements or commitments and had never drafted a private placement memorandum for an investment. Fee Dep. 101:2-22; 104:23-105:1. In August 2015, instead of investment commitments of $10 million from multiple investors, the then "current reality" of Skilled Science was that Skilled Science had no contract signed and it had "at various times" investment commitments of as much as $3.5 million, but no such funds were ever invested. Parties' Comb. Stmt. Mat. Facts, ¶ 40. Thus, there is no evidence that Skilled Science had any committed investments upon which a claim of damages can be shown. Skilled Science was an entity that had no investments for Daimler to walk away from. Accordingly, Daimler is unable to show by clear and convincing evidence that there is a genuine issue of material fact regarding damages.

### B.   Breach of Contract Claim

As regards the breach of contract claim, Daimler alleges that he entered into an oral agreement with Coal Hill for Daimler to provide financial contributions to cover third-party expenses. He alleges that the parties agreed that Daimler's financial contributions would be

treated as capital contributions, and that in exchange he would receive Coal Hill Units. Daimler alleges that Coal Hill breached the oral agreement by failing to issue him Units in exchange for his additional capital contributions, "[d]espite Section 7.2 of the [written] Operating Agreement."[8]  Pltf. Br. Opp. 24 (ECF No. 115).  "It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."  Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002).

### 1.     Existence of a Contract

Defendants first argue that Daimler has not produced sufficient evidence to establish the existence of a valid, enforceable oral contract.  Daimler, as the "party relying on an alleged oral contract . . . has the burden of proving its existence."  Ecore Int'l, Inc. v. Downey, 343 F. Supp. 3d 459, 486 (E.D. Pa. 2018).  "To establish the existence of an agreement one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration."  Id. at 487 (citations and quotations omitted).

Daimler has not produced evidence to show that he and Coal Hill intended to be bound by an oral agreement or to establish the material terms of any such alleged oral agreement.

---

[8]  Pursuant to Section 7.2 of the Coal Hill Operating Agreement, Coal Hill is required to issue Units in connection with members' additional capital contributions, with the caveat that "future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units."  ECF No. 86-6, at 21.  Daimler does not assert any Board consent to support issuance of Units pursuant to Section 7.2. Therefore, despite Daimler's reference to Section 7.2, his breach of contract claim rests entirely on a separate alleged oral agreement.

Daimler has not produced evidence to establish the type of Unit (Management Units or Common Units) he was to receive, the value of the Units in relation to his financial contribution, or the timing for issuance of the Units to Daimler.  When asked about the details of the alleged oral agreement to treat Daimler's financial contributions as capital contributions to be  reimbursed by the issuance of Units, Daimler testified as follows:

> **Q.** And you don't recall sitting here today any phone call where Mr.
> Moehle agreed to treat any financial contributions as capital contributions,
> is that right?
> . . .
> **A.** I don't recall any specific phone call.
> **Q.** How many units were you going to receive?
> **A.** I don't recall.
> **Q.** What kind of units were they?
> **A.** I don't recall.
> **Q.** What were the vesting terms?
> **A.** I don't recall.
> **Q.** How much money was going to be exchanged for the units? What was
> the number?
> **A.** I'll stand by what I wrote in the Complaint.
> **Q.** In the Complaint, you don't really provide a number. You say in excess
> of $200,000.
>     So how much was agreed, according to your Complaint, to be
> treated as capital contribution?
> **A.** I would have to go back and take a look at the totality of the
> communications and the financial records.
> **Q.** Was it $200,000?
> **A.** I don't recall.

Daimler Dep. 256:18–257:18.  Consistent with the above testimony, there is no evidence that there ever was "a discussion as to any of the essential terms of an alleged bargain."  Ecore Int'l, 343 F. Supp. 3d at 489.  Accordingly, "[i]t defies reason to suggest that these parties would have agreed to be bound by an oral agreement that omitted any mention of such material terms". Ecore Int'l, 343 F. Supp. 3d at 490-91.

In addition, there is no evidence that Daimler ever requested that Coal Hill perform on

the alleged agreement by awarding him Units; either while Daimler was in a business relationship with Moehle or after Daimler was removed from the Companies.  Finally, Fee testified that it was not until after Daimler left the Companies that he told Fee that he had made financial contributions to the Companies for which he felt he was "owed something."  Fee Dep. 120:18–121:2.

The Court concludes that the alleged oral agreement between Daimler and Coal Hill is "too indefinite for a party to reasonably believe that it could be enforceable in an action at law." Ecore Int'l, 343 F. Supp. 3d at 489.  There being no sufficient record evidence to establish any question of material fact as to the terms of any agreement entered into between Daimler and Coal Hill, Daimler has not met his burden to show the existence of the alleged oral agreement.

### 2.      Evidence of Damages

Defendants also argue that, assuming the existence of an oral agreement, Daimler has failed to provide admissible, non-speculative evidence to support his damages claim.  Defendants argue that an undated, unsubstantiated, and unreliable document of expenses produced by Daimler during discovery cannot be considered as competent evidence of Daimler's expenditures on behalf of the Companies.  Defendants further note that Daimler was unable to recall who created the document, when it was created, how it was created, or  how it got into his files. Daimler Dep. 263:17-22–264:5.  Furthermore, he could not explain many of the entries therein. Daimler Dep. 263:17-22–264:5.  Daimler also proffers 1,879 pages of purported "back up" documents for expenses he incurred on behalf of the Companies.  Daimler Aff. ¶ 12; Ex. O.– Said documents are not separated, categorized, identified, or organized for meaningful review relative to Daimler's claim for damages.  There is no evidence that Daimler averred that any of said documents were submitted to Moehle or to the Companies for reimbursement.  Several

items from the Exhibit also cut against Daimler's assertion that such documents support his claim for damages.  Thus, there are significant evidentiary issues related to Daimler's claim for damages.  Despite the damages issues presented by said documentary evidence, the relevancy and admissibility of such documents are not amenable to a clear determination to support a finding of no question of material fact.  Thus, at this stage of the proceedings, there are questions of material fact as to the element of damages.

## IV.    Conclusion

Viewing the record evidence in a light most favorable to Daimler, the Court finds that Defendants have demonstrated that there is no genuine dispute of material fact as to Daimler's fraudulent inducement claims.  Daimler is unable to show by clear and convincing evidence that a representation was made, justifiable reliance, or resulting damages.  Accordingly, Defendants' Motion for Summary Judgment will be granted and judgment on Daimler's fraudulent inducement claims asserted in Counts One, Two, and Four, will be entered in favor of Moehle, the Fund, and Coal Hill, and against Daimler.  The Court also finds that Daimler has failed to produce evidence to establish questions of material fact as to the existence of a contract and its material terms.  Absent such evidence, there is no question of material fact as regards any breach.  Thus, Daimler's breach of contract claim fails.  Accordingly, Defendants' Motion for Summary Judgment will be granted and judgment as a matter of law on Daimler's breach of contract claim asserted in Count Three will be entered in favor of Coal Hill and against Daimler.

An appropriate order will be entered.


Dated: <u>July 18, 2022</u>                                    _____

Marilyn J. Horan

United States District Court Judge

36